**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| GenCanna Global USA, Inc., *et al.*,[1] | Case No. 20-50133 (Joint Administration Requested) |
| Debtors. | Hon. Judge Gregory R. Schaaf |

---

### DECLARATION OF JAMES ALT IN SUPPORT OF CHAPTER 11 FILINGS AND FIRST DAY MOTIONS

---

I, James Alt, hereby declare as follows:

1.      I am a Managing Director at Huron Consulting Services LLC ("Huron").  I lead the US Retail and Consumer Goods business for Huron's Business Advisory practice.  I have over 20 years of experience assisting financially distressed companies implement turnaround strategies. My areas of expertise include: financial restructuring, performance improvement, strategy and sales channel focus, financial management and controls enhancement, lean operations deployment, technology implementation, and organizational collaboration.

2.      I also have extensive bankruptcy and insolvency related experience, having served in various advisory and executive roles in chapter 11 bankruptcy and out-of-court restructuring cases over the past 20 years, including: ZGallerie, ToysRUs, Capital Brands, Railworks, Venture Industries, Metropolitan Provisions, Anchor Manufacturing, Unaka Corporation, and others.

3.      Prior to joining Huron, among other things, I have served as a Business President for Sears Holdings, a Restructuring Advisor for Glass & Associates, a management consultant for

---

[1] The Debtors and the last four digits of their federal tax identification numbers are: GenCanna Global USA, Inc. (0251); GenCanna Global, Inc. (N/A); and Hemp Kentucky, LLC (2600).

Ernst & Young, and a business executive for Target Stores, and have served as a board member for several companies.

4.    I hold a Bachelor of Arts in finance from the University of St. Thomas, and a Masters in Business Administration, Technology and Operations, from Carnegie Mellon University, Tepper School of Business.

5.    I have served as the Chief Transformation Officer ("CTO") of the debtors and debtors in possession (the "Debtors") since approximately November 1, 2019.  As CTO, I report to Mr. Steven Pully, Chair of the finance committee of the board of directors of Debtor GenCanna Global, Inc. ("GenCanna Parent"), which is the parent company of Debtor GenCanna Global USA, Inc. (the "Company").

6.    Together with Mr. Marc Passalacqua, who is a Senior Director at Huron and who serves as the Deputy Chief Transformation Officer and the Chief Administrative Officer for the Debtors, my responsibilities at the Company include overseeing, managing and effectuating the business operations of the Company, including cash activities, certain contractual matters, expense, and other financial matters.  Together with other Huron team members, I also work closely and collaboratively with the Company's employees to oversee and/or complete various business functions, including financial management matters, financial planning matters, operational matters, and audit/accounting support matters.

7.    In my capacity as CTO, I have become familiar with the Debtors' day-to-day business operations, financial affairs, and books and records, as well as the events leading to the filing of these Cases.  I submit this declaration in support of the commencement of these chapter 11 cases (the "Cases") and in support of the various first day motions and applications that have been filed in these Cases (the "First Day Motions").

8.      All facts in this declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, my discussions with other Huron team members providing services to the Debtors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, restructuring efforts, or my opinions based upon my knowledge and experience.  I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors.  If called to testify, I could and would testify competently to the facts set forth herein.

## I.    THE DEBTORS' BUSINESS

### Business Operations

9.      The Debtors are a vertically-integrated agriculture-technology company that primarily engages in the development of hemp genetics and the production and distribution of wholesale and white-label hemp-derived cannabinoid products, including CBD, to customers through the United States and internationally.  Put simply, the Debtors cultivate, grow and harvest hemp plants and process them into products containing hemp derived substances, such as CBD oils and similar hemp-derived cannabinoid products.

10.     Founded by industry pioneers who championed the world's leading hemp CBD genetics, formulations and spearheaded groundbreaking US hemp legislation, the Debtors are focused on scaling their premium hemp genetics production for food products with easy availability locally, nationally and globally.  The company was founded in 2014 as an inaugural member of the Kentucky Department of Agriculture's Industrial Hemp Pilot Program, and is a longstanding pioneer in the industry.

11.     The Debtors have assembled a team of in-house developers, scientists, farmers, operators, and botanists to ensure industry leading quality.  All of the Debtors' products are tested

for safety and quality by independent laboratories.  Positive results from recent oral toxicity studies of substantiated bulk ingredients, forthcoming shortly, will bring GRAS recognition that will open domestic and international opportunities.  The Debtors also partner with research scientists from local universities to create cutting-edge programs pertaining to specialized genetics, agronomic practices and wholesale product formulations.  The Debtors' Hemp Research Campus ("HRC"), with 16 buildings, is located on nearly 150 agricultural acres formerly used by Philip Morris/Altria as a tobacco seed breeding and research facility near Winchester, Kentucky, in the Bluegrass region just outside of Lexington, Kentucky.

