# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
### LEXINGTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GenCanna Global USA, Inc., *et al.*,[1] | ) | Case No. 20-50133-grs |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |
|  | ) | Honorable Gregory R. Schaaf |
|  | ) |  |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

GenCanna Global USA, Inc. ("GenCanna") and its affiliated debtors and debtors in possession in the above-captioned cases (the "Debtors") hereby file this Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief (the "Motion"), pursuant to sections 105, 361, 362, 363, 364, 503 and 507of title 11 of the United States Code (the "Bankruptcy Code").  In support of the Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these chapter 11 bankruptcy cases are (with the last four digits of their federal tax identification numbers in parentheses): GenCanna Global USA, Inc. (0251); GenCanna Global, Inc. (N/A); and Hemp Kentucky LLC (2600).

## RELIEF REQUESTED

1.      By this Motion, the Debtors seek entry of an interim order (the "Interim Order"),

substantially in the form attached hereto as Exhibit A,[2] and a final order:[3]

> (a)      authorizing the Debtors to obtain up to $10 million (the "DIP Commitment") in senior secured post-petition financing on a superpriority basis (the "DIP Facility") pursuant to (and in accordance with the terms of) that certain Debtor In Possession Secured Multi-Draw Term Promissory Note, by and among GenCanna Global USA, Inc., as borrower (the "Borrower"), GenCanna Global, Inc. and the Borrower's direct and indirect wholly owned subsidiaries, as guarantors (the "Guarantors"), MGG Investment Group LP ("MGG"), as agent (in such capacity, together with its successors and assigns in such capacity, the "DIP Agent"), and the lenders from time to time party thereto (each a "DIP Lender" and collectively, the "DIP Lenders" and, together with the DIP Agent, the "DIP Secured Parties"), on the terms and conditions substantially in the form annexed to the Interim Order as Exhibit A (as the same may be amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time, the "DIP Loan Agreement," and the DIP Loan Agreement, together with any other related agreements, documents, security agreements, or pledge agreements, including the Interim Order and the Final Order (as defined below), collectively, the "DIP Loan Documents"), which DIP Facility shall be available as term loans (the "DIP Loans") to the Debtors upon entry of the Interim Order and satisfaction of the other conditions set forth in the DIP Loan Documents in an initial amount not to exceed $2,750,000 (the "Initial DIP Loan"), and the remainder of the DIP Facility available upon entry of the Final Order and satisfaction of the other conditions set forth in the DIP Loan Documents;
>
> (b)      authorizing the Borrower and the other Debtors to enter into the DIP Loan Agreement and the other DIP Loan Documents and to take such other and further acts as may be required in connection with the DIP Loan Documents;
>
> (c)      authorizing the Debtors to pay all amounts, obligations, and liabilities owing or payable to the DIP Secured Parties pursuant to the DIP Loan Documents, including, without limitation, any principal, interest, fees, commitment fees, administrative agent fees, audit fees, closing fees, service fees, facility fees, or other fees, costs, expenses, charges, and disbursements of the DIP Secured Parties (including the reasonable and documented fees

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the First Day Declaration, this motion, the DIP Loan Agreement, or in the Interim Order, each as defined herein, as applicable.

[3] The Debtors will file the form of final order prior to the Final Hearing (as defined herein).

and expenses of each of the DIP Secured Parties' attorneys, advisors, accountants and other consultants), any obligations in respect of indemnity claims, whether contingent or absolute, including, without limitation, any and all obligations in connection with any interest rate, currency swap, or other hedging agreement or arrangement, in each case, to the extent constituting obligations of any kind under the DIP Loan Documents (such obligations, the "DIP Obligations");

(d)     authorizing the Debtors, immediately upon entry of the Interim Order, to use proceeds of the Initial DIP Loan as expressly provided in the DIP Loan Documents and solely in accordance with the Interim Order and the applicable Approved Budget (as defined in the Interim Order) (subject to permitted variances and other exclusions set forth in the DIP Loan Documents) to:  (A) pay costs, premiums, fees, and expenses related to the above-captioned cases (collectively, the "Cases") and in connection with the DIP Facility, including the fees, costs and expenses associated with the negotiation, execution and performance of the DIP Facility; and (B) provide financing for working capital and for other general corporate purposes of the Debtors, in each case in accordance with the Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents);

(e)     authorizing the grant and approval of superpriority administrative expense claim status, pursuant to sections 364(c)(1), 503(b)(1), and 507(b) of the Bankruptcy Code, to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, in respect of all DIP Obligations, subject only to the Carve-Out (as defined in the Interim Order);

(f)     granting the DIP Secured Parties valid, enforceable, non-avoidable, automatically and fully perfected DIP Liens (as defined in the Interim Order) in all DIP Collateral (as defined in the Interim Order), including, without limitation, all property constituting Prepetition Collateral (as defined in the Interim Order), including, without limitation, any Cash Collateral (as that term is defined in section 363(a) of the Bankruptcy Code and defined in the Interim Order), to secure the DIP Obligations, which DIP Liens shall be subject to the relative rankings and priorities set forth in the Interim Order;

(g)     authorizing the Debtors to use, among other things, solely in accordance with the Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents) and the limitations provided in the Interim Order, any Cash Collateral in which any of the Prepetition Secured Parties (as defined in the Interim Order) may have an interest, and the granting of adequate protection solely to the extent of any postpetition diminution in the value of the Prepetition Secured Parties' respective interests in the Prepetition Collateral, including without limitation, the Cash Collateral, as a result of (i) the incurrence of the DIP

Obligations, (ii) the Debtors' use of Cash Collateral as set forth in the Interim Order, (iii) the subordination of the Prepetition Obligations to the Carve-Out, (iv) any other diminution in value of the Prepetition Collateral arising from the Debtors' use, sale, or disposition of such Prepetition Collateral or the proceeds thereof, (v) the priming of the Prepetition Liens to the extent set forth in the Interim Order, and (vi) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, "Diminution in Value");

(h)     modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and the other DIP Loan Documents to the extent set forth in the Interim Order;

(i)     subject to entry of a final order granting the relief requested in the Motion on a final basis (the "Final Order"), waiving the Debtors' ability to surcharge, pursuant to section 506(c) of the Bankruptcy Code, against any DIP Collateral and the Prepetition Collateral, and any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

(j)     waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order;

(k)     scheduling a final hearing on the Motion (the "Final Hearing") to consider entry of the Final Order granting the relief requested in the Motion on a final basis, and approving the form of notice with respect to the Final Hearing; and

(l)     granting related relief.