12.     The Debtors use whole-plant hemp extracts which are either full-spectrum (i.e. CBD and a natural balance of cannabinoids, flavonoids and terpenes) or are isolated Crystalline Cannabinoid CBD.  These substantiated bulk products are available to customers in Crystal CBD powders and cannabinoid oils, and can be prepared in a proprietary water dispersible powder form to support large scale manufacturing needs. The Debtors also offer a full suite of packaged, white label products spanning custom tinctures, capsules and topical creams for general and specific health-related uses.

### The Growth and Harvesting Cycle

13.     The Debtors' growth and harvest cycle is the backbone of their business operations. The cycle begins with the development and production of the seeds/germplasm used in the growth process.  The Debtors develop and produce their germplasm in collaboration with third parties, but are actively involved in the development process and the genetics of those seeds/genetics.

14.     The seeds are then planted in greenhouses and cultivated until they sprout and reach a certain level of growth, such that they can be transplanted to farms where they can grow into full

size plants.  The Debtors use a variety of farms to accomplish this, including their own corporate

farm comprised of approximately 1,800 acres located in Western Kentucky.

15.    In addition to the Debtors' corporate farm, the Debtors utilize a Certified Farming

Network ("CFN"), which is a group of approximately 60 farmers who have signed contracts with

the Debtors to grow the Debtors' hemp plants at their respective farms.  Those farmers are paid

based on a formula that includes acreage of farm land utilized, dry weight floral equivalent of the

harvest, the CBD content of the hemp plants that are grown, and other factors.  The majority of

the Debtors' 2019 hemp harvest was farmed by the CFN in this manner.

16.    In addition to the Debtors' corporate farm and the CFN, other third party farming

partners are used as well, and paid through separately negotiated contracts for their growing

services.

17.    Harvest season is generally a six-week period that runs from the middle of October

through the beginning of December, during which all hemp plants growing at the farms reach

maturity and are harvested.  The harvesting process is a collaborative effort between the farmers

and the Debtors' employees as well.  The harvested plants are then sent to various locations for

drying and/or baling.  Once the hemp is dried, it goes through various extraction, formulation, and

refinement processes, and is ultimately further processed into finished product.

18.    The Debtors used to conduct the drying process in-house at the HRC facility, but

no longer have drying capacity there.  The Debtors were constructing a new large drying and

processing center in Mayfield, Kentucky (the "Mayfield Plant") to handle larger harvests, but the

construction project experienced difficulties and was not going to be completed in time to handle

the 2019 harvest.  The construction of the Mayfield Plant remains unfinished at present, and

remains subject to a number of asserted mechanic's lien claims and creditor disputes, which are discussed in more detail below.

19.     The Debtors entered into a relationship with a third party processing company in South Carolina, Specialty Oil Extractors ("SOE"), to handle processing a large portion of the 2019 harvest.  A majority of the baled hemp inventory has been shipped down to SOE, and is being stored there on site pending processing.  Other portions of the inventory harvest are stored at other locations, including at the HRC facility.

20.     Once the hemp is processed into finished goods, it is sold to the Debtors' customers. The Debtors' two largest customers include a consumer products company that uses the Debtors' products to create CBD oil drops, soft-gels and topical creams sold to consumers online and in over 10,000 retail locations, and another company that makes multiple cannabinoid product lines and bills itself as "the world's largest producer of CBD nutraceuticals."  Other customers include smaller companies who make an array of CBD-related products.

21.     Most of the 2019 harvest remains unprocessed and is still baled and in storage at various locations.  One of the primary goals of these cases is to focus on continuing to process and sell through the 2019 harvest inventory.

### Hemp's Regulatory and Legal Status

22.     The Company's business has always been focused exclusively on federally-legal hemp and the Company does not produce marijuana or other federally controlled substances.  The Company produces its products pursuant to a state sanctioned program under the 2014 Farm Bill that provides for the federally legal production, marketing and sale of hemp and hemp derived substances, including cannabidiol ("CBD"), and engages in rigorous testing procedures to ensure its hemp is compliant with state and federal regulations.