2.      In support of this Motion, the Debtors submit the declaration of Richard Morgner, the Managing Director and Joint Global Head of the Debt Advisory & Restructuring Group at Jefferies LLC, the Debtors' proposed investment banker, attached hereto as **Exhibit B** (the "Morgner Declaration"), and the First Day Declaration (as defined below).

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over these Cases under 28 U.S.C. §§ 157 and 1334, and pursuant to L.R. 83.12 of the Joint Local Rules of Civil Practice for the United States District

20826820.1

Courts for the Eastern and Western Districts of Kentucky.   This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A).

4.    Debtors GenCanna and GenCanna Global, Inc. have maintained their principal places of business in Winchester, Clark County, Kentucky during the 180-day period immediately preceding the Order for Relief Date (as defined below).  Debtor Hemp Kentucky LLC maintained its principal place of business in Lexington, Fayette County, Kentucky during that same period as well.  Accordingly, venue for the Debtors' Cases is proper in this District under 28 U.S.C. §§ 1408 and 1409.

## **BACKGROUND**

### **General Background**

5.    On January 24, 2020, Pinnacle, Inc., Crawford Sales, Inc., and Integrity / Architecture, PLLC filed an involuntary chapter 11 petition under title 11 of the United States Code (the "Bankruptcy Code") against GenCanna Global USA, Inc.  On February 5, 2020, the Debtors GenCanna Global, Inc. and Hemp Kentucky LLC filed voluntary chapter 11 petitions for relief under the Bankruptcy Code.  On February 6, 2020 (the "Order for Relief Date"), GenCanna Global USA, Inc. consented to the involuntary petition.  As a result of these petitions, the Debtors consented to, or commenced, the current chapter 11 Cases.  The Debtors are seeking to have the Cases jointly administered for procedural purposes only.

6.    The Debtors are continuing to operate their business and manage their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.    No official committee of unsecured creditors has been appointed in these Cases as of the date hereof.

8.    The Debtors have filed various customary first day motions (the "First Day Motions") seeking emergency relief to facilitate an efficient transition of their operations into

5

chapter 11 and to minimize disruption.  In support of these Cases and the relief requested in the

First Day Motions, the Debtors have filed the *Declaration of James Alt in Support of Chapter 11*

*Filings and First Day Motions* (the "First Day Declaration").  The First Day Declaration contains

a detailed description of the Debtors' business operations, capital structure, and events leading to

the filing of these Cases, and is incorporated herein by reference.

### Concise Statement Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2[4]

9.    The below chart contains a summary of the material terms of the proposed DIP

Loan Agreement, together with references to the applicable sections of the relevant source

documents, as required by Bankruptcy Rules 4001(b)(l)(B) and 4001(c)(l)(B) and Local Rule

4001-2.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Borrower** Bankruptcy Rule 4001(c)(1)(B) | GenCanna Global USA, Inc., as a debtor and debtor in possession under Chapter 11 of the Bankruptcy Code. *See* DIP Loan Agreement: Intro. |
| **Guarantors** Bankruptcy Rule 400l(c)(l)(B) | GenCanna Global, Inc., as a debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, and each of the direct and indirect wholly-owned subsidiaries of the Borrower. *See* DIP Loan Agreement: Intro. |
| **Agent** Bankruptcy Rule 4001 (c)(1)(B) | MGG Investment Group LP. *See* DIP Loan Agreement, Intro. |
| **DIP Lenders** Bankruptcy Rule 4001(c)(l)(B) | MGG Investment Group LP ("MGG") or one or more affiliates of MGG and/or other financial institutions, lenders or investment vehicles from time to time party to the DIP Loan Agreement. *See* DIP Loan Agreement, Intro. and Schedule 1(a) |
| **Reporting Information** Bankruptcy Rule 4001(c)(1)(B) | The DIP Loan Agreement includes standard and customary conditions that require the Borrower to provide periodic reports to the DIP Agent and the DIP Lenders and their respective professionals regarding the approved budget, the status of these Cases, and certain other matters.   The failure of the Borrower to comply with such reporting |

---

[4] The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced. To the extent anything in this motion is inconsistent with such documents, the terms of the applicable DIP Loan Documents shall control.  Capitalized terms used in the following summary chart but not otherwise defined have the meanings ascribed to them in the DIP Loan Documents.