23.     The 2014 Farm Bill cleared the way for federally-legal hemp production and sale under state pilot programs focused on cultivation and research of hemp (defined as cannabis with less than 0.3% THC).  Importantly, the 2018 Farm Bill ("Agriculture Improvement Act." PL 115-334) **removed** hemp from the Controlled Substances Act and categorized it as an ordinary agricultural crop, becoming law on December 20, 2018.  Under the 2018 Farm Bill, hemp is defined broadly to mean "the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis."

24.     None of the Company's historical or present revenues have been or are generated from any marijuana related sales or the sale of any other Controlled Substances.  Indeed, since inception, the Company has always been in compliance under the Kentucky Department of Agriculture's regulations.  As noted above, the Company engages in very rigorous testing procedures to ensure the all of its products are state and federally compliant.  At times during the harvest testing processes, certain samples of plants produce false positives (for example, higher levels of THC).  In those instances, the KDA retests the harvest in question to confirm the results, and have consistently found such product to be state and federally compliant.

25.     In one instance occurring approximately one year ago, the Company conducted compliance testing on a crop in ground, and determined that the resulting plants would not be compliant at harvest in accordance with state guidelines.  The Company immediately contacted the Kentucky Department of Agriculture to request authorization to destroy that crop, received approval for the destruction, and did so in a compliant fashion.  This example underscores that fact

that the Company employs rigorous standards and procedures in ensuring compliance with applicable regulations.

26.     The Debtors note, out of an abundance of caution, that one of their primary equity holders and a creditor in these cases, MariMed, Inc. ("MariMed"), recently became involved in businesses involving marijuana.  However, MariMed's equity investment in the Debtors pre-dated such involvement.  The Debtors also note, out of an abundance of caution, that certain of their customers may be involved in businesses involving marijuana.  Notwithstanding that, none of the Debtors' business operations involve marijuana, and none of the Debtors' revenues have anything to do with the sale of anything other than state and federally compliant hemp-derived products.

27.     The 2018 Farm Bill created a federal pathway for the cultivation, manufacture, and sale of hemp produced under state regulatory programs, which applies to all aspects of the Debtors' business and operations.  The Company prides itself in compliance with all state and federal regulations and applicable law at each stage of the growth cycle process.

## II.     CORPORATE STRUCTURE

28.     GenCanna Parent is a corporation incorporated under the laws of the British Virgin Islands in 2014 and under the laws of Delaware in 2019.  GenCanna Parent has no active business operations.  It is a holding company that owns 100% of the equity interests of the Company.

29.     The Company was incorporated under the laws of Delaware in 2014, and is the main operating company of the Debtors through which day to day business operations are conducted.  The Company's headquarters and principal place of business is located at 321 Venable Road, Suite 2, Winchester, KY 40391.

30.    The Company has two wholly owned subsidiaries, each of which is a Kentucky limited liability company: (a) Hemp Kentucky LLC ("Hemp KY"), and (b) 4274 Colby, LLC ("Colby").  Hemp KY is a debtor in these Cases.  Colby is not.

31.    A chart depicting the corporate structure is attached hereto as **Exhibit A**.

## III.    DEBT STRUCTURE

### a.    Secured Debt

32.    The Debtors' primary secured obligations[2] are comprised of the following:

### The MGG Facility

33.    The Company is a borrower under that certain Financing Agreement dated as of June 24, 2019 (as amended from time to time, the "Prepetition Credit Agreement") with the lenders party thereto (the "Prepetition Lenders") and MGG Investment Group LP ("MGG") as collateral agent and administrative agent.  The Prepetition Credit Agreement was amended by that certain First Amendment to Financing Agreement dated as of August 2, 2019, that certain Second Amendment to Financing Agreement dated as of August 22, 2019, and that certain Third Amendment and Waiver to Financing Agreement dated as of November 6, 2019.

34.    Pursuant to the Prepetition Credit Agreement and related loan documents (the "Loan Documents"), the Prepetition Lenders provided a $75 million credit facility (the "Prepetition Credit Facility"), which is comprised of a term loan in the aggregate principal amount of $40 million, and availability for delayed draw term loans in an aggregate principal amount not to exceed $35 million.  As of January 31, 2020, the total outstanding principal balance due under the Prepetition Credit Facility was approximately $68.5 million.

---

[2] The following is a summary of the Debtors' primary secured obligations.  The Debtors are still in the process of reviewing their books and records and UCC financing statements that have been filed in the applicable jurisdictions to determine whether additional secured claims exist, and reserve all rights in that regard.