20826820.1

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | obligations will cause an Event of Default that may permit the DIP Agent to exercise remedies against the Borrower, including, without limitation, terminating the DIP Facility.<br><br>*See* DIP Loan Agreement: § 13 and § 16; Schedule 13. |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(l)(B) | The earliest to occur of: (i) 120 days from the Closing Date, (ii) the date that is 30 days following the date of entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (iii) the consummation of a sale of all or substantially all of the Loan Parties' assets, (iv) the substantial consummation of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order of the Bankruptcy Court, (v) the filing of a motion by any of the Loan Parties seeking dismissal of any of the Chapter 11 Cases, (vi) the dismissal of any of the Chapter 11 Cases, (vii) the filing of a motion by any of the Loan Parties seeking to convert any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, (viii) the conversion of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, (ix) the date on which the Term Loans are accelerated pursuant to Section 16 of the DIP Loan Agreement or (x) any other event set forth in the Financing Orders and/or the other DIP Loan Documents as triggering a Maturity Date.<br><br>*See* DIP Loan Agreement: § 18 (*def'n* of Maturity Date). |
| **Commitment**<br>Bankruptcy Rule 4001(c)(l)(B) | <u>Commitment</u>. A multi-draw term loan facility in an aggregate principal amount of $10,000,000.<br><br><u>Initial Commitment</u>. $2,750,000<br><br>*See* DIP Loan Agreement: § 1. |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(l)(B) | The DIP Loan Agreement includes conditions to closing that are customary and appropriate for similar debtor-in-possession financings of this type.<br><br>*See* DIP Loan Agreement: § 2. |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(l)(B) | A floating rate of LIBOR + 10.00%<br><br>*See* DIP Loan Agreement: § 4. |
| **Use of Proceeds**<br>Bankruptcy Rule 4001(b)(l)(B)(ii) | The DIP Facility will be used to (i) fund general corporate needs, including without limitation working capital and other needs, and (ii) pay administrative expenses of the Cases, including fees and expenses of professionals, in each case in accordance with the Budget, the Financing Orders and/or the other DIP Loan Documents, and the Bankruptcy Code.<br><br>*See* DIP Loan Agreement: § 1(d). |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(l)(B)(ii) | The Adequate Protection provisions are ordinary and customary for debtor-in-possession financings of this type by the Borrower and each Guarantor in favor of the DIP Agent and each of the DIP Lenders, subject to customary carve-outs.<br><br>*See* Interim Order, ¶ 3. |
| **Budget** | The DIP Agent shall have received a rolling thirteen (13) week forecast of projected receipts, disbursements, net cash flow, liquidity, loans and availability for the |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| Bankruptcy Rule 4001 (c)(1)(B) | immediately following consecutive 13 weeks after the date of delivery, which shall be in substantially the form of the Initial Budget or otherwise in form and substance acceptable to the DIP Agent in its sole discretion and shall be approved by the DIP Agent in its sole discretion.<br><br>*See* DIP Loan Agreement: § 18 (*def'n* of Budget). |
| **Variance Covenant** Bankruptcy Rule 4001(c)(1)(B) | The Permitted Variance means (a) a variance of up to 10% between the actual disbursements for the applicable 2, 3 or 4 week period and the "Total Operating Disbursements" line item as set forth in the Budget for the applicable 2, 3 or 4 week period (other than professional fees) and/or (b) a negative variance of up to 10% between the actual receipts for the applicable 2, 3 or 4 week period and the "Cash Receipts" line item as set forth in the Budget for the applicable 2, 3 or 4 week period.<br><br>*See* DIP Loan Agreement: § 18 (*def'n* of Permitted Variance). |
| **Events of Default** Bankruptcy Rule 4001(c)(1)(B) | The DIP Loan Agreement contains Events of Default that are usual and customary for debtor-in-possession financings of this type.<br><br>*See* DIP Loan Agreement, § 16. |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Loan Agreement contains indemnification provisions ordinary and customary for debtor-in-possession financing of this type by the Borrower and each Guarantor in favor of the DIP Agent and each DIP Lender, and each of their respective affiliates and each of their and their affiliates' respective officers, directors, employees, attorneys, agents and representatives, each of them subject to customary carve-outs.<br><br>*See* DIP Loan Agreement: § 9. |
| **Entities with Interests in Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(i) | The following secured parties have an interest in Cash Collateral: the DIP Lenders and the Prepetition Secured Parties.<br><br>*See* Interim Order: ¶¶ E & F. |
| **Carve Out** Bankruptcy Rule 400l(c)(1)(B) | The Interim Order provides a Carve Out of certain statutory fees, allowed professional fees of the Debtors, and official committee of unsecured creditors appointed under section 1102 of the Bankruptcy Code appointed in the Cases pursuant to section 1103 of the Bankruptcy Code, including a post Carve Out Trigger Notice Cap, all as detailed in the Interim Order.<br><br>*See* Interim Order: ¶ 4.12. |
| **Fees** Bankruptcy Rule 4001(c)(1)(B) | <u>Initial Loan Facility Fee</u> in the amount of $55,000, which fee shall be payable to the DIP Agent on the date of funding the Initial Loan and fully-earned upon the entry of the Interim Order and non-refundable once paid.<br><br><u>Additional Loan Facility Fee</u> in the amount of $145,000, which fee shall be payable to the DIP Agent on the date of funding the first Additional Loan after the entry of the Final Order and fully-earned upon the entry of the Final Order and non-refundable once paid.<br><br><u>Administration Fee</u> in the amount of $50,000, which fee shall be payable to the DIP Agent on or prior to the date of funding of the Initial Loan and fully-earned upon the entry of the Interim Order and non-refundable once paid. |

8

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | *See* DIP Loan Agreement: § 8. |
| **506(c) Waiver**<br>Bankruptcy Rule<br>4001(c)(l)(B)(x)<br><br>**Section 552(b)**<br>Bankruptcy Rule<br>4001(c)(l)(B) | *Section 506(c) Waiver.*  No costs or expenses of administration which have been or may be incurred in these Cases at any time (including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of value by the DIP Agent or the DIP Lenders upon the DIP Collateral or by the Prepetition Secured Parties upon the Prepetition Collateral, as applicable) shall be charged against the DIP Agent, DIP Lenders, or Prepetition Secured Parties, or any of the DIP Obligations or Prepetition Obligations or the DIP Collateral or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise without the prior express written consent of the affected DIP Secured Parties and/or affected Prepetition Secured Parties, in their respective sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such agents or creditors (including, without limitation, consent to the Carve-Out or the approval of any budget hereunder).  Notwithstanding the foregoing, the waiver provided in Section **Error! Reference source not found.** of the Interim Order is subject to the entry of a Final Order providing such relief.<br><br>*Section 552(b) Waiver.*  The Debtors have agreed as a condition to obtaining financing under the DIP Facility and using Cash Collateral that, subject to entry of the Final Order, the Prepetition Secured Parties are and shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and that the "equities of the case" exception under section 552(b) shall not apply to the DIP Agent, the DIP Lenders, the DIP Obligations, and, subject to entry of the Final Order, the Prepetition Secured Parties or the Prepetition Obligations.<br><br>*See* Interim Order: ¶¶ 4.26-4.27. |
| **Stipulations to Prepetition Liens and Claims**<br>Bankruptcy Rule<br>4001(c)(1)(B)(iii) | After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties-in-interest, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree immediately as of the Order for Relief Date, to certain stipulations regarding the validity and extent of the Prepetition Secured Parties' claims and liens.<br><br>*See* Interim Order: ¶ E. |
| **Liens and Priorities**<br>Bankruptcy Rule<br>4001(c)(l)(B)(i) | *Priority of Obligations and DIP Lenders' Liens.*<br><br>(a) To secure all of the Borrower's Obligations now existing or hereafter arising, the Agent, for the benefit of itself and the DIP Lenders, is granted, effective as of the Order for Relief Date:  (i) subject to the Carve-Out, an allowed  super-priority administrative expense claim against each of the Borrower and Guarantors (jointly and severally) pursuant to Section 364(c)(1) of the Bankruptcy Code, and except as set forth in the Financing Orders, having a priority over any and all other claims and costs and expenses of administration of any kind whatsoever, whether now existing or hereafter arising, including, without limitation, those specified in, ordered pursuant to or arising under, *inter alia*, sections 105, 326, 328, 330, 331, 363, 364, 503, 506, 507, 546, 726, 1113 or 1114 or any other provision of the Bankruptcy Code or otherwise (whether incurred in these Chapter 11 Cases and any Successor Case), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed superpriority administrative claim (x) shall at all times be senior to the rights of the Debtors, any successor trustee or estate representative, or any other creditor or party in interest in the Chapter 11 Cases or any Successor Case, (y) shall be, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, considered an |

20826820.1

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | administrative expense allowed under section 503(b) of the Bankruptcy Code, and (z) shall be payable from and have recourse to all prepetition and postpetition property, whether existing as of the Order for Relief Date or thereafter acquired, of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, proceeds of Avoidance Actions (as defined in the Financing Orders)); and (ii) (x) pursuant to Sections 364(c)(2) of the Bankruptcy Code, Liens on, and security interests in, the Collateral, that are first and senior in priority to all other Liens on, and security interests in, the Collateral that was not encumbered by a valid, enforceable, properly perfected and non-avoidable Lien as of the Order for Relief Date, subject only to the Carve-Out, and (y) pursuant to sections 364(c)(3) and 364(d) of the Bankruptcy Code, priming Liens on, and security interests in, all other Collateral, subject only to the Carve-Out and Permitted Prior Liens.  Except as set forth in the Financing Orders, the security interests and Liens granted to the Agent hereunder shall not be (i) subject to any Lien or security interest which is avoided and preserved for the benefit of the Loan Parties' estate under Section 551 of the Bankruptcy Code, or (ii), subordinated to or made pari passu with any other Lien or security interest under Section 364(d) of the Bankruptcy Code or otherwise.