35.     The Company's obligations under the Prepetition Credit Facility (the "Prepetition Obligations") are guaranteed by GenCanna Parent pursuant to the provisions of the Prepetition Credit Agreement, and are secured by a first priority security interest in substantially all of the assets of the Company and GenCanna Parent (the "Prepetition Collateral") pursuant to, among other things, that certain Pledge and Security Agreement dated as of June 24, 2019.

## Mortgage Loans

36.     The Debtors own certain real property encumbered by mortgage loans in favor of various mortgage lenders.  In particular, the Company owns a greenhouse located at 1895 Clintonville Road in Paris, Kentucky (the "Paris Greenhouse") that is secured by a mortgage in favor of Kentucky Bank.  The approximate outstanding principal balance of the mortgage loan in respect of the Paris Greenhouse is approximately $1.8 million.

37.     The Company also owns a retail location at 16 W Lexington Avenue in Winchester, Kentucky (the "Winchester Property") that is secured by a mortgage in favor of Central Bank & Trust Co.  The approximate outstanding principal balance of the mortgage loan in respect of the Winchester Property is approximately $270,000.

38.     The Company also owns a warehouse located in Paducah, Kentucky (the "Paducah Property") that is secured by a mortgage in favor of Community Financial Services Bank ("CFSB").  The approximate outstanding principal balance of the mortgage loan in respect of the Paducah Property is approximately $1.6 million.

## Mechanic's Liens

39.     The Company leases certain property in Mayfield, Kentucky on which the Company is constructing a hemp processing facility for its CBD products (the "Mayfield Facility").  A number of creditors have asserted mechanic's liens against the Mayfield Facility.

To date, approximately between $20 million and $25 million of mechanic's lien claims have been asserted in respect of the Mayfield Facility, with other claims being asserted in undetermined amounts. The Debtors are evaluating, and in appropriate cases, disputing and defending against, such claims. The Debtors make no admission with respect to such claims and reserve all rights.

### Letter of Credit in Favor of Southerland's Greenhouses, Inc.

40.     In connection with the Company's acquisition of the Paris Greenhouse property, the Company obtained the mortgage loan from Kentucky Bank described above, and paid the remainder of the purchase price in cash. However, the Company was also obligated to pay the seller an additional amount depending upon the seller's tax obligations resulting from the transaction. The seller was issued an Irrevocable Letter of Credit in the amount of $1 million by CFSB on March 22, 2019 (the "LOC"), in respect of such obligations. The Company's obligations to reimburse CFSB for draws made under the LOC are secured by $1 million in cash being held in a controlled deposit account at CFSB.

### Capital Leases, Equipment and Vehicle Obligations

41.     The Company is party to a number of equipment and capital leases for various pieces of equipment, machinery and other personal property. The lessors in respect of such obligations assert claims secured by the property covered by such agreements. The Debtors make no admission as to whether such leases are true leases or not, and as to any other aspect of such asserted secured claims. All rights are reserved in that regard.

42.     The Company is also party to a certain Harvesting Services Agreement with Arrow Farms, LLC, pursuant to which the counterparty purchased farm equipment on behalf of the Debtors and who are believed to either assert an ownership interest in such property or a security interest in such property. The Debtors make no admissions and reserve all rights.

**Obligations Purportedly Secured by Harvest Inventory**

43.     Certain creditors are owed obligations by the Company in respect of debenture agreements and redemption agreements that are purported to be secured by the Debtors' harvest inventory.  The Debtors make no admissions and reserve all rights.

b.  **Unsecured Debt**

44.     The Debtors' unsecured obligations are generally comprised of the following: (i) obligations owing to the Debtors' farmers and seed suppliers; (ii) obligations owing to certain unsecured debenture holders; (iii) obligations owing under non-residential real property leases; and (iv) other trade payable obligations.

## IV.    EVENTS LEADING TO THE FILING OF THESE CASES

**The Company Pursues Various Transactions**

45.     During the early months of 2019, the Company engaged Cowen and Company LLC ("Cowen") as its investment banker to investigate various strategic transactions.  That effort led to the debt financing with MGG, but did not result in any of the expected equity opportunities for the Company, and Cowen was terminated on or around August 21, 2019.

46.     On August 24, 2019, the Company engaged Goldman Sachs & Co., LLC ("Goldman Sachs") to serve as a financial advisor to assist the Company in evaluating an initial public offering  and other strategic alternatives.  Working in consultation with the Company's Chief Investment Officer, Mr. Leland O'Connor, Goldman Sachs pursued various potential transactions on behalf of the company.  In August of 2019, the Company received a significant offer that exceeded $1 billion in the form of a letter of intent, but ultimately this transaction was not realized due to the acquirer suffering a substantial decline in its own stock price.