(b)  The priority of the Agent's Liens on the Collateral shall be as set forth in the Financing Orders.

(c)  Notwithstanding anything to the contrary in the DIP Loan Agreement (i) all proceeds received by the Agent and the DIP Lenders from the Collateral subject to the Liens granted in Section 11 of the DIP Loan Agreement and in each other DIP Document, including the Financing Orders shall be subject to the Carve-Out, and (ii) no Person entitled to the Carve-Out shall be entitled to sell, or otherwise dispose, or seek or object to the sale or other disposition of, any Collateral.

(d)  Each of the Loan Parties agrees for itself that the Obligations of such Person shall constitute allowed administrative expenses in the Chapter 11 Cases, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 363, 364, 365, 503, 506, 507, 546, 726, 1113 and/or 1114 of the Bankruptcy Code, except as set forth in the Financing Orders.

(e)  The Agent's Liens on the Collateral and the super-priority administrative claim under Section 364(c) of the Bankruptcy Code afforded the Obligations and the Guaranteed Obligations shall, following the occurrence and during the continuation of an Event of Default, be subject to the Carve-Out, in accordance with the Financing Orders.

*See* DIP Loan Agreement: § 11. |
| **Milestones**<br>Bankruptcy Rule 400 l (c)(l)(B) | The Borrower shall comply with the following milestones in connection with the Cases:

(1)      no later than 2 Business Days after the Order for Relief Date, the Interim Order approving the Note shall be entered by the Bankruptcy Court;

(2)      no later than 30 days after the entry of the Interim Order, the Final Order approving this Note and the financing contemplated hereby shall be entered by the Bankruptcy Court;

(3)      no later than February 18, 2020, the Loan Parties shall file one or more motions (together with all exhibits, annexes and related documents, the "Sale Motion"), in form |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
|  | and substance reasonably acceptable to the Agent, which Sale Motion shall be in form and substance acceptable to the Agent in its sole discretion, seeking entry of orders (x) establishing bidding procedures (the "Bid Procedures") for the sale(s) of all or substantially all of the Loan Parties' assets (such order, together with all exhibits, annexes and related documents, the "Bid Procedures Order"), which Bid Procedures Order shall be in form and substance acceptable to the Agent in its sole discretion, and (y) approving the sale(s) of all or substantially all the assets of the Loan Parties (any such order, together with all exhibits, annexes and related documents, the "Sale Order"), which Sale Order shall be in form and substance acceptable to the Agent in its sole discretion; |
|  | (4)    no later than February 24, 2020, the Loan Parties shall have received one or more letters of intent from potential bidders, each in form and substance acceptable to the Agent in its sole discretion; |
|  | (5)    no later than March 11, 2020, the hearing on the Sale Motion as it relates to the approval of the Bid Procedures and entry of the Bid Procedures Order shall be held; |
|  | (6)    no later than March 13, 2020, the Loan Parties shall obtain entry of the Bid Procedures Order in form and substance acceptable to the Agent in its sole discretion; |
|  | (7)    no later than April 17, 2020, the Loan Parties shall have received one or more Qualified Bid(s) (as defined in the Bid Procedures), each in form and substance acceptable to the Agent in its sole discretion; |
|  | (8)    to the extent required under the Bid Procedures Order and more than one Qualified Bid is received by the Bid Deadline (as defined in the Bid Procedures), not later than April 20, 2020, the Loan Parties shall commence an auction in accordance with the Bid Procedures Order, and after consultation with and approval by the Agent , select the successful bid(s); |
|  | (9)    no later than April 23, 2020, the hearing on the Sale Motion as it relates to the approval of the sale(s) of all or substantially all of the Loan Parties' assets and entry of the Sale Order shall be held; |
|  | (10)    no later than April 24, 2020, the Bankruptcy Court shall have entered Sale Order, in form and substance acceptable to the Agent in its sole discretion, which Sale Order, among other things, (x) authorizes the sale(s) of the Loan Parties' assets free and clear of all liens, claims and interests (other than those expressly preserved in the Sale Order) and (y) contains the "good faith" protections pursuant to Bankruptcy Code section 363(m) (the "Approved Sale(s)"); and |
|  | (11)    no later than May 1, 2020, the Approved Sale(s) shall have been consummated and all proceeds of such sales applied in accordance with the Financing Orders. |
|  | *See* DIP Loan Agreement: § 14. |
| **Challenge Period** Bankruptcy Rule 4001 (c)(l)(B) | *Challenge Period*. (x) by the Creditors' Committee (if appointed) within 60 calendar days after the date of the appointment of such Creditors' Committee and (y) if no Creditors' Committee has been appointed, by any party in interest with requisite standing within 75 calendar days after entry of the Interim Order.

*See* Interim Order, ¶ 4.14. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law would be modified to the extent necessary to permit each of the DIP Agent or the Prepetition Agent, as applicable, to enforce all of their rights under the applicable DIP Loan Documents, including, without limitation, declaring an Event of Default, terminating any further DIP Commitment, declaring all DIP Obligations immediately due and owing, terminating the applicable DIP Loan Documents, and/or terminating the use of Cash Collateral. *See* Interim Order: ¶ 4.7. |

## The Debtors' Prepetition Capital Structure

### The MGG Facility

10.     The Company is a borrower under that certain Financing Agreement dated as of June 24, 2019 (as amended from time to time, the "Prepetition Credit Agreement") with the lenders party thereto (the "Prepetition Lenders") and MGG Investment Group LP ("MGG") as collateral agent and administrative agent.  The Prepetition Credit Agreement was amended by that certain First Amendment to Financing Agreement dated as of August 2, 2019, that certain Second Amendment to Financing Agreement dated as of August 22, 2019, and that certain Third Amendment and Waiver to Financing Agreement dated as of November 6, 2019.