Unfortunately, no transaction came to fruition, and Goldman Sachs was terminated in January 2020.

47.    Mr. O'Connor also engaged the services of a third party broker in an effort to identify potential sources for equity and debt raises for the Company.  Those efforts were similarly unsuccessful.

### Huron's Engagement

48.    On or about September 1, 2019, at about the same time that the Company engaged Goldman Sachs, the Company retained Huron to provide limited finance and accounting related services.  On or about November 2, 2019, Huron's engagement was expanded to, among other things, provide the Company with the services of myself as CTO and Mr. Marc Passalacqua as Deputy Chief Transformation Officer and Chief Administrative Officer.

### Explosion at the HRC Facility

49.    On November 7, 2019, a large fire occurred at the HRC facility, debilitating certain critical functions that were performed at the plant.  No final conclusion has been made as to the cause of the fire, but an investigation conducted by the State of Kentucky arson division found no intentional malfeasance by the Company, any of its employees, or other individuals.  State Fire Marshals concluded that the investigation could be closed and the property turned back to the property owner.

### Construction Dispute at the Mayfield Facility

50.    As noted above, in the summer of 2019, the Debtors were in the process of constructing a new state-of-the-art hemp processing facility located in Mayfield, Kentucky when the Company put further construction on hold due to construction delays which would not allow the plant to be operational for its 2019 harvest season. Additionally, cost overruns created

considerable capital stress on the Company, which caused it to reallocate capital to pay for the construction. Ultimately, the Company was unable to secure adequate financing to complete the construction of this facility, leading to the current situation. These circumstances gave rise to disputes with various contractors and service providers and to a number of asserted mechanic's liens in respect of the Mayfield Facility. The three petitioning creditors in these cases are mechanic's lien claimants.

### Challenges with Finding Appropriate Financial Leadership

51.     The Company is a relatively young, growing company in transition. It has struggled to find competent financial leadership to handle the Company's financial functions. Prior individuals hired to serve that role were determined not to have the expertise needed to perform according to Company standards.

52.     Most recently, in the summer of 2019, the Company hired an individual to fill the role of Chief Financial Officer ("CFO") and to replace a prior individual serving that role on an interim basis. Unfortunately, performance and professional issues surfaced almost immediately. Among other things, the CFO decided to take it upon himself to meet with one of our lenders soon after being hired without preparation and without first acclimating to the Company. As a consequence of that meeting, our lender advised the Company that it did not have confidence in the CFO's capabilities and required the Debtors to employ a financial advisor to perform various financial functions, which is what led to Huron's hiring.

53.     The CFO was also tasked with moving forward with the Company's 2018 audit, which was a requirement under the Debtors' Prepetition Credit Facility. Unfortunately, the process was not managed well, and the individual misrepresented the timing and status of the completion of the audit to others at the Company, which in turn led others at the Company to provide incorrect

information to third parties as to the timing and status of the completion of the audit. The audit process began in May of 2019, and its completion was delayed under prior financial leadership as well. The Company's prior finance teams were simply unable to deliver the audit or provide realistic estimates as to the timing for ultimately completing the audit.

54.     As Huron's role expanded to encompass more duties, the CFO advised of his intent to resign. In conjunction with resigning and winding down his responsibilities, the CFO stated that he had identified some purportedly fraudulent activity in the way certain transactions had been booked. The Company immediately conducted an investigation of the allegations and determined them to be unfounded. The allegations were likely nothing more than "sour grapes" on the part of the departing CFO.

55.     Nonetheless, the Company's auditor has to date refused to resume activity on completing the 2018 audit, notwithstanding having already received payment of several hundred thousand dollars for its "hard work," having spent over six months in an endless work stream. The audit remains incomplete at this time. Unfortunately, not having the completed 2018 audit caused considerable hardship on the Company for its fundraising, refinancing, and M&A activities that were underway. The audit was a major "gating" item that was required by these investors.

## CFN Farmer Disputes

56.     As noted above, the Debtors utilized the CFN to conduct a large portion of the farming in connection with the Debtors' 2019 harvest. The Debtors entered into fixed pricing agreements with the CFN farmers in early 2019 that obligated the Debtors to, among other things, pay the farmers a fixed price regardless of the commodity market pricing. Ultimately, however, the Debtors' sales did not materialize as projected, and they were unable to make all of the agreed

payments to the CFN farmers.  The Company did, however, make approximately $6.3 million in payments in the aggregate to approximately 75% of the CFN farmers.