11.     Pursuant to the Prepetition Credit Agreement and related loan documents (the "Loan Documents"), the Prepetition Lenders provided a $75 million credit facility (the "Prepetition Credit Facility"), which is comprised of a term loan in the aggregate principal amount of $40 million, and availability for delayed draw term loans in an aggregate principal amount not to exceed $35 million.  As of January 31, 2020, the total outstanding principal balance due under the Prepetition Credit Facility was approximately $69 million.

12.     The Company's obligations under the Prepetition Credit Facility (the "Prepetition Obligations") are guaranteed by GenCanna Parent pursuant to the provisions of the Prepetition Credit Agreement, and are secured by a first priority security interest in and liens on substantially

20826820.1

all of the assets of the Company and GenCanna Parent (the "Prepetition Collateral") pursuant to, among other things, that certain Pledge and Security Agreement dated as of June 24, 2019.

**Mortgage Loans**

13.     The Debtors own certain real property encumbered by mortgage loans in favor of various mortgage lenders.  In particular, the Company owns a greenhouse located at 1895 Clintonville Road in Paris, Kentucky (the "Paris Greenhouse") that is secured by a mortgage in favor of Kentucky Bank.  The approximate outstanding principal balance of the mortgage loan in respect of the Paris Greenhouse is approximately $1.8 million.

14.     The Company also owns a retail location at 16 W Lexington Avenue in Winchester, Kentucky (the "Winchester Property") that is secured by a mortgage in favor of Central Bank & Trust Co.  The approximate outstanding principal balance of the mortgage loan in respect of the Winchester Property is approximately $270,000.

15.     The Company also owns a warehouse located in Paducah, Kentucky (the "Paducah Property") that is secured by a mortgage in favor of Community Financial Services Bank ("CFSB").  The approximate outstanding principal balance of the mortgage loan in respect of the Paducah Property is approximately $1.6 million.

**Mechanic's Liens**

16.     The Company leases certain property in Mayfield, Kentucky on which the Company is constructing a hemp processing facility for its CBD products (the "Mayfield Facility").  A number of creditors have asserted mechanic's liens against the Mayfield Facility. To date, approximately between $20 million and $25 million of mechanic's lien claims have been asserted in respect of the Mayfield Facility, with other claims being asserted in undetermined

amounts.  The Debtors are evaluating, and in appropriate cases, disputing and defending against, such claims.  The Debtors make no admission with respect to such claims and reserve all rights.

**Letter of Credit in Favor of Southerland's Greenhouses, Inc.**

17.     In connection with the Company's acquisition of the Paris Greenhouse property, the Company obtained the mortgage loan from Kentucky Bank described above, and paid the remainder of the purchase price in cash.  However, the Company was also obligated to pay the seller an additional amount depending upon the seller's tax obligations resulting from the transaction.  The seller was issued an Irrevocable Letter of Credit in the amount of $1 million by CFSB on March 22, 2019 (the "LOC"), in respect of such obligations.  The Company's obligations to reimburse CFSB for draws made under the LOC are secured by $1 million in cash being held in a controlled deposit account at CFSB.

**Capital Leases, Equipment and Vehicle Obligations**

18.     The Company is party to a number of equipment and capital leases for various pieces of equipment, machinery and other personal property.  The lessors in respect of such obligations assert claims secured by the property covered by such agreements.  The Debtors make no admission as to whether such leases are true leases or not, and as to any other aspect of such asserted secured claims.  All rights are reserved in that regard.

19.     The Company is also party to a certain Harvesting Services Agreement with Arrow Farms, LLC, pursuant to which the counterparty purchased farm equipment on behalf of the Debtors and who are believed to either assert an ownership interest in such property or a security interest in such property.  The Debtors make no admissions and reserve all rights.

**Obligations Purportedly Secured by Harvest Inventory**

14

20.     Certain creditors are owed obligations by the Company in respect of debenture agreements and redemption agreements that are purported to be secured by the Debtors' harvest inventory.  The Debtors make no admissions and reserve all rights.

## The DIP Facility

I.      **The Debtors' Need for Access to Financing and Use of Cash Collateral.**

21.     As described in the Morgner Declaration and the First Day Declaration, the Debtors require immediate access to liquidity to continue operating during these Cases and to preserve the value of their estates for the benefit of all stakeholders.  In the months prior to the chapter 11 filing, the Debtors have been forced to delay payments and stretch payment terms for many of their vendors to retain sufficient liquidity to operate their businesses.  Without a cash infusion at this critical point, the Debtors will be unable to meet their commitments to vendors that provide necessary goods and services, and will suffer irreparable harm to their businesses.  The DIP Facility provides the necessary cash to meet immediate operational needs, addresses significant vendor unease, and provides the liquidity for a smooth transition into chapter 11.

22.     Since the retention of Jefferies LLC ("Jefferies"), the Debtors and Jefferies have worked to evaluate the Debtors' operations, including determining potential liquidity needs for a chapter 11 case.  As part of that analysis, Jefferies, together with the Debtors' other professionals, analyzed the Debtors' liquidity forecasts and liquidity position.  This analysis was based upon the Debtors' business plan, overlaid with the estimated impact of the commencement of these Cases.

23.     In addition, Jefferies, the Debtors, and the Debtors' other professionals also considered the incremental administrative costs of a complex chapter 11 filing with a large number of stakeholders, including prepetition lenders, business entities, employees, and governmental entities, each of whom will likely be represented by counsel.

20826820.1

24.     Based on these considerations, the Debtors and their advisors determined that smooth postpetition operations would require initial liquidity of approximately $10 million.  The Debtors believe the proposed DIP Facility will allow them to operate their businesses and satisfy all administrative costs and expenses associated with these Cases as they come due.

25.     Without the cash and stability provided by the DIP Facility, irreparable harm would occur as a result of the Debtors' inability to continue ordinary course operations, which would not only impact revenue generation, but also risk losing the confidence of employees, vendors, and customers.

## II.     The Debtors' Efforts to Secure Financing.

26.     The proposal before the Court represents the best available source of postpetition financing available to the Debtors.  *First*, substantially all of the Debtors' assets are encumbered under their prepetition secured credit facilities.  *Second*, the Debtors' depressed operating performance limited the Debtors' options for postpetition financing of the size necessary to fund these Cases.  *Third*, the Prepetition Secured Parties indicated that they would not consent to "priming" debtor-in-possession financing provided by a third party.  As such, the Debtors and their advisors were forced to solicit postpetition financing proposals from third parties on a junior basis or prepare for a priming fight on the first day of these Cases.