57.     The Debtors negotiated modifications to the fixed pricing agreements to obtain some limited relief, including by deferring a portion of the amounts owed to the CFN farmers under their respective agreements.

### Hemp Industry Price Plummets and the Impact on Capital Markets

58.     Beginning in the summer of 2019, pricing in the industry plummeted across all CBD product categories. By the end of the year and through today, bulk product prices in nearly all categories have dropped by as much as 80%.  This dramatic plunge in pricing also correlated to the large drop in the public capital markets for cannabis companies in both the US and Canada.

59.     This market correction and drop in market values caused further stress on raising new capital, which created working capital difficulties within the industry and company's ability to pay its suppliers.

60.     The Debtors were caught in the middle of this market correction with both its capital raise process and its reliance on timely payments from its customers.  This dramatic deterioration in pricing also had an immediate and corresponding negative impact on Company revenues, and as a result, the Company had difficulty reaching its 2019 business plan as a result of pricing that was about 50% below its expectation.  Additionally, as a result of its HRC fire, the Company had difficulty ensuring an adequate level of inventory resulting in missed sales opportunities.

### Less than Clear Regulatory Landscape

61.     While the state of the law and the removal of hemp from the Controlled Substances Act is clear, third parties, especially large food processors and manufacturers, are still hesitant to

do business with the Debtors given a lack of clarity as to the regulatory landscape applicable to hemp-derived products.  More specifically, lack of policy development by the FDA and confusing signaling have caused large American companies to consider reputational risk ahead of novel product development, in spite of their stated desire to work with the Debtors.  National brands are just beginning to engage, with multi-million dollar POs recently achieved.  The lack of regulatory clarity has also caused difficulty for cannabis companies to attract capital at competitive rates and left companies with few options.

### Cost Reduction Initiatives

62.    In an effort to reduce costs to better match the revenue shortfall it experienced, the Company evaluated its employment levels and implemented reductions in its workforce in order to reduce its monthly cash burn.  Additionally, the Company implemented several other cost reduction initiatives, including pay concessions or reductions in wages to provide additional liquidity to the Company.  The Company also increased its efforts with the collection of its past due receivables from its customers to increase its cash position.

### The Involuntary Bankruptcy Petition

63.    On January 24, 2020, three creditors - Pinnacle, Inc., Crawford Sales, Inc. and Integrity / Architecture, LLP - filed an involuntary chapter 11 petition against the Company in this Court.  A summons was issued on January 27, 2020, and was served on the Company on January 31, 2020.  The summons provided that a response to the summons was due within 21 days of the service date.  Unfortunately, while the Company was underway in addressing its liquidity situation, this involuntary filing caused the Debtors' efforts and situation to become destabilized and unable to complete a turnaround on its own without a voluntary filing.

### Need for Chapter 11 Relief and Goals of the Cases

64.    In light of the foregoing, the Debtors determined that relief was necessary under chapter 11 of the Bankruptcy Code.  To say the least, due to a confluence of events and a severe drop in commodity pricing across the board, and a drop in demand for the Debtors' products, the Debtors would greatly benefit from the breathing spell afforded by the automatic stay, and time to adequately investigate all available alternatives and transactions to restructure or sell the Company.

65.    To that end, the Debtors have retained Jeffries as their investment banker, and intend on running a process, in consultation with MGG and the other key stakeholders in these Cases, to identify the best available alternative for maximizing value under the circumstances.

66.    The filing was also necessitated as the Debtors projected that they would not have sufficient funds to meet their payroll obligations this week absent obtaining additional financing.

67.    The Debtors goals in these Cases include pursuing a process to identify all available alternatives for maximizing value, including the possibility of a sale, a refinancing transaction, or a reorganization transaction, and continuing to focus on selling their 2019 hemp harvest and exploring ways to increase revenues and reduce costs given the current commodity pricing environment.  The Debtors will seek to build consensus on a path forward, and envision moving forward with necessary motions to establish procedures to govern such a transaction process.

## V.    THE FIRST DAY MOTIONS

68.    The Debtors have filed the First Day Motions in order to facilitate a smooth transition of their business operations into chapter 11.  One of the primary goals is to avoid any material disruption that would jeopardize the Debtors' ability to conduct business as a going concern and to maximize the value of their assets through these Cases.