### A.     The Debtors' Immediate Liquidity Needs.

27.     The Debtors need an immediate capital infusion to operate their business postpetition and to fund these Cases.  As of the Order for Relief Date, the Debtors lack sufficient funds to operate their enterprise and continue paying their debts as they come due.  *See* Morgner Decl. ¶¶ 9.

28.     In light of the Debtors' limited liquidity, the Debtors' advisors assisted the Debtors in evaluating potential financing alternatives for both an out-of-court restructuring and an in-court

16

process.  Among other things, Jeffries worked closely with the Debtors, their management, and other advisors to evaluate the Debtors' cash requirements necessary to continue to operate their business as a going concern.  *See* Morgner Decl. ¶¶ 6-8.  Based on this work, and after the Debtors concluded that an out-of-court restructuring was not a viable option, the Debtors determined, in consultation with their advisors, that procuring sufficient financing at the start of these Cases would be essential to meet operational expenses and fund these Cases.  *See id.* at ¶ 9.  The proposed DIP Facility is critical to the Debtors' ability to administer these Cases, provide the Debtors with sufficient liquidity to continue operations in the ordinary course, and pursue a reorganization of their business for the benefit of their employees, vendors, customers, and other stakeholders.  *See id.* at ¶ 10.

### B.    The DIP Facility.

29.    The Debtors engaged in arm's-length negotiations with the DIP Lenders with respect to funding these Cases.  *See* Morgner Decl. ¶ 12.  The parties exchanged numerous term sheets and mark-ups, each with significant changes to the material terms of the proposals.  *See id.* Through these negotiations, the economic and other terms of the DIP Facility improved to the benefit of the Debtors.  *See id.*  The DIP Facility includes various fees, milestones, and other agreements, which were expressly required by the DIP Lender as a condition to provide the DIP Facility and are an integral component of the financing package.  *See id.* at ¶ 19.  These fees and other agreements were each subject to arm's length negotiations.  *See id.*  Given the financial and operating condition of the Debtors, the timing, cost, and risk of administering these Cases, these fees and other agreements are appropriate under the circumstances.  *See id*

30.    While the parties focused on the ultimate DIP sizing, including the amount necessary to avoid irreparable harm, the DIP Facility provides a framework within which the Debtors can ultimately reorganize for the benefit of all of their stakeholders.  *See* Morgner Decl. ¶

20826820.1

17. The DIP Facility and is also expressly linked to certain case milestones. *See* Morgner Decl. ¶ 19. These milestones provide a structure for the Debtors' anticipated chapter 11 process, which will benefit all stakeholders by continuing to drive parties towards a global and comprehensive solution for the Debtors' liabilities. *See id.* The milestones were negotiated by the DIP Lenders as a condition to providing the DIP Facility and were a critical inducement for the DIP Lenders in providing the Debtors with the cash necessary to operate their business and fund these cases. *See id.* The Debtors engaged in good-faith negotiations with respect to these milestones and believe the milestones provide them with adequate time to implement a value-maximizing restructuring. *See id.*

    **D.**    **The DIP Financing Is The Best Postpetition Financing Arrangement Available to the Debtors.**

31.    The proposed DIP financing maximizes the value of the enterprise by providing the Debtors with access to significant and crucial liquidity at the outset of these Cases. It allows the Debtors to maximize value by continuing operations with minimal disruption and provide new money to adequately fund these Cases.

32.    The terms of the DIP Facility are reasonable under the circumstances and were the product of arm's length negotiations, and that the DIP Facility will benefit all stakeholders in these Cases. *See* Morgner Decl. ¶ 20.

<u>**Basis for Relief**</u>

**I.**    **The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Loan Documents.**

    **A.**    **Entry into the DIP Loan Documents Is an Exercise of the Debtors' Sound Business Judgment.**

33.    The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Loan Documents, obtain access to the DIP Facility, and continue

using Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See*, *e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.").

34.    Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Dwight's Piano Co.*, 424 B.R. 260, 285 (S.D. Ohio 2009) ("The business-judgment-rule presumption may be rebutted by showing that no reasonable business person could possibly authorize the action in good faith . . .").

35.    Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003)

20826820.1

(while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition financing facility.  For example, in *In re ION Media Networks, Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  ***Relevant features of the financing must be evaluated, including non economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.***  This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

36.    The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following an arm's-length process and careful evaluation of available alternatives.  Specifically, the Debtors and their advisors determined that the Debtors would require significant postpetition financing to support their operational and chapter 11 activities.  The DIP Facility will allow the Debtors to: (a) fund capital expenditures that are essential to the Debtors' continuation as a going concern, (b) provide the liquidity necessary to continue favorable trade terms with vendors and to reassure other stakeholders, (c) fund payroll obligations, and (d) fund the administrative cost of these Cases.  The Debtors negotiated the DIP

20826820.1

Loan Agreement and other DIP Loan Documents with the DIP Lenders in good faith, at arm's-length, and with the assistance of their respective advisors, and the Debtors believe that they have obtained the best financing available under the circumstances. Accordingly, the Court should authorize the Debtors' entry into the DIP Loan Documents, as it is a reasonable exercise of the Debtors' business judgment.

**B.     The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

37.     The Debtors propose to obtain financing under the DIP Loan Agreement by providing security interests and liens as set forth in the DIP Loan Documents pursuant to section 364(c) of the Bankruptcy Code. Specifically, the Debtors propose to provide to the DIP Lenders postpetition security interest in and liens on the DIP Collateral (as defined in the Interim Order) and Prepetition Collateral that are valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute or subordination immediately upon entry of the Interim Order.

38.     The above-described liens on encumbered and unencumbered assets are common features of postpetition financing facilities, and as set forth in greater detail in the Morgner Declaration, were a necessary feature here to provide security for the proposed financings. Indeed, postpetition financing facilities routinely are secured by the proceeds of a debtor's unencumbered assets such as leaseholds that are subject to leases that prohibit the impositions of liens thereon. *See*, *e.g.*, *Blackhawk Mining, LLC*, No. 19-11595 (Bankr. D. Del. July 19, 2019) (approving DIP liens on collateral including any leasehold interests or the proceeds thereof as permitted by applicable law); *In re Vanguard Natural Resources, Inc.*, No 19-31786 (DRJ) (Bankr. S.D. Tex. April 30, 2019); *In re Windstream*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. April 22, 2019) (same); *In re Mission Coal Company LLC*, No. 18-04177 (TLM) (Bankr. N.D. Ala. Nov. 20, 2018) (same);

*In re Westmoreland Coal Company*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Nov. 15, 2018) (same).[5]

39.      The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c).  *See In re YL West 87th Holdings I LLC*, 423 B.R. 421, 440-41 (Bankr. S.D.N.Y. 2010) (noting that secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

(a)      the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, i.e., by allowing a lender only an administrative claim;

(b)      the credit transaction is necessary to preserve the assets of the estate; and

(c)      the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Los Angeles Dodgers LLC*, 457 B.R. 308 (Bankr. D. Del. 2011); *see also In re Ames Dep't Stores*, 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990); *In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *In re Crouse Grp. Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa 1987).