69.     I believe that the relief requested in each of the First Day Motions is necessary to achieve those goals, necessary to avoid irreparable harm to the Debtors and the value of their assets, and will ultimately inure to the benefit of all parties in interest.  The relief requested is tailored to the needs of these Cases, and will enable the Debtors to move forward with their reorganization efforts while preserving and maximizing the going concern value of their business for the benefit of creditors and other stakeholders.

      a.   *Motion of the Debtors and Debtors in Possession for Entry of an Order Directing the Joint Administration of the Debtors' Chapter 11 Cases ("Joint Administration Motion")*

70.     The Joint Administration Motion seeks to consolidate and jointly administer the chapter 11 cases of each of the Debtors for procedural purposes only under the case number assigned to the Company, who is the proposed lead Debtor.  I believe that doing so would promote efficiency and reduce costs, and as the consolidation is only for procedural purposes, I do not believe that any party would be harmed or prejudiced by the relief requested.

      b.   *Motion of the Debtors and Debtors in Possession for Entry of an Order Under 11 U.S.C. § 366 Establishing Adequate Assurance Procedures with Respect to its Utility Providers ("Utilities Motion")*

71.     The Utilities Motion seeks to establish procedures for providing the Debtors' utility providers with adequate assurance of future performance during these Cases, and ensuring compliance with the provisions of section 366 of the Bankruptcy Code.

72.     I have reviewed the facts set forth in the Utilities Motion and I believe them to be true and correct.  I further believe that the relief requested in the Utilities Motion is necessary to enable an efficient transition into chapter 11 and avoid any disruption to the day-to-day business operations.  Accordingly, I believe that the relief requested is in the best interest of the bankruptcy estates and should be granted.

c. *Motion of the Debtors and Debtors in Possession for Entry of an Order (I) Approving the Continued Use of the Debtors' Cash Management System and (II) Granting Related Relief ("*Cash Management Motion*")*

73.     The Cash Management Motion seeks authority and approval to continue the Debtors' existing cash management system, and certain related relief designed to avoid disruption and minimize unnecessary expense.

74.     I have reviewed the facts set forth in the Cash Management Motion and I believe them to be true and correct.  I further believe that the relief requested in the Cash Management Motion is necessary to enable an efficient transition into chapter 11 and avoid any disruption to the day-to-day business operations.  Accordingly, I believe that the relief requested is in the best interest of the bankruptcy estates and should be granted.

d. *Motion of the Debtors and Debtors in Possession for Entry of an Order Extending the Deadlines to File Their Schedules of Assets and Liabilities and Statements of Financial Affairs ("*Schedules Motion*")*

75.     The Schedules Motion seeks a 14-day extension of the deadline to file the required Schedules of Assets and Liabilities and Statement of Financial Affairs for each of the Debtors. The deadline sought is through and including March 4, 2020.

76.     Compiling these documents requires the assembly and compilation of a vast amount of information that will take numerous hours to complete.  Furthermore, the Debtors are concurrently focused on transitioning their business into chapter 11 and stabilizing their operations.  There are many things that need to be done to put the Debtors in the best position possible to be successful in their efforts to reorganize.  Having the additional time to prepare and file their schedules and statements would benefit the Debtors, and will not prejudice any other party in interest in these Cases.

e. *Motion of the Debtors and Debtors in Possession for Entry of an Order Establishing Notice Procedures, Master Service List, and Related Relief ("*Notice Procedures Motion*")*

77.     The Notice Procedures Motion seeks approval of various administrative and notice procedures to be used in these Cases, the goals of which include to promote efficiency and reduce unnecessary cost and expense.  Having consulted with counsel for the Debtors, I believe these procedures are appropriate for these cases.

> f.  *Motion of the Debtors and Debtors in Possession for Entry of Interim and Final Orders Under 11 U.S.C. §§ 105, 363, 507 and 541 and Bankruptcy Rules 6003 and 6004 Authorizing the Debtors to Pay and Honor Prepetition Wages and Related Items ("Employee Wages Motion")*

78.     The Employee Wages Motion seeks relief focused on, among other things, paying employees for the wages and preserving employee morale.  The continued operation of the Debtors' business depends on the skills and specialized knowledge of the Debtors' employees. These employees are crucial to the Debtors' operations, the preservation of value for the benefit of the Debtors' creditors, and to the ability of the Debtors to successfully reorganize their operations.