40.      As described above and as set forth in the Morgner Declaration, each third-party lender indicated it would be unwilling to provide postpetition DIP financing on an unsecured, junior lien, or *pari passu* basis to the Prepetition Secured Parties.  *See* Morgner Decl. ¶¶ 14-16. Therefore, the Debtors, in consultation with their advisors, concluded that any workable financing likely would require the support of, or be provided by, the Debtors' existing lenders.  The Debtors,

---

[5] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

however, also negotiated with their creditors and surveyed certain potential lending sources for actionable alternative proposals-but determined that the DIP Facility provides the best collective opportunity available to the Debtors under the circumstances to fund these Cases.  *See id.*

41.    Absent the DIP Facility, which will assure creditors that the Debtors will have sufficient liquidity to administer these Cases, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  *See* Morgner Decl. ¶ 17.  Without postpetition financing, the Debtors lack sufficient funds to operate their enterprise, continue paying their debts as they come due, and cover the projected costs of these Cases.  *See id.*  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Loan Agreement, and the other DIP Loan Documents, are reasonable as more fully set forth above and in the Morgner Declaration.  *See id.* at ¶¶ 18-20  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

42.    In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien."  As described above, the Debtors are unable to obtain unsecured credit or junior credit, or credit on a *pari passu* basis, or credit secured by unencumbered property only.  *See* Morgner Decl. ¶¶ 14-16.  Therefore, approving a superpriority claim in favor of the DIP Agent, for the benefit of the DIP Lenders, is reasonable and appropriate.

43.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  The Debtors may incur "priming" liens under the DIP Loan Agreement if either (a) the Prepetition Lenders have consented or (b) Prepetition Lenders' interest in collateral are adequately protected.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Accordingly, the Debtors may incur "priming" liens under the DIP Loan Documents if either (a) their prepetition lenders have consented or (b) the prepetition lenders' interests in collateral are adequately protected.

44.     Here, the Prepetition Lenders have affirmatively consented to the DIP Loan Documents and actively facilitated the proposed DIP Loan Documents.  Moreover, as set forth more fully in the Interim Order, the Debtors propose to provide a variety of adequate protection to protect the interests of the Prepetition Lenders.  Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

**C.     No Comparable Alternative to the DIP Facility is Reasonably Available on More Favorable Overall Terms.**

45.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and

24

unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F. 2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *Ames Dep't Stores*, 115 B.R. at 37-39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

46.   As noted above, the Debtors do not believe that a more favorable alternative DIP financing is reasonably available.   Thus, the Debtors have determined that the DIP Loan Agreement provides the most favorable terms.   Simply put, the DIP Loan Agreement provides the Debtors with the liquidity they need at the lowest cost available while simultaneously placing the Debtors on an optimal path for a successful restructuring.   Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

**II.   The Debtors Should Be Authorized to Use the Cash Collateral.**

47.   Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use Cash Collateral with the consent of the secured party.   Here, the DIP Lenders and the Prepetition Lenders consent or are deemed to consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order.

48.   Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses Cash Collateral.   Further, section 3 62(d)(1) of the Bankruptcy

20826820.1

Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *See*, *e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("the circumstances of the case will dictate the necessary relief to be given"); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) ("[W]hat interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis."); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361-66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

49.    As more fully set forth in Section 3 of the Interim Order, the Debtors propose to provide the Prepetition Secured Parties with a variety of adequate protection to protect against the postpetition Diminution in Value of the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral by the Debtors and the imposition of the automatic stay (the "Adequate Protection Obligations").

50.    The Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Secured Parties from any potential diminution in value to the

20826820.1

Cash Collateral. In light of the foregoing, the Debtors further submit, and the Prepetition Secured Parties agree, that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Secured Parties are appropriate. Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these Cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates:

**III.    The Debtors Should Be Authorized to Pay the Fees Required by the DIP Lenders and DIP Agent Under the DIP Loan Documents.**

51.    Under the DIP Loan Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agent and the DIP Lenders. In particular, as noted above, the Debtors have agreed to pay the following fees:

    (a)    to the DIP Agent:

        (i)    an Initial Loan Facility Fee of $55,000.00;

        (ii)    an Additional Loan Facility Fee of $145,000; and

        (iii)    an Administration Fee of 50,000.00.

52.    Courts in this jurisdiction and others have approved similar aggregates in fees in large chapter 11 cases. *See*, *e.g.*, *In re Cambrian Holding Company, Inc.*, No. 19-51200 (GRS) (Bankr. E.D. Ky. Jul. 25, 2019) (approving a commitment fee equal to 2.5 percent of the total DIP commitment in the final order); *see also In re Sanchez Energy Corporation*, No. 19-34508 (MI) (Bankr. S.D. Tex. Aug. 15, 2019) (approving an exit fee of 1 percent of the aggregate DIP loan and a backstop fee of 5 percent of each lender's commitment); *In re ATD Corporation*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (approving a cash fee of approximately 2.0 percent of the overall DIP facilities in the final order); *In re PES Holdings LLC*, No. 18-10122 (KG)

(Bankr. D. Del. Jan. 23, 2018) (approving a cash fee of approximately 2.0 percent of the overall DIP facilities in the interim order); *In re Toys "R" US, Inc.*, No. 17-34665 (KLP) (Bankr. E.D.Va. Sept. 20, 2017) (approving aggregate fees that were slightly less than 3.0 percent of the overall DIP facilities in the interim order). *In re Alpha Natural Resources, Inc.*, No. 15-33896 (KRH) (Bankr. E.D. Va. Sep. 17, 2015) (approving an upfront fee of 5.00% of the aggregate principal amount of the postpetition term loan).

53.     It is understood and agreed by all parties, that these fees are an integral component of the overall terms of the DIP Facility, and were required by the DIP Secured Parties as consideration for the extension of postpetition financing. *See* Morgner Decl. ¶ 18.  Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Loan Documents in connection with entering into those agreements.