79.     I have reviewed the facts set forth in the Employee Wages Motion and I believe them to be true and correct.  I further believe that the relief requested in the Employee Wages Motion is necessary to enable an efficient transition into chapter 11 and avoid any disruption to the day-to-day business operations.  Accordingly, I believe that the relief requested is in the best interest of the bankruptcy estates and should be granted.

> g.  *Application of Debtors for Entry of an Order Authorizing Debtors to Employ and Retain Epiq Corporate Restructuring, LLC as Claims, Noticing, Solicitation, and Administrative Agent for Debtors Nunc Pro Tunc to the Petition Date ("Epiq Retention Application")*

80.     The Epiq Retention Application seeks approval to retain Epiq Corporate Restructuring, LLC ("Epiq") as the claims, noticing, solicitation, and administrative agent for the Debtors.  I have reviewed the terms of their engagement and believe them to be reasonable.  I further believe that retaining Epiq to perform the agreed services will help the Debtors perform

their service obligations and other administrative obligations efficiently, and is therefore in the

best interest of the Debtors' bankruptcy estates.

       h.    *Debtors' Expedited Motion for Entry of Interim and Final Orders Authorizing (I)*
           *Debtors to Pay Certain Prepetition Critical Vendor Claims and (II) Financial*
           *Institutions to Honor and Process Related Checks and Transfers ("Critical*
           *Vendors Motion")*

81.    The Critical Vendors Motion seeks authority to pay prepetition claims of those

vendors and suppliers the Debtors determine to be critical to the success of their business

operations and to their ability to preserve and maximize the value of their business as a going

concern.

82.    I have reviewed the facts set forth in the Critical Vendors Motion and I believe

them to be true and correct.  I further believe that the relief requested in the Critical Vendors

Motion is necessary to enable an efficient transition into chapter 11 and avoid any disruption to

the day-to-day business operations.  Accordingly, I believe that the relief requested is in the best

interest of the bankruptcy estates and should be granted.

       i.    *Debtors' Expedited Motion for Entry of Interim and Final Orders Authorizing (I)*
           *Debtors to Pay Certain Prepetition Claims of Shippers and Freight Carriers, and*
           *(II) Financial Institutions to Honor and Process Related Checks and Transfers*
           *("Shippers Motion")*

83.    The Shippers Motion seeks authority to pay certain prepetition claims of shippers

and freight carriers (the "Shippers") used by the Debtors in the ordinary course of business.  The

Debtors rely on the Shippers primarily in conjunction with transporting  harvested hemp product

to and from a processing center the Debtors do business with in South Carolina.

84.    I have reviewed the facts set forth in the Shippers Motion and I believe them to be

true and correct.  I further believe that the relief requested in the Shippers Motion is necessary to

enable an efficient transition into chapter 11 and avoid any disruption to the day-to-day business

operations. Accordingly, I believe that the relief requested is in the best interest of the bankruptcy estates and should be granted.

> j.   *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief ("<u>DIP Motion</u>")*

85.    The DIP Motion seeks authority to, among other things, obtain a $[10] million postpetition financing facility from MGG that would enable the Debtors to pay their operating and administrative expenses in these cases pursuant to an agreed budget.

86.    To state the obvious, it is critical for the Debtors' to have access to adequate financing to fund these cases. The Debtors, through their advisors, contacted a number of potential lenders and worked diligently to find the best financing terms available under the circumstances. Following those efforts, and following good faith negotiations with MGG, the Debtors determined that the proposed financing from MGG on the terms summarized in the DIP Motion represent the best alternative for financing available.

87.    I believe the agreed budget is adequate and will allow the Debtors to pay their operating and administrative expenses in these cases. I also believe that the terms of the proposed financing are fair and reasonable. I further believe that absent this financing, the Debtors' estates and efforts to reorganize their business will suffer irreparable harm. Among other things, absent adequate financing, the Debtors will be forced to cease operating, which will destroy value for all stakeholders. This is an outcome that must be avoided if value is to be maximized, and the Debtors are to succeed in their efforts to reorganize through these Cases.

88.    I have reviewed the facts set forth in the DIP Motion and I believe them to be true and correct. I further believe that the relief requested in the DIP Motion is necessary to enable an efficient transition into chapter 11 and avoid any disruption to the day-to-day business operations.

Accordingly, I believe that the relief requested is in the best interest of the bankruptcy estates and should be granted.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: February 5, 2020

/s/ _____
James Alt
Chief Transformation Officer

## Exhibit A

**(Corporate Organization Chart)**

# GenCanna's Current Organizational Structure