**IV.    The DIP Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e).**

54.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

55.     As explained herein and in the Morgner Declaration, the DIP Loan Documents are the result of (a) the Debtors' reasonable and informed determination that the DIP Lenders provided the best postpetition financing alternative available under the circumstances and (b) extended

arm's length, good-faith negotiations between the Debtors and the DIP Lenders.  The Debtors

submit that the terms and conditions of the DIP Loan Documents are reasonable under the

circumstances, and the proceeds of the DIP Facility will be used only for purposes that are

permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party

to the DIP Loan Documents other than as described herein.  Accordingly, the Court should find

that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the

Bankruptcy Code and are entitled to all of the protections afforded by that section.

**V.      The Automatic Stay Should Be Modified on a Limited Basis.**

56.      The proposed Interim Order provides that the automatic stay provisions of section

362 of the Bankruptcy Code will be modified to allow the DIP Secured Parties to file any financing

statements, security agreements, notices of liens, and other similar instruments and documents in

order to validate and perfect the liens and security interests granted to them under the Interim

Order.  The proposed Interim Order further provides that the automatic stay is modified as

necessary to permit the Debtors to grant liens to the DIP Secured Parties and to incur all liabilities

and obligations set forth in the Interim Order.  Finally, the proposed Interim Order provides that,

following the occurrence of a DIP Event of Default or Event of Default (as defined in the DIP

Loan Agreement) and an appropriate opportunity for the Debtors to obtain appropriate relief from

the Court, the automatic stay shall be vacated and modified to the extent necessary to permit each

of the DIP Agent or the Prepetition Agent, as applicable, to exercise all rights and remedies in

accordance with the DIP Loan Documents, or applicable law.

57.      Stay modifications of this kind are ordinary and standard features of debtor in

possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair

under the circumstances of these Cases.  *See*, *e.g.*, *In re Milacron Inc.*, No. 09-11235 (NA) (Bankr.

S.D. Ohio Apr. 10, 2009) (modifying automatic stay to permit DIP lender to exercise rights under

the DIP Loan Agreement documents); *see also In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr.

D. Del. Sept. 29, 2019) (terminating automatic stay after an event of default on an interim basis);

*In re Charming Charlie LLC*, No. 19-11534 (CSS) (Bankr. D. Del. July 12, 2019) (terminating

automatic stay after a default or event of default and a notice period); *In re Oreck Corporation*,

No. 13-04006 (KML) (Bankr. M.D. Tenn. June 12, 2013) (terminating automatic stay after a

default or event of default and a notice period); *In re James River Coal Co.*, No. 03-04095 (MFH)

(Bankr. M.D. Tenn. Mar. 26, 2003) (same).

## VI.    Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.

58.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to

obtain credit pursuant to section 364 of the Bankruptcy Code or to use Cash Collateral pursuant to

section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service

of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing

on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary

to avoid immediate and irreparable harm to a debtor's estate.

59.    For the reasons noted above, the Debtors have an immediate postpetition need to

use Cash Collateral, and access the liquidity provided by the DIP Facility.  The Debtors cannot

maintain the value of their estates during the pendency of these Cases without access to cash.  The

Debtors will use cash, among other things, to fund the operation of their business, including paying

employee wages and benefits, ensure that vendors continue to provide necessary goods and

services, and to fund the administration of these Cases.  Substantially all of the Debtors' available

cash constitutes the Cash Collateral of the Prepetition Lenders.  The Debtors will therefore be

unable to operate their business or otherwise fund these Cases without access to Cash Collateral,

and will suffer immediate and irreparable harm to the detriment of all creditors and other parties

in interest.  *See* Morgner Decl. ¶ 11.  In short, the Debtors' ability to administer these Cases through the use of Cash Collateral is vital to preserve and maximize the value of the Debtors' estates.

60.     The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facility.  The Debtors require the initial funding under the DIP Facility prior to the Final Hearing and entry of the final order to continue operating, pay their administrative expenses, and to implement the relief requested in the Debtors' other "first day" motions.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## Request for Final Hearing

61.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date which is no later than 30 days after the entry of the Interim Order, to hold a hearing to consider entry of the final order and the permanent approval of the relief requested in this motion.  The Debtors also request authority to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, to entry of the final order, by first class mail upon the notice parties listed below, and further request that the Court deem service thereof sufficient notice of the hearing on the final order under Bankruptcy Rule 4001(c)(2).

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

62.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Motion Practice

63.     This motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this motion. Accordingly, the Debtors submit that this motion satisfies Local Rule 9013-1(a).

## No Prior Request

64.     No prior request for the relief sought in this motion has been made to this or any other court.

## Notice

65.     The Debtors sent notice of this Motion on February 5, 2020 to: (a) the Office of the United States Trustee for the Eastern District of Kentucky, (b) the Debtors' secured creditors, (c) the twenty (20) largest unsecured creditors of each Debtor, (d) the Internal Revenue Service, (e) the Commonwealth of Kentucky Department of Revenue, (f) the Securities and Exchange Commission, and (g) all other parties who have requested notice in the Cases.  The Debtors submit that the foregoing constitutes adequate notice under the circumstances.  Furthermore, the Debtors will provide further notice of any final hearing on the Motion to parties in interest as the Court directs.

66.     Notice is hereby given that the foregoing shall be brought on for hearing before the United States Bankruptcy Court for the Eastern District of Kentucky, 100 East Vine Street, Second Floor Courtroom, Lexington, Kentucky on February 6, 2020 at 1:00 p.m. (ET) or as soon as counsel may be heard.

20826820.1

**WHEREFORE**, the Debtors respectfully request that the Court grant the relief requested herein, and such other and further relief as the Court deems just and proper.

Dated: February 6, 2020

/s/ James R. Irving
James R. Irving
April A. Wimberg
Christopher B. Madden
DENTONS BINGHAM GREENEBAUM LLP
3500 PNC Tower
101 South Fifth Street
Louisville, Kentucky 40202
Telephone:    (502) 587-3606
Facsimile:    (502) 540-2215
E-mail:    james.irving@dentons.com
    april.wimberg@dentons.com
    chris.madden@dentons.com

*Proposed counsel to the Debtors*

Respectfully submitted,

Michael J. Barrie (pro hac vice pending)
Jennifer R. Hoover (pro hac vice pending)
BENESCH, FRIEDLANDER, COPLAN, & ARONOFF LLP
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone:    (302) 442-7010 Phone
E-mail:    mbarrie@beneschlaw.com
    jhoover@beneschlaw.com

-and-

Elliot M. Smith (pro hac vice pending)
BENESCH, FRIEDLANDER, COPLAN, & ARONOFF LLP
200 Public Square, Suite 2300
Cleveland, OH 44114
Telephone:    (216) 363-4500
E-mail:    esmith@beneschlaw.com

*Proposed Counsel for the Debtors*

20826820.1