**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GENCANNA GLOBAL USA, INC., *et al.,*[1] | ) | Case No. 20-50133-grs |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**INTERIM ORDER PURSUANT TO**
**11 U.S.C. §§ 105, 361, 362, 363, 364, 503, AND 507**
**(I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED**
**SUPERPRIORITY POSTPETITION FINANCING; (II) GRANTING (A) LIENS AND**
**SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS AND (B) ADEQUATE**
**PROTECTION TO PREPETITION LENDERS; (III) AUTHORIZING USE OF CASH**
**COLLATERAL; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A**
**FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "Motion") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rules 2002-1, 4001-2, and 9014-1 of the Local Bankruptcy Rules (the "Local Rules") for the United States Bankruptcy Court for the Eastern District of Kentucky (this "Court"), *inter alia*, requesting, among other things:

(1)      authorization for the Debtors to obtain up to $10 million (the "DIP Commitment") in senior secured post-petition financing on a superpriority basis (the "DIP Facility") pursuant to (and in accordance with the terms of) that certain *Debtor In Possession Secured Muti-Draw Term Promissory Note*, by and among GenCanna Global USA, Inc., as borrower (the "Borrower"),

---

[1]    The Debtors in these chapter 11 bankruptcy cases are (with the last four digits of their federal tax identification numbers in parentheses): GenCanna Global USA, Inc. (0251); GenCanna Global, Inc. (N/A); and Hemp Kentucky LLC (2600).

GenCanna Global, Inc. and the Borrower's direct and indirect wholly owned subsidiaries, as guarantors (the "Guarantors"), MGG Investment Group LP ("MGG"), as agent (in such capacity, together with its successors and assigns in such capacity, the "DIP Agent"), and the lenders from time to time party thereto (each a "DIP Lender" and collectively, the "DIP Lenders" and, together with the DIP Agent, the "DIP Secured Parties"), on the terms and conditions substantially in the form annexed hereto as **Exhibit A** (as the same may be amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time, the "DIP Loan Agreement," and the DIP Loan Agreement, together with any other related agreements, documents, security agreements, or pledge agreements, including the Interim Order and the Final Order (each as defined below), collectively, the "DIP Loan Documents"), which DIP Facility shall be available as term loans (the "DIP Loans") to the Debtors upon entry of this interim order (the "Interim Order") and satisfaction of the other conditions set forth in the DIP Loan Documents in an initial amount not to exceed $2,750,000 (the "Initial DIP Loan"), and the remainder of the DIP Facility available upon entry of the Final Order and satisfaction of the other conditions set forth in the DIP Loan Documents;

(2)      authorization for the Borrower and the other Debtors to enter into the DIP Loan Agreement and the other DIP Loan Documents and to take such other and further acts as may be required in connection with the DIP Loan Documents;

(3)      authorization for the Debtors to pay all amounts, obligations, and liabilities owing or payable to the DIP Secured Parties pursuant to the DIP Loan Documents, including, without limitation, any principal, interest, fees, commitment fees, administrative agent fees, audit fees, closing fees, service fees, facility fees, or other fees, costs, expenses, charges, and disbursements of the DIP Secured Parties (including the reasonable and documented fees and expenses of each

of the DIP Secured Parties' attorneys, advisors, accountants and other consultants), any obligations in respect of indemnity claims, whether contingent or absolute, including, without limitation, any and all obligations in connection with any interest rate, currency swap, or other hedging agreement or arrangement, in each case, to the extent constituting obligations of any kind under the DIP Loan Documents (such obligations, the "DIP Obligations");

(4)    authorization for the Debtors, immediately upon entry of this Interim Order, to use proceeds of the Initial DIP Loan as expressly provided in the DIP Loan Documents and solely in accordance with this Interim Order and the applicable Approved Budget (as defined below) (subject to permitted variances and other exclusions set forth in the DIP Loan Documents) to: (A) pay costs, premiums, fees, and expenses related to the above-captioned cases (collectively, the "Cases") and in connection with the DIP Facility, including the fees, costs and expenses associated with the negotiation, execution and performance of the DIP Facility; and (B) provide financing for working capital and for other general corporate purposes of the Debtors, in each case in accordance with the Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents);

(5)    the grant and approval of superpriority administrative expense claim status, pursuant to sections 364(c)(1), 503(b)(1), and 507(b) of the Bankruptcy Code, to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, in respect of all DIP Obligations, subject only to the Carve-Out (as defined below);

(6)    granting the DIP Secured Parties valid, enforceable, non-avoidable, automatically and fully perfected DIP Liens (as defined below) in all DIP Collateral (as defined below), including, without limitation, all property constituting Prepetition Collateral (as defined below), including, without limitation, any Cash Collateral (as that term is defined in section 363(a) of the

Bankruptcy Code and defined below), to secure the DIP Obligations, which DIP Liens shall be subject to the relative rankings and priorities set forth herein;

(7)      authorization for the Debtors to use, among other things, solely in accordance with the Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents) and the limitations provided herein, any Cash Collateral in which any of the Prepetition Secured Parties (as defined below) may have an interest, and the granting of adequate protection solely to the extent of any postpetition diminution in the value of the Prepetition Secured Parties' respective interests in the Prepetition Collateral, including without limitation, the Cash Collateral, as a result of (i) the incurrence of the DIP Obligations, (ii) the Debtors' use of Cash Collateral as set forth in this Interim Order, (iii) the subordination of the Prepetition Obligations to the Carve-Out, (iv) any other diminution in value of the Prepetition Collateral arising from the Debtors' use, sale, or disposition of such Prepetition Collateral or the proceeds thereof, (v) the priming of the Prepetition Liens to the extent set forth herein, and (vi) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, "Diminution in Value");

(8)      the modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the other DIP Loan Documents to the extent hereinafter set forth;

(9)      subject to entry of a final order granting the relief requested in the Motion on a final basis (the "Final Order"), a waiver of the Debtors' ability to surcharge pursuant to section 506(c) of the Bankruptcy Code against any DIP Collateral or the Prepetition Collateral, and any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

20828720.1

(10)    this Court's waiver of any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order;

(11)    the scheduling of a final hearing on the Motion (the "Final Hearing") to consider entry of the Final Order granting the relief requested in the Motion on a final basis, and approving the form of notice with respect to the Final Hearing; and

(12)    granting the Debtors such other and further relief as is just and proper.

The initial hearing on the Motion having been held by this Court on February 6, 2020 (the "Interim Hearing"), and upon the record made by the Debtors at the Interim Hearing, including the Motion, the *Declaration Of James Alt In Support Of Chapter 11 Filings And First Day Motions* [Docket No. 44], the *Declaration Of Richard W. Morgner In Support Of The Debtors' Motion For Entry Of Interim And Final Orders (I) Authorizing The Debtors To (A) Obtain Postpetition Financing And (B) Utilize Cash Collateral, (II) Granting Liens And Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying The Automatic Stay, (V) Scheduling A Final Hearing, And (VI) Granting Related Relief*, and any other declarations filed in support of the relief requested herein; any exhibits in connection with the foregoing, and the filings and pleadings in these Cases, the Court having found that the interim relief requested in the Motion is fair and reasonable and is in the best interests of the Debtors, the Debtors' estates (as defined under section 541 of the Bankruptcy Code, the "Estates"), their stakeholders and other parties in interest, and represents a sound exercise of the Debtors' business judgment and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; it appearing to the Court that granting the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their Estates pending the Final Hearing; and appropriate and adequate notice of the Motion,

20828720.1

5

the interim relief requested therein, and the Interim Hearing (the "<u>Notice</u>") having been given

under the circumstances; and the Notice having been served by the Debtors in accordance with

Bankruptcy Rules 4001 and 9014 and the Local Rules on: (a) their twenty (20) largest unsecured

creditors (on a consolidated basis); (b) the DIP Agent and the DIP Lenders and their respective

counsel; (c) the Prepetition Secured Parties and their counsel; (d) the Office of the United States

Trustee for the Eastern District of Kentucky (the "<u>U.S. Trustee</u>"); (e) other known secured creditors

and their counsel (if known); (f) the local office for the Internal Revenue Service; (g) all parties

that have requested notice in these Cases pursuant to Bankruptcy Rule 2002; and (h) and all parties

entitled to notice pursuant to Local Rule 4001-2(c) (collectively, the "<u>Notice Parties</u>"); and the

opportunity provided for an interim hearing on the Motion was appropriate in connection with the

Motion and no other notice need be provided; and all objections, if any, to the relief requested in

the Motion having been withdrawn, resolved, or overruled by the Court; and after due deliberation

sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND
CONCLUSIONS OF LAW:**[2]

A.    <u>Petition Date</u>.    On January 24, 2020, Pinnacle, Inc., Crawford Sales, Inc., and

Integrity / Architecture. PLLC filed an involuntary chapter 11 petition under the Bankruptcy Code

against GenCanna Global USA, Inc. (the "<u>Alleged Debtor</u>").    On February 5, 2020, the Debtors

GenCanna Global, Inc. and Hemp Kentucky LLC filed voluntary chapter 11 petitions for relief

under the Bankruptcy Code.    On February 6, 2020 (the "<u>Order for Relief Date</u>"), the Court entered

the order for relief under chapter 11 of the Bankruptcy Code against the Alleged Debtor.    The

---

[2]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

20828720.1

Debtors have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No chapter 11 trustee or examiner has been appointed in any of the Cases.

B.    <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 9013 and 9014 and Local Rules 4001-2, 9013-1, 9013-4, and 9014-1.

C.    <u>Committee Formation</u>.  As of the date hereof, no official committee of unsecured creditors under section 1102 of the Bankruptcy Code (the "<u>Committee</u>") or any other statutory committee has been appointed in the Cases.

D.    <u>Notice</u>.  The Notice was given in the manner described in the Motion.  Under the circumstances, the Notice given by the Debtors of the Motion, the Interim Hearing, and the relief granted under this Interim Order constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 4001 and the Local Rules.

E.    <u>Parties' Acknowledgments, Agreements and Stipulations</u>.  In requesting the DIP Facility and use of Cash Collateral, and in exchange for and as a material inducement to the DIP Lenders and the Prepetition Secured Parties to agree to provide, or consent to, the DIP Facility, the use of Cash Collateral, and subordination of the Prepetition Liens to the Carve-Out and the DIP Liens, and as a condition to providing financing under the DIP Facility and consenting to the use of Cash Collateral, subject to the rights of the parties-in-interest (other than the Debtors) set

forth in Section 4.10, the Debtors permanently and irrevocably admit, stipulate, acknowledge, and agree, as follows:

(i)      Prepetition Facility.    GenCanna Global, Inc. (the "Parent"), GenCanna Global USA, Inc. ("GenCanna USA"), each subsidiary of the Parent listed as a "Borrower" on the signature pages thereto (together with GenCanna USA and each other Person (as defined in the Prepetition Credit Agreement (as defined below)) that has executed a joinder agreement and became a "Borrower" thereunder, each a "Prepetition Borrower" and collectively, the "Prepetition Borrowers"), each subsidiary of the Parent listed as a "Guarantor" on the signature pages thereto (together with the Parent and each other Person that has executed a joinder agreement and became a "Guarantor" thereunder, each a "Prepetition Guarantor" and collectively, the "Prepetition Guarantors" and, together with the Prepetition Borrowers, collectively, the "Prepetition Obligors"), the lenders from time to time party thereto (collectively, the "Prepetition Lenders"), MGG, as collateral agent for the Prepetition Lenders (in such capacity, together with its successors and assigns in such capacity, the "Prepetition Collateral Agent"), and MGG, as administrative agent for the Prepetition Lenders (in such capacity, together with its successors and assigns in such capacity, the "Prepetition Administrative Agent" and, together with the Prepetition Collateral Agent, each a "Prepetition Agent" and collectively, the "Prepetition Agents" and, the Prepetition Agents together with the Prepetition Lenders, collectively, the "Prepetition Secured Parties") are parties to the Financing Agreement, dated as of June 24, 2019 (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "Prepetition Credit Agreement" and together with all other agreements, documents, and instruments executed and/or delivered with, to or in favor of the Prepetition Secured Parties, including, without limitation, all security agreements, pledge agreements, notes, guarantees, mortgages, Uniform Commercial Code financing

statements, documents, and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, the "Prepetition Loan Documents"). Prior to and after the Order for Relief Date, including as of the date hereof, the Prepetition Obligors were and remain in default under the Prepetition Loan Documents. Pursuant to the Prepetition Loan Documents, the Prepetition Secured Parties provided the Prepetition Obligors with term loan facilities in an aggregate principal amount of approximately $69,031,125.12 (the "Prepetition Facility"). As of the Order for Relief Date, approximately $69,031,125.12 in principal amount was outstanding under the Prepetition Facility, plus interest accrued and accruing at the rates set forth in the Prepetition Credit Agreement (together with any other amounts outstanding under the Prepetition Facility as provided in the Prepetition Credit Agreement, including interest, fees, costs, expenses, penalties, premiums, indemnities and other charges owed and owing under or in connection with the Prepetition Loan Documents, collectively, the "Prepetition Obligations"). The Prepetition Facility and the Prepetition Obligations are secured by first priority security interests in and liens on all or substantially all of the property and assets (other than real property) of the Prepetition Obligors, including, without limitation, all (a) personal property, (b) Accounts, (c) Chattel Paper (whether tangible or electronic), (d) Commercial Tort Claims, (e) Deposit Accounts, all cash, and all other property from time to time deposited therein or otherwise credited thereto and the monies and property in the possession or under the control of the Prepetition Collateral Agent or any Prepetition Lender or any affiliate, representative, agent or participant of the Prepetition Collateral Agent or any Prepetition Lender, (f) Documents, (g) General Intangibles (including, without limitation, all Payment Intangibles, Intellectual Property and Licenses), (h) Goods, including, without limitation, all Equipment, Fixtures and Inventory, (i) Instruments (including, without limitation, Promissory Notes), (j) Investment Property, (k) Letter-of-Credit Rights, (l) Pledged

Interests, (m) Supporting Obligations, (n) Additional Collateral, (o) all other tangible and intangible personal property and Fixtures, (p) other property of the Prepetition Obligors, and (q) Proceeds, including Cash Proceeds and Noncash Proceeds, and products of any and all of the foregoing (other than property expressly excluded from Collateral in the Prepetition Loan Documents) (collectively, the "Prepetition Collateral") (such liens and security interests, the "Prepetition Liens").[3]

(ii)    Prepetition Obligations.    The Prepetition Obligations owing to the Prepetition Secured Parties constitute legal, valid, and binding obligations of the Prepetition Obligors and their applicable affiliates, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of the Prepetition Obligations owing to the Prepetition Secured Parties is subject to avoidance, recharacterization, reduction, set-off, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery, subordination, or any other challenges pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity.

(iii)    Prepetition Collateral.    To secure the Prepetition Obligations, the Prepetition Obligors entered into certain guaranty and collateral agreements and certain other security documents governing the Prepetition Secured Parties' respective security interests in the Prepetition Collateral (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition Collateral Documents").  Pursuant to the Prepetition Collateral Documents, and on the terms set forth therein, the Prepetition Obligors granted to the Prepetition Secured Parties the Prepetition Liens on the Prepetition Collateral.

---

[3]    Capitalized terms used in this clause E.(i) but not otherwise defined in this Interim Order shall have the meanings ascribed to such terms in the applicable Prepetition Loan Documents.

(iv)    <u>Prepetition Liens</u>.  The Prepetition Liens granted to the Prepetition Secured Parties constitute legal, valid, binding, non-avoidable, enforceable (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and perfected security interests in and liens on the Prepetition Collateral, were granted to, or for the benefit of, the Prepetition Secured Parties for fair consideration and reasonably equivalent value, and are not subject to defense, counterclaim, recharacterization, subordination, avoidance, or recovery pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity.

(v)    <u>No Challenges/Claims</u>.  No offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Obligations exist, and no portion of the Prepetition Liens or Prepetition Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law.  The Debtors and their Estates have no valid Claims (as such term is defined in section 101(5) of the Bankruptcy Code) objections, challenges, causes of action, and/or choses in action against any of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees with respect to the Prepetition Loan Documents, the Prepetition Obligations, the Prepetition Liens, or otherwise, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents.  The Prepetition Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(vi)    <u>Indemnity</u>.  The DIP Agent, the DIP Lenders, and the Prepetition Secured Parties have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens (each as defined below), any challenges or objections to the DIP Facility or the use of Cash Collateral, and all documents related to any and all transactions contemplated by the foregoing.  Accordingly, the Prepetition Secured Parties, the DIP Agent, and the DIP Lenders shall be and hereby are indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto, *provided* that no such parties will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence or willful misconduct.  No exception or defense exists in contract, law, or equity as to any obligation set forth, as the case may be, in this paragraph E(vi), in the Prepetition Loan Documents, or in the DIP Loan Documents, to the Debtors' obligation to indemnify and/or hold harmless the Prepetition Secured Parties, the DIP Agent, or the DIP Lenders, as the case may be.

(vii)    <u>Sale and Credit Bidding</u>.  The Debtors and the Prepetition Obligors admit, stipulate, acknowledge, and agree that, in connection with any sale process authorized by the Court, (i) the DIP Agent and the DIP Lenders and (ii) subject to the entry of a Final Order and to the rights preserved in Section 4.14, the Prepetition Secured Parties, or any assignee or designee of the foregoing, shall have the right to credit bid for the entirety of (or any portion of) of Prepetition Collateral pursuant to section 363(k) of the Bankruptcy Code.

20828720.1

(viii)  <u>Release</u>.  Subject to Section 4.14, each of the Debtors, their Estates, the Borrower, the Guarantors, and the Prepetition Obligors, on their own behalf and on behalf of each of their past, present, and future predecessors, successors, heirs, subsidiaries, and assigns, hereby forever, unconditionally, permanently, and irrevocably release, discharge, and acquit each of the Prepetition Secured Parties, and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "<u>Released Parties</u>") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, attorneys' fees), debts, liens, actions, and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether known or unknown, matured or contingent, arising under, in connection with, or relating to the Prepetition Obligations or the Prepetition Loan Documents, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code, and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether arising at law or in equity, including any recharacterization, recoupment, subordination, avoidance, or other claim or cause of action arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law, including, without limitation, any right to assert any disgorgement or recovery, in each case, with respect to the extent, amount, validity, enforceability, priority, security, and perfection of any of the Prepetition Obligations, the

Prepetition Loan Documents, or the Prepetition Liens, and further waive and release any defense, right of counterclaim, right of setoff, or deduction to the payment of the Prepetition Obligations that the Debtors now have or may claim to have against the Released Parties, arising under, in connection with, based upon, or related to any and all acts, omissions, conduct undertaken, or events occurring prior to entry of this Interim Order.

(ix)    Cash Collateral.    All of the cash and cash equivalents of the Debtors, wherever located, including all cash in deposit accounts, constitute "cash collateral" (within the meaning of section 363(a) of the Bankruptcy Code; "Cash Collateral") of the Prepetition Secured Parties.

F.    Findings Regarding the Postpetition Financing and Use of Cash Collateral.

(i)    Postpetition Financing.    The Debtors have requested from each of the DIP Secured Parties, and the DIP Secured Parties are willing, subject to the terms of this Interim Order and satisfaction of the conditions set forth in the DIP Loan Agreement, to extend the DIP Loans on the terms and conditions set forth in this Interim Order and the other DIP Loan Documents, respectively.

(ii)    Need for Postpetition Financing and the Use of Cash Collateral.    The Debtors have an immediate and critical need to use Cash Collateral on an interim basis and to obtain credit on an interim basis pursuant to the DIP Facility in order to, among other things, maintain, administer and preserve their businesses and maximize the value of their assets.  Without the ability of the Debtors to obtain sufficient working capital and liquidity through the proposed postpetition financing arrangements with the DIP Secured Parties and the use of Cash Collateral, the Debtors, their Estates, and parties-in-interest would be immediately and irreparably harmed. Accordingly, the Debtors have an immediate need to obtain the postpetition financing and to use

20828720.1

14

Cash Collateral to, among other things, minimize the disruption of their business operations and preserve and maximize the value of the assets of the Debtors' Estates to maximize the recovery to all creditors of the Estates.

(iii)    <u>No Credit Available on More Favorable Terms</u>.  The Debtors are unable to procure financing in the form of unsecured credit allowable as an administrative expense under sections 364(a), 364(b), or 503(b)(1) of the Bankruptcy Code or in exchange for the grant of a superpriority administrative expense, or liens on property of the Estates not subject to a lien pursuant to sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code.  The Debtors assert in the Motion and the First Day Declaration, and have demonstrated at the Interim Hearing, that they have been unable to procure the necessary financing on terms more favorable, taken as a whole, than the financing offered by the DIP Secured Parties pursuant to the DIP Loan Documents. In light of the foregoing, and considering all alternatives, the Debtors have reasonably and properly concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to the Debtors at this time, and is in the best interests of the Debtors, their Estates, and all of their stakeholders.

(iv)    <u>Findings Regarding the Budget</u>.  The Debtors have prepared and delivered to the DIP Secured Parties a detailed initial budget that reflects, among other things, the Debtors' anticipated cash receipts and anticipated disbursements for each calendar week commencing with the week ending February 7, 2020 through and including the week ending May 1, 2020 (the "<u>Initial Budget Period</u>").  The Debtors believe that the Initial Budget (as defined below) is reasonable under the facts and circumstances.  The DIP Secured Parties and the Prepetition Secured Parties are relying upon the Debtors' agreement to comply with the Initial Budget and any other Approved Budget (as defined below), and the terms of this Interim Order and the other DIP Loan Documents,

in determining to enter into the postpetition financing arrangements provided for herein and to consent to the Debtors' use of Cash Collateral.

(v)     Certain Conditions to DIP Facility.  The DIP Lenders' willingness to make the DIP Loans is conditioned upon, among other things:  (a) the Debtors obtaining Court approval to enter into the DIP Loan Documents and to incur all of the obligations thereunder, and to confer upon the DIP Secured Parties all applicable rights, powers, and remedies thereunder in each case as modified by this Interim Order; (b) the provision of adequate protection of the Prepetition Secured Parties' interests in the Prepetition Collateral pursuant to sections 361, 363, and 364 of the Bankruptcy Code; (c) the DIP Secured Parties being granted, as security for the prompt payment of the DIP Facility and all other obligations of the Debtors under the DIP Loan Documents, subject to the Carve-Out and the priorities described herein, superpriority perfected security interests in and liens upon all property and assets (and interests in property and assets) of the Debtors and the Estates of any kind or nature, now existing or hereafter acquired, arising or created, and wherever located, including, without limitation, valid and perfected security interests in and liens upon all of the now existing or hereafter arising or acquired assets and property constituting DIP Collateral.  As used in this Interim Order, "DIP Collateral" shall include all Prepetition Collateral and all other prepetition and post-petition property, assets, and interests in property and assets of the Debtors and their respective estates, of any kind or nature, now existing or hereafter acquired, arising or created, and wherever located, including, without limitation, all real and personal property, tangible, intangible and/or mixed property, accounts, goods (including inventory and equipment), documents (including, if applicable, electronic documents), fixtures, instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), equity interests,

securities, all other investment property, commercial tort claims, general intangibles (including all

payment intangibles), the Debtors' rights and interests under any permits or licenses issued by any

governmental entity (to the fullest extent allowed under applicable state and/or local law), money,

deposit accounts (and all amounts on deposit therein from time to time), patents, trademarks, other

intellectual property, licenses of any intellectual property, any other contract rights or rights to the

payment of money, books and records, all supporting obligations, any insurance, indemnity,

warranty or guaranty payable to any of the Debtors from time to time, any claims and causes of

action of the Debtors (other than Avoidance Actions (as defined below) but, subject to entry of the

Final Order, the proceeds (the "Avoidance Proceeds") of any claim or cause of action arising under

or pursuant to chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable

state, federal, or foreign law (including any other avoidance actions under the Bankruptcy Code)

(collectively, the "Avoidance Actions")), and all proceeds, rents, products, accessions to,

replacements for and substitutions of any of the foregoing.

      (vi)   Business Judgment and Good Faith Pursuant to Section 364(e).  Any credit

extended, loans made, and other financial accommodations extended to the Debtors by the DIP

Secured Parties, including, without limitation, pursuant to this Interim Order, have been extended,

issued, or made, as the case may be, in "good faith" within the meaning of section 364(e) of the

Bankruptcy Code and in express reliance upon the protections offered by Bankruptcy Code section

364(e), and the DIP Facility, the DIP Liens, and the DIP Superpriority Claim (as defined below)

shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this

Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise.

      G.   Adequate Protection.  The Prepetition Secured Parties are entitled, pursuant,

sections 361, 362, 363, and 364 of the Bankruptcy Code, to receive adequate protection against

any Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral).

H.    Sections 506(c) and 552(b).  The Debtors have agreed, as a condition to obtaining financing under the DIP Facility and the use of Cash Collateral, that as a material inducement to the DIP Secured Parties to agree to provide the DIP Facility and the Prepetition Secured Parties' consent to the use of Cash Collateral, and in exchange for (a) the DIP Secured Parties' willingness to provide the DIP Facility to the extent set forth herein, (b) the DIP Secured Parties' and the Prepetition Secured Parties' agreement to subordinate their liens and superpriority claims to the Carve-Out, and (c) the consensual use of Cash Collateral consistent with the Approved Budget, the terms of the DIP Loan Agreement, and the terms of this Interim Order, subject to entry of the Final Order, each of the DIP Secured Parties and the Prepetition Secured Parties are entitled to receive (1) a waiver of any equities of the case exceptions or claims under section 552(b) of the Bankruptcy Code and a waiver of unjust enrichment and similar equitable relief as set forth below, and (2) a waiver of the provisions of section 506(c) of the Bankruptcy Code.

I.    Good Cause.  Good cause has been shown for the entry of this Interim Order.  The relief requested in the Motion is necessary, essential, and appropriate and is in the best interest of and will benefit the Debtors, their creditors, and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (1) minimize disruption to the Debtors' remaining operating businesses and on-going operations, (2) preserve and maximize the value of the Debtors' Estates for the benefit of all the Debtors' creditors, and (3) avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets.  The terms of the DIP Facility are fair and reasonable, reflect each Debtor's exercise of its business judgment, and are supported by reasonably equivalent value and fair consideration.  The

DIP Facility is the product of reasonable, arm's length, good faith negotiations between the Debtors and the DIP Secured Parties.

J.    <u>Immediate Entry</u>.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).  Any objections that were made (to the extent such objections have not been withdrawn, waived, resolved, or settled) are hereby overruled on the merits.

K.    <u>Interim Hearing</u>.  Notice of the Interim Hearing and the relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to the Notice Parties.  The Debtors have made reasonable efforts to afford the best notice possible under the circumstances and no other notice is required for the relief to be granted in this Interim Order.

Based upon the foregoing, and upon the record made before the Court at the Interim Hearing, and after due consideration and good cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

Section 1.    <u>Motion Approval</u>

1.1    <u>Interim Approval of Motion</u>.  The Motion is granted to the extent provided in this Interim Order.  Any objections to the entry of this Interim Order that have not been withdrawn, waived, resolved, or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.

Section 2.    <u>DIP Facility Authorization</u>

2.1    <u>Authorization of DIP Facility</u>.

(a)    The Debtors are hereby authorized and empowered to immediately execute and deliver the DIP Loan Documents and to incur and perform the DIP Obligations, pursuant to the terms and conditions of the DIP Loan Agreement and this Interim Order, in an

20828720.1

aggregate principal amount prior to the entry of a Final Order not to exceed $2,750,000.  DIP

Loans under the DIP Loan Documents up to the amount of the Initial DIP Loan shall be made upon

entry of this Interim Order and satisfaction of all other conditions set forth in the DIP Loan

Documents.

(b)    The Debtors are hereby authorized to (i) borrow under the DIP

Facility during the Interim Financing Period (as defined below) in accordance with, and for the

purposes permitted by, the DIP Loan Documents, the Interim Order and the Approved Budget and

(ii) pay all interest, costs, fees, and other amounts and obligations accrued or accruing under the

DIP Loan Agreement and other DIP Loan Documents, all pursuant to the terms and conditions of

this Interim Order, the  DIP Loan Agreement, and the other DIP Loan Documents, in each case

during the period commencing on the date of this Interim Order through and including the earlier

to occur of (x) entry of the Final Order and (y) a DIP Termination Event (as defined herein)

(the "Interim Financing Period").  The Initial Budget is hereby approved in all respects.  The

Debtors shall use the proceeds of the DIP Facility solely in a manner consistent with the Approved

Budget and the terms and conditions of the DIP Loan Documents and this Interim Order.

2.2    Financing Documents.

(a)    Authorization.  The Debtors are hereby authorized and directed to

enter into, execute, deliver, and perform all obligations under the DIP Loan Documents.  No

obligation, payment, transfer, or grant of security hereunder or under the DIP Loan Documents

shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under

any applicable state, federal, or foreign law (including, without limitation, under chapter 5 of the

Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform

Fraudulent Conveyance Act, or similar statute or common law), or be subject to any defense,

reduction, setoff, counterclaim, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise), cross-claims, or any other challenge under the Bankruptcy Code or any applicable law, rule, or regulation by any person or entity.

(b)    <u>Approval; Evidence of Borrowing Arrangements</u>.    All terms, conditions, and covenants set forth in the DIP Loan Documents (including, without limitation, the DIP Loan Agreement) are approved.  All such terms, conditions, and covenants shall be sufficient and conclusive evidence of (i) the borrowing arrangements by and among the Debtors, the DIP Agent, and the DIP Lenders, and (ii) each Debtor's assumption and adoption of, and agreement to comply with, all the terms, conditions, and covenants of the DIP Loan Agreement and the other DIP Loan Documents for all purposes, including, without limitation, to the extent applicable, the payment of all DIP Obligations arising thereunder, including, without limitation, all principal, interest, fees, and other expenses, including, without limitation, all of the DIP Agent's and DIP Lender's closing, arranger, and administrative fees, consultant fees, professional fees, attorney's fees and legal expenses, as more fully set forth in the DIP Loan Documents.  Upon effectiveness thereof, the DIP Loan Documents shall evidence the DIP Obligations, which DIP Loan Documents and DIP Obligations shall be valid, binding, and enforceable against the Debtors, their Estates, and any successors thereto, including, without limitation, any trustee appointed in any of these Cases or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of these Cases (collectively, the "<u>Successor Cases</u>"), and their creditors and other parties-in-interest, in each case, in accordance with the terms of this Interim Order and the DIP Loan Documents.

(c)    <u>Payment of DIP Fees and Other Expenses</u>.  Any and all fees and expenses payable pursuant to the DIP Loan Documents (collectively, any and all such fees and expenses, the "<u>DIP Fees</u>") are hereby approved and the Debtors are hereby authorized and directed

to pay, currently in cash or as otherwise provided on the DIP Loan Documents, all reasonable and documented out-of-pocket costs, disbursements, and expenses of the DIP Agent and the DIP Lenders incurred at any time, as provided by the DIP Loan Documents and this Interim Order in accordance with Section 4.13 hereof.  The DIP Fees shall not be subject to any offset, defense, claim, counterclaim, or diminution of any type, kind, or nature whatsoever.

   2.3 <u>Indemnification</u>. The Debtors are authorized to indemnify and hold harmless the DIP Agent, each DIP Lender, and, solely in their capacities as such, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (each, an "<u>Indemnified Party</u>"), in accordance with, and subject to, the DIP Loan Documents, which indemnification is hereby authorized and approved.

   2.4 <u>Postpetition Liens</u>.

   (a) **<u>Postpetition DIP Lien Granting</u>.** To secure performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of any and all DIP Obligations of the Debtors to the DIP Secured Parties of whatever kind, nature, or description, whether absolute or contingent, now existing or hereafter arising, the DIP Agent, for the benefit of itself and the DIP Lenders, shall have and is hereby granted, effective as of the Order for Relief Date, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens (collectively, the "<u>DIP Liens</u>") upon all DIP Collateral, subject to the rankings and priorities set forth in Section 2.4(b) below.

(b)    **DIP Lien Priority in DIP Collateral.**    Subject to the Carve-Out, the DIP Liens securing the DIP Obligations shall be, (a) pursuant to section 364(c)(2) of the Bankruptcy Code, first and senior in priority to all other interests in (including security interests) and liens on DIP Collateral that was not encumbered by a valid, enforceable, properly perfected and non-avoidable lien as of the Order for Relief Date; and (b) pursuant to sections 364(c)(3) and 364(d) of the Bankruptcy Code, priming liens on and security interests in all other DIP Collateral, which liens and security interests shall be:  (x) junior only to the pre-existing liens on and security interests in such DIP Collateral (other than liens and security interests granted to any Prepetition Secured Party) that, as of the Order for Relief Date, were in existence, valid, enforceable, properly perfected, non-avoidable and senior in priority to the liens and security interests granted to any of the Prepetition Secured Parties or were in existence, valid, enforceable and non-avoidable as of, but perfected after, the Order for Relief Date to the extent permitted by section 546(b) of the Bankruptcy Code (such liens and security interests in this clause (x), the "Permitted Prior Liens"); and (y) senior to all other liens on and security interests in the DIP Collateral, including the Adequate Protection Liens (as defined below) and Prepetition Liens.

2.5    Superpriority Administrative Expenses.    Subject to the Carve-Out, the DIP Agent, for the benefit of itself and the DIP Lenders, shall have and is hereby granted, effective as of the Order for Relief Date, an allowed superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code against each of the Debtors (jointly and severally), with priority over any and all obligations, liabilities and indebtedness of the Debtors, and over any and all administrative expenses and other claims against the Debtors, in each case, whether now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses or other claims of the kind specified in, ordered pursuant to or arising

20828720.1

under, *inter alia*, sections 105, 326, 328, 330, 331, 363, 364, 365, 503, 506, 507, 507, 546, 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed superpriority administrative claim shall be (x) for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, considered an administrative expense allowed under section 503(b) of the Bankruptcy Code and (y) payable from and have recourse to all prepetition and postpetition property, whether existing as of the Order for Relief Date or thereafter acquired, of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, proceeds of Avoidance Actions) (such superpriority administrative expense claim, the "<u>DIP Superpriority Claim</u>").

Section 3.    <u>Prepetition Secured Lenders' Adequate Protection.</u>

3.1    <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this Interim Order and in accordance with the Approved Budget, the Debtors are authorized to use Cash Collateral net of the adequate protection payments to the Prepetition Secured Parties provided for in Section 3.3 below until the occurrence of a DIP Termination Event; *provided*, *however*, that during the Remedies Notice Period (as defined herein) the Debtors may use Cash Collateral solely to meet payroll obligations and pay expenses critical to the administration of the Debtors' Estates strictly in accordance with the Approved Budget, and as otherwise agreed by the DIP Agent in its sole discretion.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their Estates outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order (including the Carve-Out), and in accordance with the Approved Budget.

3.2    <u>Adequate Protection Liens and Superpriority Claims</u>.  The Prepetition Secured Parties are entitled, pursuant to sections 361, 363(e), and 364(d)(1) of the Bankruptcy

Code and *nunc pro tunc* to the Order for Relief Date, to adequate protection of their respective interests in the Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate Diminution in Value of the Prepetition Secured Parties' respective interests in the Prepetition Collateral from and after the Order for Relief Date.  On account of such adequate protection, the Prepetition Secured Parties are hereby granted the following, in each case, subject to the Carve-Out, the DIP Obligations, the DIP Liens and the DIP Superpriority Claim (collectively, the "Adequate Protection"):

(a)  Adequate Protection Liens.  The Prepetition Secured Parties are hereby granted (effective and perfected as of the Order for Relief Date and without the necessity of any Perfection Act (as defined below)) valid and perfected postpetition replacement security interests in and liens upon the DIP Collateral (the "Adequate Protection Liens"), which liens shall be:  (i) subject and subordinate to the Carve-Out, the DIP Liens, DIP Obligations and the Permitted Prior Liens; and (ii) senior to all other security interests in and liens upon the DIP Collateral, whether now existing or hereafter arising or acquired, including the Prepetition Liens.

(b)  Adequate Protection Superpriority Claim.  Subject and subordinate to the Carve-Out, the DIP Obligations and the DIP Superpriority Claim, the Prepetition Secured Parties are hereby granted allowed superpriority administrative expense claims pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code (the "Adequate Protection Superpriority Claim"), which Adequate Protection Superpriority Claim shall be an allowed claim against each of the Debtors (jointly and severally), with priority (except as otherwise provided herein) over any and all administrative expenses and all other claims against the Debtors, whether now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses or other claims of the kind specified in, ordered pursuant to or arising

under, *inter alia*, sections 105, 326, 328, 330, 331, 363, 364, 365, 503, 507, 507, 546(c), 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment. The Adequate Protection Superpriority Claim shall be (x) for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, considered an administrative expense allowed under section 503(b) of the Bankruptcy Code and (y) payable from and have recourse to all prepetition and postpetition property, in each case, subject to the Carve-Out, the DIP Obligations and the DIP Superpriority Claim.

3.3    Fees and Expenses. The Prepetition Secured Parties shall be entitled to add to Prepetition Obligations, all reasonable and documented fees and out-of-pocket expenses incurred by such Prepetition Secured Parties that are required to be paid by the Debtors under the Prepetition Loan Documents, and allowed in accordance with Section 4.18 below, including the reasonable and documented fees and out-of-pocket expenses of Schulte Roth & Zabel LLP ("SRZ") and Fowler Bell PLLC ("Fowler") as counsel to the Prepetition Secured Parties.

Section 4.    Provisions Common to DIP Facility and Use of Cash Collateral

4.1    Postpetition Lien Perfection.

(a)    This Interim Order shall be sufficient and conclusive evidence of the priority, perfection, and validity of the DIP Liens, the Prepetition Liens, Adequate Protection Liens, and the other security interests granted herein, effective as of the Order for Relief Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien, including, without limitation, control agreements with any financial institution(s) party to a Control Agreement or other depository account consisting of DIP Collateral, or requirement to register liens on any certificates of title (a "Perfection Act"). Notwithstanding the foregoing, if the DIP Agent or the Prepetition Agent, as

20828720.1

applicable, shall, in its sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, then the DIP Agent or the Prepetition Agent, as applicable, is authorized to perform such act, and the Debtors are authorized and directed to perform such act to the extent necessary or required by the DIP Loan Documents, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Interim Order notwithstanding the date and time actually accomplished, and, in such event, the subject filing or recording office is authorized to accept, file, or record any document in regard to such act in accordance with applicable law. The DIP Agent or the Prepetition Agent, as applicable, may choose to file, record, or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, or record such certified copy of this Interim Order in accordance with applicable law.  Should the DIP Agent or the Prepetition Agent, as applicable, so choose and attempt to file, record, or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, priority, or perfection of the postpetition liens and security interests granted herein by virtue of the entry of this Interim Order.

(b)     To the extent that any applicable non-bankruptcy law otherwise would restrict the granting, scope, enforceability, attachment, or perfection of any liens and security interests granted and created by this Interim Order (including the DIP Liens and the Adequate Protection Liens) or otherwise would impose filing or registration requirements with respect to such liens and security interests, such law is hereby pre-empted to the maximum extent permitted by the Bankruptcy Code, applicable federal or foreign law, and the judicial power and authority of this Court; *provided*, *however*, that nothing herein shall excuse the Debtors from

20828720.1

payment of any local fees, if any, required in connection with such liens. By virtue of the terms

of this Interim Order, to the extent that the DIP Agent or the Prepetition Agent, as applicable, has

filed Uniform Commercial Code financing statements, mortgages, deeds of trust, or other security

or perfection documents under the names of any of the Debtors (including all Guarantors), such

filings shall be deemed to properly perfect its liens and security interests granted and confirmed

by this Interim Order without further action by the DIP Agent or the Prepetition Agent, as

applicable.

(c)    Except as provided in section 4.10 herein, the DIP Liens, the DIP

Superpriority Claim, the Adequate Protection Liens, and the Adequate Protection Superpriority

Claim (i) shall not be made subject to or *pari passu* with (A) any lien, security interest, or claim

heretofore or hereinafter granted in any of these Cases or any Successor Cases and shall be valid

and enforceable against the Debtors, their Estates, any trustee, or any other estate representative

appointed or elected in these Cases or any Successor Cases and/or upon the dismissal of any of

these Cases or any Successor Cases; (B) any lien that is avoided and preserved for the benefit of

the Debtors and their Estates under section 551 of the Bankruptcy Code or otherwise; and (C) any

intercompany or affiliate lien or claim; and (ii) shall not be subject to sections 510, 549, 550, or

551 of the Bankruptcy Code.

4.2    <u>Amendments to DIP Loan Documents</u>. Subject to the terms and conditions

of the applicable DIP Loan Documents, the Debtors and the applicable DIP Secured Parties may

make amendments, modifications, or supplements to any DIP Loan Document, and the DIP Agent

and the DIP Lenders may waive any provisions in the DIP Loan Documents, without further

approval of the Court; *provided* that any amendments, modifications, or supplements to any DIP

Loan Documents that operate to increase the aggregate commitments, the rate of interest payable

thereunder, or existing fees or add new fees thereunder (excluding, for the avoidance of doubt, any amendment, consent or waiver fee) other than as currently provided in the DIP Loan Documents (collectively, the "Material DIP Amendments"), shall be filed with the Court, and the Debtors shall provide prior written notice of the Material DIP Amendment to (i) counsel to the Prepetition Agent, (ii) counsel to the Committee, or, in the event no such Committee is appointed at the time of such Material DIP Amendment, the Debtors' 20 largest unsecured creditors, and (iii) the U.S. Trustee; *provided, further*, that the consent of the foregoing parties will not be necessary to effectuate any such amendment, modification or supplement, except that any Material DIP Amendment subject to a timely and unresolved objection must be approved by the Court.  For the avoidance of doubt, the Debtors must receive written consent as to any Material DIP Amendment (i) from the DIP Secured Parties prior to filing notice thereof with the Court and (ii) from the Prepetition Agent, on behalf of the Prepetition Lenders, as applicable, for any amendment, modification, supplement, or waiver that materially adversely affects any rights of applicable Prepetition Secured Parties hereunder or the treatment of the applicable Prepetition Obligations hereunder.

    4.3    Sale Milestones.  The Debtors shall pursue the sale of all or substantially all of the Debtors' assets in accordance with section 363 of the Bankruptcy Code and the following milestones (the "Sale Milestones"):

    (a)    not later than February 18, 2020, the Debtors shall file a motion (together with all exhibits, annexes and related documents, the "Sale Motion"), which Sale Motion shall be in form and substance acceptable to the DIP Agent in its sole discretion, seeking entry of orders (x) establishing bidding procedures (the "Bid Procedures") for the sale(s) of all or substantially all of the Debtors' assets (such order, together with all exhibits, annexes and related documents, the "Bid Procedures Order"), which Bid Procedures Order shall be in form and substance acceptable to the DIP Agent in its sole discretion, and (y) approving the sale(s) of all or substantially all the assets of the Debtors (any such order, together with all exhibits, annexes and related

20828720.1

documents, the "Sale Order"), which Sale Order shall be in form and substance acceptable to the DIP Agent in its sole discretion;

(b)   not later than February 24, 2020, Debtors shall have received one or more letters of intent from potential bidders, each in form and substance acceptable to the DIP Agent in its sole discretion;

(c)   not later than March 11, 2020, the hearing on the Sale Motion as it relates to the approval of the Bid Procedures and entry of the Bid Procedures Order shall be held;

(d)   not later than March 13, 2020, Debtors shall obtain entry of the Bid Procedures Order in form and substance acceptable to the DIP Agent in its sole discretion;

(e)   not later than April 17, 2020, Debtors shall have received one or more Qualified Bid(s) (as defined in the Bid Procedures), each in form and substance acceptable to the DIP Agent in its sole discretion;

(f)   to the extent required under the Bid Procedures Order and more than one Qualified Bid is received by the Bid Deadline (as defined in the Bid Procedures), not later than April 20, 2020, the Debtors shall commence an auction in accordance with the Bid Procedures Order, and after consultation with and approval by the DIP Agent, select the successful bid(s);

(g)   not later than April 23, 2020, the hearing on the Sale Motion as it relates to the approval of the sale(s) of all or substantially all of the Debtors' assets and entry of the Sale Order shall be held;

(h)   not later than April 24, 2020, the Debtors shall obtain entry of the Sale Order, in form and substance acceptable to the DIP Agent in its sole discretion, which Sale Order, among other things, (x) authorizes the sale(s) of the Debtors' assets free and clear of all liens, claims and interests (other than those expressly preserved in the Sale Order) and (y) contains the "good faith" protections pursuant to Bankruptcy Code section 363(m) (the "Approved Sale(s)"); and

(i)   not later than May 1, 2020, the Approved Sale(s) shall have been consummated.

4.4    Events of Default.  The occurrence of (i) any "Event of Default" as that term is defined in the DIP Loan Agreement; (ii) any failure to meet or satisfy any Milestone (as defined in the DIP Loan Agreement), including any of the Sale Milestones in accordance with the DIP

Loan Documents; (iii) the Maturity Date (as defined in and under the DIP Loan Agreement); or (iv) any violation, breach, or default by any Debtor with respect to any of its obligations under this Interim Order, shall constitute a "DIP Termination Event" hereunder unless waived in writing by the DIP Secured Parties.

4.5     Rights and Remedies upon a DIP Termination Event.  During the period covered by this Interim Order, after five (5) calendar days following the delivery of a written notice of the occurrence of and during the continuance of a DIP Termination Event (the "Remedies Notice Period"), (a) the DIP Agent shall be entitled to independently take any act or exercise any right or remedy as provided in this Interim Order or any other DIP Loan Document, as applicable, including, without limitation, (i) declare all DIP Obligations owing under the DIP Loan Documents to be immediately due and payable; (ii) terminate, reduce, or restrict any commitment to extend additional credit to the Debtors to the extent any such commitment remains; (iii) terminate the DIP Facility and any DIP Loan Document as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; (iv) invoke the right to charge interest at the default rate under the DIP Loan Documents; and/or (v) stop lending and (b) the Prepetition Agent shall be entitled to independently take any act or exercise any right or remedy provided in this Interim Order, including, without limitation, to terminate and/or revoke the Debtors' right, if any, under this Interim Order to use any Cash Collateral and all authority to use Cash Collateral shall cease.  For the avoidance of doubt, during the Remedies Notice Period the DIP Agent and DIP Lenders shall have no obligation to make DIP Loans to the extent the conditions to borrowing set forth in the DIP Loan Documents are not satisfied.

4.6    Debtors' Waivers.

(a)    Prior to the payment in full of all Prepetition Obligations and all DIP Obligations, any request by the Debtors with respect to the following shall also constitute a DIP Termination Event:  (i) to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code that does not provide for the repayment in full of the DIP Obligations, other than as provided in this Interim Order or as may be otherwise permitted pursuant to the DIP Loan Documents; (ii) to challenge the application of any payments authorized by this Interim Order pursuant to section 506(b) of the Bankruptcy Code; (iii) to propose or support any challenge by any party in interest to seek to limit or prevent the DIP Lenders or the Prepetition Secured Parties from exercising their credit bid rights in connection with the sale of any assets of the Debtors; or (iv) to seek relief under the Bankruptcy Code, including, without limitation, under section 105 of the Bankruptcy Code, to the extent any such relief would restrict or impair (A) the rights and remedies of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties against the Debtors as provided in this Interim Order or any of the DIP Loan Documents or (B) the exercise of such rights or remedies by the DIP Agent, the DIP Lenders or the Prepetition Secured Parties against the Debtors in accordance with the DIP Loan Agreement or this Interim Order; *provided*, *however*, that the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, as applicable, may otherwise consent in writing, but no such consent shall be implied from any other action, inaction, or acquiescence by DIP Agent, any DIP Lender or any of the Prepetition Secured Parties.

(b)    It shall also be a DIP Termination Event under the DIP Facility if, prior to the payment in full of the DIP Facility, the Debtors propose or support any chapter 11 plan or sale of all or substantially all of the Debtors' assets, or orders confirming such plan or approving such sale are entered, that are not conditioned upon the payment of the DIP Obligations and the

Prepetition Obligations (in each case, other than indemnities then due and payable) in full in cash and the payment of the Debtors' obligations with respect to the adequate protection hereunder, in full in cash, without the written consent of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties, as applicable.

4.7     <u>Modification of Automatic Stay</u>.    The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified without further notice, application, or order of the Court to the extent necessary to permit each of the DIP Agent or the Prepetition Agent, as applicable, to perform any act authorized or permitted under or by virtue of this Interim Order, the DIP Loan Agreement, or the other DIP Loan Documents, as applicable, including, without limitation, (A) to implement the postpetition financing arrangements authorized by this Interim Order, (B) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the DIP Collateral, (C) to assess, charge, collect, advance, deduct and receive payments with respect to the Prepetition Obligations and DIP Obligations (or any portion thereof), including, without limitation, all interests, fees, costs, and expenses permitted under any of the DIP Loan Documents or the Prepetition Loan Documents and apply such payments to the applicable obligations, and (D) subject to the Remedies Notice Period, to take any action and exercise all rights and remedies provided to it by this Interim Order, the other DIP Loan Documents, or applicable law.

4.8     <u>Reporting</u>.    The Debtors shall promptly provide (through email) to SRZ copies of all written reports provided by Debtors to the Committee, any other statutory committee appointed in the Cases, the U.S. Trustee and/or any other party in interest in the Cases (which SRZ may share with the DIP Secured Parties and the Prepetition Secured Parties and their other professionals).    In addition to, and without limiting whatever rights to access the Prepetition

20828720.1

Secured Parties have under the Prepetition Loan Documents, upon reasonable prior notice, at reasonable times during normal business hours, and otherwise not to be unreasonably withheld, the Debtors shall permit the DIP Secured Parties and the Prepetition Secured Parties to (a) have access to and inspect the Debtors' facilities, properties, books and records, and (b) discuss the Debtors' affairs, finances, and conditions directly with the Debtors' management, officers, directors, agents, other representatives, the Chief Transformation Officer (the "CTO"), financial advisors, investment bankers, counsel and other professionals.  Further, the Debtors shall:  (x) provide, on a monthly basis, income statements, balance sheet statements and cash follow statements; (y) provide the DIP Secured Parties and the Prepetition Secured Parties (and their respective counsel) access to information and materials related to the sale(s) of any of the Debtors' assets and the related sale(s) process(es), including (i) access to any data room, (ii) the list of parties that the Debtors have contacted with respect to such sale(s) and any responses that the Debtors have received from any such party, (iii) any letters of intent the Debtors have received from any interested or potentially interested buyers , (iv) any indications of interest that the Debtors have received from any interested or potentially interested buyer(s), (v) periodic updates regarding the sale(s) process, and/or (vi) any bid(s) submitted in connection with the sale of any of the Debtors' assets (subject to the limitations contained in any bidding procedures approved by the Court in the even that any of the DIP Secured Parties or Prepetition Secured Parties submit a qualified bid for such assets); and (z) hold weekly standing calls between the Debtors' financial advisors, investment bankers, the CTO, on the one hand, and the DIP Secured Parties and the Prepetition Secured Parties (and their respective advisors), on the other hand.

> 4.9    Budget.  The use of borrowings under the DIP Facility and the use of Cash Collateral shall be in accordance with and as set forth in the detailed budget for the Initial Budget

Period containing, among other things, projected cash receipts and detailed line items for operating disbursements, including employee-related expenses and processing costs, and non-operating activity (including the fees and expenses for each of the Debtors' and other estate retained professionals) for such Initial Budget Period in form and substance satisfactory to, and approved by, the DIP Agent in sole discretion (as such budget may be modified from time to time by the Debtors in accordance with the DIP Loan Documents, the "Initial Budget" and any subsequent budget delivered by the Debtors to the DIP Agent, in each case, to the extent approved in writing by the DIP Agent in its sole discretion, each an "Approved Budget").  Attached hereto as **Exhibit B** is a summary form of the Initial Budget that was approved by the DIP Agent.  The Approved Budget shall be updated by the Debtors from time to time in accordance with the DIP Loan Documents at the request of the DIP Agent.  No such updated, modified or supplemented budget shall be effective until so approved in writing by the DIP Agent in its sole discretion, and only once so approved shall such budget be deemed the "Approved Budget"; *provided*, *however* that in the event that the DIP Agent, on the one hand, and the Debtors, on the other hand, cannot agree as to an updated, modified or supplemented budget, the prior Approved Budget shall continue in effect for these Cases, and such disagreement shall give rise to an Event of Default under the DIP Loan Documents and this Interim Order once the period covered by the prior Approved Budget has terminated.  Any Approved Budget (including the Initial Budget) shall include, among other things, detailed line items of any operating receipts and disbursements, any prepetition amounts paid pursuant to the Court's order, any chapter 11 expenses, including the amount of fees and expenses of professionals retained by the Debtors, any statutory committee and any other estate-retained professional (in each case, on a professional by professional basis).  For the avoidance of doubt, notwithstanding anything to the contrary contained in this Interim Order or the Approved

20828720.1

Budget, in no way shall any budget (including any Approved Budget) be construed as a cap or a limitation on the amount of fees and/or expenses of any of the DIP Secured Parties or Prepetition Secured Parties (and none of the DIP Secured Parties, the Prepetition Secured Parties or Secured Parties' Professions be subject to a budget, including any Approved Budget).  A copy of any Approved Budget shall be delivered to counsel for a Committee (if appointed) and the U.S. Trustee after (or if) it has been approved by the DIP Agent in its sole discretion.

        4.10    Credit Bid.  The (a) DIP Agent (or any assignee thereof), at the direction of the DIP Lenders and on behalf of the DIP Secured Parties, shall have the right to "credit bid" on a dollar-for-dollar basis (i) up to the full amount of the outstanding DIP Obligations and DIP Superpriority Claim and (ii) any unpaid amounts due and owing to the DIP Secured Parties under this Interim Order, including section 4.18 hereof, and (b) subject to the entry of the Final Order, the Prepetition Agent (or any assignee thereof), at the direction of the Prepetition Lenders and on behalf of the Prepetition Secured Parties, shall have the right to "credit bid" on a dollar-for-dollar basis (x) up to the full amount of the outstanding Prepetition Obligations, the Adequate Protection obligations (including the Adequate Protection Superpriority Claim), and (y) any unpaid amounts due and owing to the Prepetition Secured Parties under this Interim Order, including section 4.18 hereof, in any sale of all or any portion of the Debtors' assets, including DIP Collateral and Prepetition Collateral, and/or any deposit in connection with such sale, including, without limitation, any sale (1) pursuant to section 363 of the Bankruptcy Code, (2) pursuant to a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code, or (3) by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code.  Any such credit bid shall be treated as the equivalent of a cash bid.  The DIP Agent, at the direction of the DIP Lenders, and on behalf of the DIP Secured Parties, and the Prepetition Agent, at the direction of the

Prepetition Lenders, and on behalf of the Prepetition Secured Parties, each shall have the absolute

right to assign, sell, or otherwise dispose of its right to credit bid in connection with any credit bid

by or on behalf of the DIP Secured Parties (or any acquisition entity or joint venture formed in

connection with such bid) and the Prepetition Secured Parties (or any acquisition entity or joint

venture formed in connection with such bid), respectively.

4.11    Employee Incentive/Retention Plans. The Debtors shall not seek (including

by filing any pleading) approval of any employee incentive or retention plans (or any similar sort

of retention or incentive program) without (a) the prior written consent of the DIP Agent in its sole

discretion and (b) providing to the DIP Agent and its counsel the (i) terms of any such incentive

or retention plan or program (including copies of any materials related thereto), (ii) list of any

individuals proposed to be covered by any retention plan or program, and (iii) the aggregate

amount sought to be paid under any such incentive or retention plan or program.

4.12    Carve-Out Provisions.  For purposes of this Interim Order, "Carve-Out"

shall mean the sum of:  (i) all fees required to be paid to the Clerk of the Court and to the U.S.

Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory

rate; (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b)

of the Bankruptcy Code (the "Chapter 7 Trustee Carve-Out"); (iii) to the extent allowed at any

time, whether by interim order, procedural order, or otherwise, subject to and in the amounts set

forth in the Approved Budget, all unpaid fees (excluding any success or transaction fees, other

than any such fees of Jefferies LLC in an amount expressly agreed upon by the DIP Agent in its

sole discretion), costs, disbursements and expenses (the "Allowed Professional Fees") incurred or

earned by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the

Bankruptcy Code (the "Debtor Professionals") and the Committee pursuant to sections 328 or

1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor

Professionals, the "Professional Persons") at any time before or on the first business day following

delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by

the Court prior to, on or after delivery of a Carve-Out Trigger Notice (the "Pre-Trigger Carve-Out

Cap"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to

exceed $250,000 (inclusive of any prepetition retainer held by the applicable Professional Person

to the extent not previously applied or returned) incurred after the first business day following

delivery by the DIP Agent of the Carve-Out Trigger Notice (such date, the "Trigger Date"), to the

extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts

set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap" and such amounts set

forth in clauses (i) through (iv), the "Carve-Out Cap"); provided that nothing herein shall be

construed to impair any party's ability to object to court approval of the fees, expenses,

reimbursement of expenses or compensation of any Professional Person.  For purposes of the

foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by email by the DIP

Agent to the Debtors, their lead restructuring counsel, counsel to the Prepetition Agent, the U.S.

Trustee, and counsel to the Committee, if any (collectively, the "Carve-Out Trigger Notice

Parties"), which notice may be delivered following the occurrence and during the continuation of

an Event of Default under the DIP Facility, and shall describe in reasonable detail such Event of

Default that is alleged to have occurred and be continuing and stating that the Post-Carve-Out

Trigger Notice Cap has been invoked.

      4.13    No Direct Obligation To Pay Allowed Professional Fees.  None of the DIP

Secured Parties or the Prepetition Secured Parties shall be responsible for the payment or

reimbursement of any fees or disbursements of any Professional Person incurred in connection

with the Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this

Interim Order or otherwise shall be construed to obligate the DIP Secured Parties or the Prepetition

Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional

Person or to guarantee that the Debtors have sufficient funds to pay such compensation or

reimbursement.

4.14    <u>Reservation of Third Party Challenge Rights</u>.  The stipulations, releases,

agreements, and admissions contained in this Interim Order, including, without limitation,

paragraph E hereof, and the releases contained in clause (viii) thereof (collectively, the "<u>Debtors'</u>

<u>Stipulations</u>"), shall be binding on the Debtors in all circumstances.  The Debtors' Stipulations

shall be binding on each other party in interest, including, without limitation, the Committee (if

any), unless, and solely to the extent that (a) any such party in interest, including the Committee

(if any), with standing and requisite authority has timely commenced an adversary proceeding or

other appropriate contested matter (subject to the limitations contained herein, including, *inter*

*alia*, in this Section 4.14) by no later than (i) the earlier of (A) if no Committee has been appointed,

75 calendar days from the date of entry of this Interim Order and (B) if a Committee has been

appointed, 60 calendar days after the date of the appointment of such Committee and (ii) any such

later date as has been agreed to, in writing, by the DIP Secured Parties and the Prepetition Secured

Parties (such time period established by the foregoing clauses (i) and (ii), the "<u>Challenge Period</u>"),

against any Prepetition Secured Party in connection with matters related to the Prepetition Loan

Documents, the Prepetition Obligations, the Prepetition Liens, and the Prepetition Collateral,

including by (A) objecting to or challenging the amount, validity, perfection, enforceability,

priority, or extent of the Prepetition Obligations or Prepetition Liens, or (B) otherwise asserting or

prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power

20828720.1

claims or any other claims, counterclaims, or causes of action, objections, contests, or defenses

with respect to the Prepetition Obligations, Prepetition Liens or the acts or omissions of any

Prepetition Secured Party (a "Challenge Proceeding") and (b) there is a final, non-appealable order

in favor of the plaintiff sustaining any Challenge Proceeding in any such timely filed adversary

proceeding or contested matter; *provided* that any pleadings filed in connection with any Challenge

Proceeding shall set forth with specificity the basis for such Challenge and any challenges or

claims not so specified prior to the expiration of the Challenge Period shall be deemed forever

waived, released, and barred.  For the avoidance of doubt, a party in interest's commencement of

a timely Challenge Proceeding shall preserve the Challenge Period only with respect to such party

in interest commencing the Challenge Proceeding.   If no such Challenge Proceeding is timely

commenced, then:  (v) the Debtors' stipulations, admissions, agreements, and releases contained

in this Interim Order, including, without limitation, those contained in paragraph E of this Interim

Order, and the releases contained in clause (viii) thereof, shall be binding on all parties in interest,

(w) any and all Challenge Proceedings by any party (including, without limitation, the Committee,

any chapter 11 trustee, or any examiner and/or other estate representative appointed or elected in

these Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or

elected in any Successor Case) shall be deemed to be forever waived, released, and barred; (x) to

the extent not theretofore repaid, the Prepetition Obligations shall constitute allowed claims, not

subject to counterclaim, setoff, subordination, recharacterization, reduction, defense or avoidance,

for all purposes in these Cases and any subsequent chapter 7 case; (y) the Prepetition Liens on the

Prepetition Collateral shall be deemed to have been, as of the Order for Relief Date, and to be,

legal, valid, binding, perfected and of the priority specified in paragraph E hereof, not subject to

defense, counterclaim, recharacterization, subordination or avoidance; and (z) the obligations

20828720.1

under the Prepetition Loan Documents and the Prepetition Liens on the Prepetition Collateral shall

not be subject to any other or further challenge by the Debtors, the Committee (if any) or any other

party in interest, each of whom shall be enjoined from seeking to exercise the rights of the Debtors'

Estates, including, without limitation, any successor thereto (including, without limitation, any

estate representative or a chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors

with respect thereto).  If any Challenge Proceeding is timely commenced, the stipulations, releases,

agreements, and admissions contained in paragraph E of this Interim Order, and the releases

contained in clause (viii) thereof, shall nonetheless remain binding and preclusive (as provided in

this paragraph) on the Debtors, the Committee (if any), and any other person or entity, except as

to any such findings and admissions that were expressly and successfully challenged in such

Challenge Proceeding as set forth in a final, non-appealable order of a court of competent

jurisdiction.  Nothing in this Interim Order vests or confers on any Person (as defined in the

Bankruptcy Code), including the Committee (if any), standing or authority to pursue any cause of

action belonging to the Debtors or their Estates, including, without limitation, claims and defenses

with respect to the Prepetition Loan Documents or the Prepetition Liens on the Prepetition

Collateral.  Notwithstanding the foregoing, if a chapter 11 trustee is appointed or the Cases are

converted to chapter 7 prior to the expiration of the Challenge Period, (1) the chapter 11 trustee or

chapter 7 trustee, as applicable, shall have until the later of the end of the Challenge Period or the

tenth (10th) day after the appointment of the chapter 11 trustee or the conversion of the Case to

chapter 7, as applicable, to commence a Challenge, subject to any further extension by order of

the Court for cause, and (2) if the Committee has asserted a Challenge prior to the Challenge

Deadline, the chapter 11 trustee or chapter 7 trustee will stand in the shoes of the Committee in

such Challenge.

4.15    <u>Limitation on the Use of DIP Collateral</u>.  No portion of the DIP Loans, the

DIP Collateral (including Cash Collateral or Prepetition Collateral) or the Carve-Out may be used,

directly or indirectly, in connection with:  (a) preventing, hindering or delaying any of the DIP

Secured Parties' and/or Prepetition Secured Parties' enforcement or realization upon any of the

DIP Collateral or the Prepetition Collateral, as applicable; (b) using or seeking to use Cash

Collateral or selling or otherwise disposing of DIP Collateral without the prior written consent of

the DIP Agent in its sole discretion, except as otherwise provided herein; (c) using or seeking to

use any insurance proceeds constituting DIP Collateral without the prior written consent of the

DIP Agent in its sole discretion; (d) incurring any indebtedness without the prior written consent

of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties, except to the extent

permitted under the DIP Loan Documents; (e) objecting to, challenging, contesting or, other than

the Investigation Budget (as defined herein), investigating any of the DIP Obligations, DIP Liens,

DIP Superpriority Claim, DIP Collateral, Prepetition Obligations, Prepetition  Liens, Adequate

Protection Superpriority Claim, Adequate Protection Liens, or any other claims or liens granted,

held by or on behalf of the DIP Secured Parties and/or the Prepetition Secured Parties; (f) asserting,

commencing or prosecuting any Challenge Proceeding or any other challenge, claim or cause of

action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy

Code or applicable state law equivalents or actions to recover or disgorge any payments, against

any of the DIP Secured Parties, Prepetition Secured Parties or their respective agents, affiliates,

parents, subsidiaries, representatives, partners, controlling persons, attorneys, advisors,

professionals, officers, directors or employees; (g) litigating, objecting to, challenging or

contesting in any manner, or raising any defenses to, the amount, validity, perfection, priority,

extent or enforceability of the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the

20828720.1

Prepetition Obligations, the Prepetition Liens, the Adequate Protection Liens, the Adequate Protection Superpriority Claim, or any other rights or interests of any of the DIP Secured Parties and/or the Prepetition Secured Parties, or any other liens and/or claims granted under this Interim Order, the other DIP Loan Documents and/or the Prepetition Loan Documents; (h) seeking to modify or amend any of the rights granted to the DIP Secured Parties or the Prepetition Secured Parties under the DIP Loan Documents and the Prepetition Loan Documents (as applicable); (i) seeking to subordinate, recharacterize, disallow, or avoid the DIP Obligations or the Prepetition Obligations; or (j) paying any amount on account of any claims arising prior to the Order for Relief Date unless in accordance with the Approved Budget (or if not included in the Approved Budget, with the prior written consent of the DIP Agent in its sole discretion) and such payments are approved by an order of the Court, *provided* that notwithstanding anything to the contrary herein, no more than $25,000 of the Prepetition Collateral in the aggregate may be used by the Committee (if any) to investigate (but not prosecute or challenge) the validity, enforceability, perfection, priority or extent of the Prepetition Liens or Prepetition Obligations.

4.16    No Modification or Stay of this Interim Order.  The DIP Agent and the DIP Lenders have acted in good faith in connection with the DIP Facility and with this Interim Order, and their reliance on this Interim Order is in good faith, and the DIP Agent and the DIP Lenders are entitled to the protections of Bankruptcy Code section 364(e).

4.17    Power to Waive Rights; Duties to Third Parties.

(a)    Subject to the terms of the DIP Loan Documents, the DIP Agent shall have the right (acting at the direction of the DIP Lenders if so required by the DIP Loan Documents) to waive any of the terms, rights, and remedies provided or acknowledged in this Interim Order that are in favor of the DIP Lenders (the "DIP Lender Rights"), and shall have no

obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any DIP Lender Right(s).  Any waiver by the DIP Agent of any DIP Lender Rights shall not be nor shall it constitute a continuing waiver unless otherwise expressly provided therein.  Any delay in or failure to exercise or enforce any DIP Lender Right shall neither constitute a waiver of such DIP Lender Right, subject the DIP Agent or any DIP Lender to any liability to any other party, nor cause or enable any party other than the Debtors to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to the DIP Agent or any DIP Lender.

(b)     The Prepetition Agent shall have the right to waive any of the terms, rights, and remedies provided or acknowledged in this Interim Order that are in favor of the Prepetition Secured Parties (the "Prepetition Lender Rights"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any Prepetition Lender Right(s).  Any waiver by the Prepetition Agent of any Prepetition Lender Rights shall not be, nor shall it constitute, a continuing waiver unless otherwise expressly provided therein.  Any delay in or failure to exercise or enforce any Prepetition Lender Right shall neither constitute a waiver of such Prepetition Lender Right, subject the Prepetition Agent or any Prepetition Lender to any liability to any other party, nor cause or enable any party other than the Debtors to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to the Prepetition Agent or any Prepetition Lender; *provided* that the Prepetition Agent shall obtain the prior written consent of the DIP Secured Parties for any waiver that affects any rights of the DIP Secured Parties hereunder or any treatment of the DIP Obligations.

4.18    DIP and Other Expenses; Procedures for Payment of DIP Agents' and Prepetition Secured Parties' Professional Fees and Expenses.  The Debtors are authorized and

directed to pay, in cash, on the terms set forth in this paragraph: (i) all reasonable and documented fees, out-of-pocket expenses, disbursements and other charges of, and payable to, the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders, including, without limitation, any contractual agency fees, and (ii) all reasonable and documents fees, out-of-pocket expenses, disbursement and other charges of the following professionals of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders (collectively, the "Secured Parties' Professionals"): (a) SRZ, as lead counsel, (b) Fowler, as local counsel, and (c) any other counsel, advisors, consultants and professionals of the DIP Secured Parties and the Prepetition Secured Parties, in each case, whether incurred before, on or after the Order for Relief Date and without further order of, or applicable to, the Court. The Debtors are authorized and directed to pay on the Closing Date (as defined in the DIP Credit Agreement) all undisputed reasonable and documents fees, out-of-pocket expenses, disbursement and other charges of the DIP Secured Parties, the Prepetition Secured Parties and the Secured Parties' Professionals incurred prior to or on the Order for Relief Date without the need for any such party or professional to first deliver a copy of its invoice. The allowance and payment of any disputed portion of such fees, out-of-pocket expenses, disbursements or other charges incurred prior to or on the Order for Relief Date shall be subject to the procedures set forth below in this section governing the payment of such amounts incurred after the Order for Relief Date. Any time that any of the DIP Secured Parties, the Prepetition Secured Parties or the Secured Parties' Professionals seek payment from the Debtors of fees, out-of-pocket expenses, disbursements and other charges incurred after the Order for Relief Date, each such party or professional shall provide copies of its invoices (which shall not be required to contain time entries, but shall only include a general, brief description summarizing the nature of the matters for which services were performed, and which may be redacted or modified to the

20828720.1

extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to the Debtors, the U.S. Trustee and counsel for a Committee (if appointed), with a copy of such invoices delivered simultaneously to the DIP Lenders and the DIP Agent.  If no written objection is received by the applicable party and/or professional in clauses (i) and/or (ii) of this section by 12:00 p.m., prevailing Eastern Time, on the date that is ten (10) calendar days after delivery of such invoice to the Debtors, the U.S. Trustee, and any Committee, such fees, out-of-pocket expenses, disbursements and other charges shall be deemed allowed in full and shall be paid promptly by the Debtors.  If a written objection to an invoice of an applicable party and/or professional in clauses (i) and/or (ii) of this section is timely made by such applicable party and/or professional, the fees, out-of-pocket expenses, disbursements and other charges contained in such invoice shall be deemed allowed and promptly paid by the Debtors in the undisputed amount of the invoice, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.  For the avoidance of doubt, pending such resolution, the undisputed portion of any such invoice will be deemed allowed and the Debtors are directed to promptly pay such undisputed portion.  The DIP Secured Parties, the Prepetition Secured Parties and the Secured Parties' Professionals shall not be required to comply with the U.S. Trustee fee guidelines or file applications or motions with, or obtain approval of, the Court for the payment of any of their fees, out-of-pocket expenses, disbursements and other charges.  Payments of any amounts set forth in this section are not subject to recharacterization, avoidance, subordination, or disgorgement.

20828720.1

4.19    No Unauthorized Disposition of Collateral.    The Debtors shall not sell, transfer, lease, encumber, use, or otherwise dispose of any portion of the DIP Collateral (including inventory and Cash Collateral), other than pursuant to the terms of this Interim Order or as permitted by the DIP Loan Documents or further order of the Court.

4.20    No Waiver.    The failure of the DIP Lenders or the Prepetition Lenders, as applicable, to seek relief or otherwise exercise their rights and remedies under the DIP Loan Documents, the DIP Facility, the Prepetition Loan Documents, the Prepetition Facilities, or the Interim Order, as applicable, shall not constitute a waiver of any of the DIP Lenders' or Prepetition Lenders' rights hereunder, thereunder, or otherwise.    Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the rights of the DIP Lenders or the Prepetition Lenders under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the rights of the DIP Lenders and the Prepetition Lenders to: (a) request conversion of the Cases to cases under chapter 7, dismissal of the Cases, or the appointment of a trustee in the Cases; (b) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a plan; or (c) exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Secured Parties or the Prepetition Secured Parties.

4.21    Maintenance of Collateral.    Unless the DIP Secured Parties otherwise consent in writing, until (i) the payment in full or otherwise acceptable satisfaction of all DIP Obligations and (ii) the termination of the DIP Agent's and the DIP Lenders' obligations to extend credit under the DIP Facility, the Debtors shall comply with the covenants contained in the DIP Loan Documents regarding the maintenance and insurance of the DIP Collateral.    Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agent (on behalf

20828720.1

47

of the DIP Lenders) shall be, and shall be deemed to be, without any further action or notice,

named as additional insureds and loss payees on each insurance policy maintained by the Debtors

that in any way relates to the DIP Collateral.

4.22    Reservation of Rights.  The terms, conditions, and provisions of this Interim

Order are in addition to and without prejudice to the rights of each DIP Secured Party and

Prepetition Secured Party, as applicable, to pursue any and all rights and remedies under the

Bankruptcy Code, the DIP Loan Documents, the Prepetition Loan Documents, or any other

applicable agreement or law, including, without limitation, rights to seek adequate protection

and/or additional or different adequate protection, to seek relief from the automatic stay, to seek

an injunction, to oppose any request for use of cash collateral or granting of any interest in the DIP

Collateral or the Prepetition Collateral, as applicable, or priority in favor of any other party, to

object to any sale of assets, and to object to applications for allowance and/or payment of

compensation of professionals or other parties seeking compensation or reimbursement from the

Estates.

4.23    Binding Effect.

(a)    All of the provisions of this Interim Order and the DIP Loan

Documents, the DIP Obligations, all liens, and claims granted hereunder in favor of each of the

DIP Secured Parties and the Prepetition Secured Parties, and any and all rights, remedies,

privileges, immunities and benefits in favor of the DIP Agent, DIP Lenders, and Prepetition

Secured Parties set forth herein, including, without limitation, the parties' acknowledgements,

stipulations, and agreements in Section E of this Interim Order, subject to Section 4.14 hereof

(without each of which the DIP Secured Parties would not have entered into or provided funds

under the DIP Loan Documents and the Prepetition Secured Parties would not have consented to

the priming of the Prepetition Liens as set forth herein and use of Cash Collateral provided for hereunder), provided or acknowledged in this Interim Order, and any actions taken pursuant thereto, shall be effective and enforceable *nunc pro tunc* to the Order for Relief Date immediately upon entry of this Interim Order and not subject to any stay of execution or effectiveness (all of which are hereby waived), notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, and 9024, or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, shall continue in full force and effect, and shall survive entry of any other order or action, including, without limitation, any order which may be entered confirming any chapter 11 plan providing for the refinancing, repayment, or replacement of the DIP Obligations, converting one or more of the Cases to any other chapter under the Bankruptcy Code, dismissing one or more of the Cases, approving any sale of any or all of the DIP Collateral or the Prepetition Collateral, or vacating, terminating, reconsidering, revoking, or otherwise modifying this Interim Order or any provision hereof; *provided* that in the event a Final Order is entered, the terms and conditions of such Final Order shall control over this Interim Order; *provided further* that such Final Order must affirm each of the provisions, protections, grants, statements, stipulations, and agreements in this Interim Order in order for such provisions, protections, grants, statements, stipulations, and agreements to remain in effect after entry of the Final Order.

(b)      No order dismissing one or more of the Cases under section 1112 or otherwise may impair the DIP Superpriority Claim, the Adequate Protection Superpriority Claim, and the DIP Secured Parties' and the Prepetition Secured Parties' respective liens on and security interests in the DIP Collateral and the Prepetition Collateral, respectively, and all other claims, liens, adequate protections, and other rights granted pursuant to the terms of this Interim Order, which shall continue in full force and effect notwithstanding such dismissal until the DIP

Obligations and Prepetition Obligations are indefeasibly paid and satisfied in full. Notwithstanding any such dismissal, this Court shall retain jurisdiction for the purposes of enforcing all such claims, liens, protections, and rights referenced in this paragraph and otherwise in this Interim Order.

(c)    Except as set forth in this Interim Order, in the event this Court modifies, reverses, vacates, or stays any of the provisions of this Interim Order or any of the DIP Loan Documents following a Final Hearing, such modifications, reversals, vacatur, or stays shall not affect the (i) validity, priority, or enforceability of any DIP Obligations and/or Adequate Protection obligations incurred prior to the actual receipt of written notice by the DIP Agent or Prepetition Agent, as applicable, of the effective date of such modification, reversal, vacatur, or stay, (ii) validity, priority, or enforceability of the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens and the Adequate Protection Superpriority Claim or (iii) rights or priorities of the DIP Agent, DIP Lenders and/or the Prepetition Secured Parties pursuant to this Interim Order with respect to the DIP Collateral, any portion of the DIP Obligations or any portion of the Adequate Protection obligations.

(d)    This Interim Order shall be binding upon the Debtors, the Prepetition Obligors, all parties in interest in the Cases, and their respective successors and assigns, including, without limitation, (i) any trustee or other fiduciary appointed in the Cases or any subsequently converted bankruptcy case(s) of any Debtor and (ii) any liquidator, receiver, administrator, or similar such person or entity appointed in any jurisdiction or under any applicable law.  This Interim Order shall also inure to the benefit of the Debtors, DIP Agent, DIP Lenders, Prepetition Secured Parties, and each of their respective successors and assigns.

4.24    Discharge.  The DIP Obligations and the obligations of the Debtors with respect to adequate protection hereunder, including granting the Adequate Protection Liens and the Adequate Protection Superpriority Claim, shall not be discharged by the entry of an order confirming any plan of reorganization in any of these Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan of reorganization, or each of the DIP Secured Parties or the Prepetition Secured Parties, as applicable, has otherwise agreed in writing in its respective sole discretion.

4.25    No Priming of Prepetition Obligations.  Notwithstanding anything to the contrary herein, from and after the entry of this Interim Order, absent the express written consent of the Prepetition Lenders, no Debtor shall seek authorization from this Court to obtain or incur any Indebtedness or enter into an alternative financing facility from a party other than the DIP Lenders (a "Competing DIP Facility") seeking to impose liens on any DIP Collateral ranking on a *pari passu* or priming basis with respect to the liens held by the Prepetition Secured Parties; *provided*, *however*, that nothing herein shall preclude the Debtors from seeking authorization to incur any Indebtedness or enter into any Competing DIP Facility that provides for the payment in full of the DIP Obligations and the Prepetition Obligations.

4.26    Section 506(c) Waiver.  No costs or expenses of administration which have been or may be incurred in these Cases at any time (including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of value by the DIP Agent or the DIP Lenders upon the DIP Collateral or by the Prepetition Secured Parties upon the Prepetition Collateral, as applicable) shall be charged against the DIP Agent, DIP Lenders, or Prepetition Secured Parties, or any of the DIP Obligations or Prepetition Obligations or the DIP

Collateral or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code

or otherwise without the prior express written consent of the affected DIP Secured Parties and/or

affected Prepetition Secured Parties, in their respective sole discretion, and no such consent shall

be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such

agents or creditors (including, without limitation, consent to the Carve-Out or the approval of any

budget hereunder).   Notwithstanding the foregoing, the waiver provided in this Section 4.26 is

subject to the entry of a Final Order providing such relief.

      4.27   <u>Section 552(b) Waiver</u>.  The Debtors have agreed as a condition to obtaining

financing under the DIP Facility and using Cash Collateral that, subject to entry of the Final Order,

the Prepetition Secured Parties are and shall each be entitled to all of the rights and benefits of

section 552(b) of the Bankruptcy Code and that the "equities of the case" exception under section

552(b) shall not apply to the DIP Agent, the DIP Lenders, the DIP Obligations, and, subject to

entry of the Final Order, the Prepetition Secured Parties or the Prepetition Obligations.

      4.28   <u>No Marshaling/Application of Proceeds</u>.  In no event shall the DIP Agent,

the DIP Lenders, or, subject to the entry of the Final Order, the Prepetition Secured Parties be

subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP

Collateral or the Prepetition Collateral, as applicable, and all proceeds shall be received and applied

in accordance with the DIP Loan Documents and the Prepetition Credit Agreements, as applicable.

      4.29   <u>Relief Subject to a Final Order</u>.  For the avoidance of doubt, nothing in this

Interim Order shall be deemed to grant or approve (a) a waiver of the Debtors' ability to surcharge

against any Prepetition Collateral or DIP Collateral pursuant to section 506(c) of the Bankruptcy

Code; (b) any right of the Debtors under the "equities of the case" exception in section 552(b) of

the Bankruptcy Code with respect to any of the Prepetition Secured Parties; (c) except as provided

in Section 4.28 hereof, the application of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral; or (d) a lien on or superpriority claim against the Avoidance Proceeds.

4.30    <u>Limits on Lender Liability</u>.

(a)    In determining to make any loan under the DIP Loan Agreement, authorizing the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall not be deemed to (i) be in control of the operations of the Debtors or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of the Debtors or (ii) owe any fiduciary duty to any of the Debtors.  Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

4.31    **Release.    The provisions of this paragraph shall be enforceable notwithstanding that such provisions may vary from the requirements of Local Bankruptcy Rule 4001-2(d)(ii).  Each of the Debtors, their Estates, and the Prepetition Obligors, on their own behalf and on behalf of each of their past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby forever, unconditionally, permanently, and irrevocably release, discharge, and acquit each of the DIP Secured Parties and, subject to Section 4.14, the Prepetition Secured Parties and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents,**

attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "<u>Released Parties</u>") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, attorneys' fees), debts, liens, actions, and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether known or unknown, matured or contingent, arising under, in connection with, or relating to (i) the DIP Facility or the DIP Loan Documents or (ii) the Prepetition Facility or the Prepetition Loan Documents, as applicable, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code, and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether arising at law or in equity, including any recharacterization, recoupment, subordination, avoidance, or other claim or cause of action arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law, including, without limitation, any right to assert any disgorgement or recovery, in each case, with respect to the extent, amount, validity, enforceability, priority, security, and perfection of any of the DIP Obligations, the DIP Loan Documents, or the DIP Liens, and further waive and release any defense, right of counterclaim, right of setoff, or deduction to the payment of the DIP Obligations that the Debtors now have or may claim to have against the Released Parties, arising under, in

**connection with, based upon, or released to any and all acts, omissions, conduct undertaken, or events occurring prior to entry of this Interim Order.**

4.32    Survival.  The provisions of this Interim Order, the validity, priority, and enforceability of the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens, the Adequate Protection Superpriority Claim, and any actions taken pursuant hereto shall survive, and shall not be modified, impaired or discharged by, entry of any order that may be entered (a) confirming any plan of reorganization in any of these Cases, (b) converting any or all of these Cases to a case under chapter 7 of the Bankruptcy Code, (c) dismissing any or all of these Cases, (d) terminating the joint administration of these Cases or any other act or omission, (e) approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Loan Documents), or (f) pursuant to which the Court abstains from hearing any of these Cases.  The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections (as applicable) granted to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties pursuant to this Interim Order, notwithstanding the entry of any such order, shall continue in any of these Cases, following dismissal of any of these Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until (i) in respect of the DIP Facility, all of the DIP Obligations, pursuant to the DIP Loan Documents and this Interim Order, have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms) and all commitments to extend credit under the DIP Facility are terminated, and (ii) in respect of the Prepetition Obligations, all of the adequate protection obligations owed to the Prepetition Secured Parties provided for in this Interim Order and under the Prepetition Loan Documents have been indefeasibly paid in full in cash.

20828720.1

4.33    <u>Proofs of Claim</u>.    None of the Prepetition Secured Parties or the DIP Secured Parties shall be required to file proofs of claim (or request for payment of an administrative expense) in any of these Cases or subsequent cases of any of the Debtors under any chapter of the Bankruptcy Code. The Debtors' Stipulations in this Interim Order (and the Prepetition Liens, Adequate Protection Liens, Adequate Protection Superpriority Claim, DIP Liens, DIP Superpriority Claim, and the other liens, interests, rights and protections granted to, or in favor of the Prepetition Secured Parties and the DIP Secured Parties under this Interim Order, the Prepetition Loan Documents and the DIP Loan Documents) shall be deemed to constitute valid, timely and properly filed proofs of claim (and requests for payment of administrative expenses) against each Debtor by each of the Prepetition Secured Parties and the DIP Secured Parties, without the need for any such party to file a proof of claim or request for payment of an administrative expense.  Any bar dates for filing claim (including, without limitation, an administrative expense claim) established in any order entered in any of these Cases or subsequent cases shall not apply to any of the Prepetition Secured Parties or DIP Secured Parties, and any such order shall expressly provide that the Prepetition Secured Parties and the DIP Secured Parties are exempt from complying with any such bar date and filing proofs of claim (or requests for payment of administrative expenses).   Notwithstanding anything to the contrary in this Interim Order or any other order entered in any of these Cases or any subsequent cases, each of the Prepetition Agent (on behalf of itself and the other Prepetition Secured Parties) and the DIP Agent (on behalf of itself and the other DIP Secured Parties) is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as applicable) a single, consolidated master proof of claim (each, a "<u>Master Proof of Claim</u>") for any and all claims of, and obligations owed to, any of the Prepetition Secured Parties and the DIP Secured Parties, as applicable, arising from or

granted under the Prepetition Loan Documents or in respect of the Prepetition Obligations, the DIP

Loan Documents or in respect of the DIP Obligations, and/or this Interim Order, as applicable,

which Master Proof of Claim (x) will be filed in the lead Case, GENCANNA GLOBAL USA,

INC., *et al.*, No. 20-50133-grs and shall be deemed a valid, timely and properly filed proof of claim

against each Debtor in each of the Cases and in any of the Debtors' subsequent cases and (y) need

not attach or contain any supporting documentation.  Any Master Proof of Claim filed by any of

the Prepetition Agent or the DIP Agent shall be deemed to be in addition to, and not in lieu of, any

other proof of claim that may be filed by any other Prepetition Secured Party or DIP Secured Party,

as applicable; *provided* that, for the avoidance of doubt, no such Prepetition Secured Party or DIP

Secured Party is required to file any such proof of claim.

 4.34   No Third Party Rights. Except as specifically provided for herein, this

Interim Order does not create any rights for the benefit of any third party, creditor, equity holders,

or any direct, indirect, or incidental beneficiary.

 4.35   No Avoidance.  No obligations incurred or payments or other transfers

made by or on behalf of the Debtors on account of the DIP Facility shall be avoidable or

recoverable from the DIP Agent or the DIP Lenders under any section of the Bankruptcy Code, or

any other federal, state, or other applicable law.

 4.36   Reliance on Order.   All postpetition advances under the DIP Loan

Documents are made in reliance on this Interim Order.

 4.37   Payments Free and Clear.  Any and all payments or proceeds remitted to the

DIP Agent on behalf of the DIP Secured Parties or, subject to Section 4.14 hereof, the Prepetition

Agent on behalf of the Prepetition Secured Parties, pursuant to the provisions of this Interim Order,

any subsequent order of this Court, the DIP Loan Documents or the Prepetition Loan Documents,

shall, subject to the terms of this Section 4.37, be irrevocable, received free and clear of any claims,

charge, assessment, or other liability, including, without limitation, any such claim or charge

arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code or section

552(b) of the Bankruptcy Code, whether asserted or assessed by, through or on behalf of the

Debtors, and in the case of payments made or proceeds remitted after the delivery of a Carve-Out

Trigger Notice, subject to the Carve-Out in all respects.

      4.38   <u>Limited Effect</u>.  In the event of a conflict between the terms and provisions

of any of the other DIP Loan Documents and this Interim Order, the terms and provisions of this

Interim Order shall govern.

      4.39   <u>Headings</u>.  Section headings used herein are for convenience only and are

not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

      4.40   <u>Bankruptcy Rules</u>.  The requirements of Bankruptcy Rules 4001, 6003, and

6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

      4.41   <u>General Authorization</u>. The Debtors, the DIP Secured Parties, and the

Prepetition Secured Parties are authorized to take any and all actions necessary to effectuate the

relief granted in this Interim Order.

      4.42   <u>Retention of Exclusive Jurisdiction</u>.  This Court shall retain exclusive

jurisdiction and power with respect to all matters arising from or related to the implementation or

interpretation of this Interim Order, the  DIP Loan Agreement, and the other DIP Loan Documents.

      4.1   <u>Final Hearing and Response Dates</u>.  The Final Hearing on the Motion

pursuant to Bankruptcy Rule 4001(c)(2) will be held on **February 25, 2020, at 9:00 a.m.**,

prevailing Eastern Time.  The Debtors shall promptly mail copies of this Interim Order to the

Notice Parties, and to any other party that has filed a request for notices with this Court and to any

Committee after same has been appointed, or the Committee's counsel if same shall have filed a request for notice.  The Debtors may serve the Motion and the Interim Order without the exhibits attached thereto as such exhibits are voluminous and available, free of charge, at https://dm.epiq11.com/case/gencanna/info (the website maintained for these Cases by the Debtors' claims and noticing agent), and such notice is deemed good and sufficient and no further notice need be given.  Any party in interest objecting to the relief sought at the Final Hearing shall file a written objection with the Court (with a courtesy copy to Chambers) and serve such objection on the following parties so as to be received by no later than **4:00 p.m. prevailing Eastern Time** on **February 20, 2020**:  (a) proposed counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 801, Wilmington, Delaware 19801, Attn.: Michael J. Barrie and Jennifer R. Hoover; (b) proposed local counsel to the Debtors, Dentons Bingham Greenebaum LLP, 3500 PNC Tower, 101 South Fifth Street, Louisville, KY, 40202, Attn.: James Irving; (c) counsel to the DIP Secured Parties and the Prepetition Secured Parties, Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, Attn.: Adam Harris and Kristine Manoukian; (d) co-counsel to the DIP Secured Parties and Prepetition Secured Parties, Fowler Bell PLLC, 300 West Vine Street, Suite 600, Lexington, KY 40507-1751, Attn.: Christopher G. Colson and Taft A. McKinstry; (e) counsel to any statutory committee appointed in these Cases; and (f) the U.S. Trustee, 100 E. Vine St., #500, Lexington, KY 40507, Attn.: John L. Daugherty.

20828720.1

Tendered by:

*/s/ James R. Irving*
James R. Irving
DENTONS BINGHAM GREENEBAUM LLP
3500 PNC Tower
101 South Fifth Street
Louisville, Kentucky 40202
Telephone: (502) 587-3606
Facsimile:  (502) 587-3695
Email: james.irving@dentons.com
*Proposed Counsel to the Debtors*

20828720.1

60

The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and
electronically entered by the Clerk in the official record of this case.



Signed By:
*Gregory R. Schaaf*
**Bankruptcy Judge**
**Dated: Thursday, February 6, 2020**
(grs)

# **EXHIBIT A**

**DIP Loan Agreement**

FOR PURPOSES OF SECTIONS 1272, 1273 AND 1275 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "INTERNAL REVENUE CODE"), THIS NOTE IS BEING ISSUED WITH ORIGINAL ISSUE DISCOUNT.  REQUESTS FOR INFORMATION REGARDING THE ORIGINAL ISSUE DISCOUNT ON THIS NOTE MAY BE DIRECTED TO GENCANNA GLOBAL USA, INC., 321 VENABLE ROAD, WINCHESTER, KY 40391.

**DEBTOR IN POSSESSION SECURED
MULTI-DRAW TERM PROMISSORY NOTE**

$10,000,000                                                                    New York, New York
                                                                            February __, 2020

On February 6, 2020 (the "Order for Relief Date"), the United States Bankruptcy Court for the Eastern District of Kentucky (the "Bankruptcy Court") entered an order for relief with respect to GENCANNA GLOBAL USA, INC., a Delaware corporation (the "Borrower") and, on February 5, 2020, GENCANNA GLOBAL, INC., a Delaware corporation (the "Parent") and certain of the Borrower's subsidiaries commenced chapter 11 cases by filing their own voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), which cases (including the Borrower's case) are being jointly administered under Chapter 11 Case No. 20-50133-grs (each a "Chapter 11 Case" and collectively, the "Chapter 11 Cases"). The Loan Parties (as defined herein) continue to operate their respective businesses and manage their respective properties as debtors and debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  The Borrower has requested that MGG Investment Group LP, a Delaware limited partnership, as agent (in such capacity, the "Agent") for the lenders (the "DIP Lenders") from time to time party to this Debtor in Possession Secured Multi-Draw Term Promissory Note (as amended, modified, or supplemented from time to time, this "Note"), make Term Loans (as defined below) from time to time evidenced by this Note. The Parent and certain subsidiaries of the Borrower who comprise the other debtors in the Chapter 11 Cases wish to guaranty the Borrower's Obligations under this Note (collectively, the "Guarantors"), and are simultaneously executing Guarantees in favor of the Agent.  The Borrower intends to utilize such Term Loans to (i) fund general corporate needs, including without limitation working capital and other needs, and (ii) pay administrative expenses of the Chapter 11 Cases, including fees and expenses of professionals, in each case in accordance with the Budget. Capitalized terms used herein and not otherwise defined herein shall have the meanings provided in Section 18 of this Note.

1.    Term Loans.

(a)    Subject to the terms and conditions hereof including the Agent's receipt of a Borrowing Request (as defined below), the DIP Lenders agree to provide the Borrower with a term loan on the Closing Date in the principal amount of $2,750,000 (the "Initial Loan").  Subject to the terms and conditions hereof, at any time on or after the date of entry of the Final Order and upon the Agent's receipt of a Borrowing Request, the DIP Lenders agree to provide the Borrower with one or more additional loans, each in a principal amount of not less than $500,000 and not more than $2,000,000, and together in an aggregate principal amount not to exceed $7,250,000

(each, an "Additional Loan" and collectively, the "Additional Loans" and, together with the Initial Loan, each, a "Term Loan" and collectively, the "Term Loans"). For the avoidance of doubt, each Borrowing Request shall be made by the Borrower in accordance with the Budget. The Borrower may request the Initial Loan and the Additional Loans pursuant to written notice (which may be by email) delivered to the Agent three (3) Business Days prior to the proposed borrowing date (or such shorter period as the Agent may agree) (a "Borrowing Request"). The Borrowing Request shall be in a form reasonably satisfactory to the Agent.  Each DIP Lender shall provide the Term Loans in an aggregate amount equal to its Commitment set forth on Schedule 1(a) and the obligation of each DIP Lender to make the Term Loans under this Note shall be several and not joint and several.  Upon receipt of a Borrowing Request, subject to the satisfaction of the conditions set forth in this Note, the DIP Lenders shall simultaneously and proportionately to their Pro Rata Share of the Maximum Amount, make the proceeds of such Term Loans available to the Borrower on the applicable date of funding of such Term Loan by transferring immediately available funds equal to such proceeds to an account designated in writing by the Borrower consistent with its existing cash management system.  The Commitment of each DIP Lender shall be permanently reduced upon the making of a Term Loan in an amount equal to such Term Loan. Any principal amount of the Term Loan which is repaid or prepaid may not be reborrowed.

(b)    The aggregate principal amount of Terms Loans outstanding shall not exceed $10,000,000, subject to any limitation of credit extensions under this Note and the Financing Orders (the "Maximum Amount").

(c)    The Agent shall be entitled to rely upon, and shall be fully protected in relying upon, any Borrowing Request or similar notice believed by the Agent to be genuine.  The Agent may assume that each Person executing and delivering any such notice was duly authorized, unless the responsible individual acting thereon for the Agent has actual knowledge to the contrary.

(d)    The Borrower shall utilize the proceeds of Term Loans to (i) fund general corporate needs, including without limitation working capital and other needs, and (ii) pay administrative expenses of the Chapter 11 Cases, including fees and expenses of professionals, in each case in accordance with the Budget, this Note, the Bankruptcy Code, and the Financing Orders; provided, that, unless otherwise provided in the Budget or approved by the Agent in its sole discretion, no portion of any Term Loan shall be used, directly or indirectly: (a) except as permitted by Section 15(e), to make any payment on Prepetition Obligations or to finance or make any Restricted Payment, (b) to pay any fees or similar amounts payable to any Person who has proposed or may propose to purchase interests in any of the Borrower or any of its respective Subsidiaries or affiliates or who otherwise has proposed or may propose to invest in the Borrower or any of its respective Subsidiaries or affiliates (including so-called "topping fees," "exit fees," and similar amounts), or (c) to make any distribution under a plan of reorganization in the Chapter 11 Cases or any similar proceeding of any of the Subsidiaries or affiliates of the Borrower.

2.    Certain Conditions to Each Term Loan.  No DIP Lender shall be obligated to fund any Term Loan, if, as of the date thereof:

(a)    The Borrower shall not have paid any amount then payable hereunder (including the fees and expenses of counsel to the Agent) or under any other DIP Document;

DOC ID - 33364517.8

(b)    the Loan Parties shall not have delivered corporate resolutions, incumbency certificates and similar documents, in form and substance satisfactory to Agent with respect to this Note and the other DIP Documents and the transactions contemplated hereby and thereby;

(c)    the Loan Parties shall not have delivered guarantees of each of the Guarantors, each in form and substance satisfactory to Agent with respect to this Note and the other DIP Documents and the transactions contemplated hereby and thereby;

(d)    any representation or warranty by any Loan Party contained herein or in any other DIP Document shall be untrue or incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date;

(e)    with respect to the Initial Loan (i) the Bankruptcy Court shall not have entered the Interim Order; or (ii) the Interim Order shall have been stayed, vacated, reversed, modified or amended without Agent's consent in its sole discretion;

(f)    with respect to any Additional Loan (i) the Bankruptcy Court shall not have entered the Final Order; or (ii) the Final Order shall have been stayed, vacated, reversed, modified or amended without Agent's consent in its sole discretion;

(g)    on the date of the entry of the Final Order, the Agent and the DIP Lenders shall not have received an updated Budget, satisfactory to the Agent in its sole discretion, for the remaining period through the term of this Note;

(h)    except as occasioned by the commencement of the Chapter 11 Cases and the actions, proceedings, investigations and other matters related thereto or arising therefrom (including any actions taken in accordance with the Budget, this Note or the Financing Orders), any event or circumstance having a Material Adverse Effect shall have occurred since the date hereof;

(i)    any Default or Event of Default shall have occurred and be continuing or would result after giving effect to any Term Loan;

(j)    after giving effect to any Term Loan, the outstanding principal amount of all Term Loans would exceed the lesser of (i) the Maximum Amount, or (ii) the amount permitted to be borrowed on a cumulative basis from the date hereof through the date of such requested Term Loan as set forth in the Budget and the Financing Orders;

(k)    the Agent shall not have received and approved the Budget in accordance with this Note and the Financing Orders;

(l)    the Loan Parties shall have filed one or more pleadings with the Bankruptcy Court and such pleadings shall not be in form and substance acceptable to the Agent in its sole discretion; or

(m)    the Bankruptcy Court shall have entered orders and such orders shall not be

in form and substance acceptable to the Agent in its sole discretion.

The request and acceptance by the Borrower of the proceeds of any Term Loan shall be deemed to constitute, as of the date of such request, acceptance or incurrence, (i) a representation and warranty by the Borrower that the conditions in this Section 2 have been satisfied and (ii) a reaffirmation by the Borrower of the granting and continuance of the Liens granted in favor of the Agent on behalf of the DIP Lenders, pursuant to the Financing Orders.

3.      Payment of Principal.  FOR VALUE RECEIVED, the Borrower promises to pay to the Agent, the unpaid principal amount of all Term Loans made by the Agent on behalf of the DIP Lenders to the Borrower, on the Maturity Date, together with all accrued and unpaid interest, fees and expenses to the extent provided, without duplication, in this Note and the Financing Orders.

4.      Payment of Interest.

(a)      Subject to the terms of this Note, the Term Loan or any portion thereof shall be a LIBOR Rate Loan and shall bear interest on the principal amount thereof from time to time outstanding, from the date of the Term Loan until repaid, at a rate per annum equal to the LIBOR Rate for an interest period of one month (or such portion thereof) plus 10.00%.

(b)      Interest on the Term Loan shall be payable monthly, in arrears, on the first day of each month, commencing on the first day of the month following the month in which the applicable Term Loan is made.  If any payment of any of the Obligations becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(c)      All computations of fees and interest shall be made by the Agent on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such fees or interest are payable.  Each determination by the Agent of an interest rate hereunder shall be final, binding and conclusive on the Borrower (absent manifest error).

(d)      So long as an Event of Default shall have occurred and be continuing, and at the election of the Agent, the interest rate applicable to the Obligations shall be increased by three percentage points (3.00%) per annum above the rate of interest otherwise applicable hereunder (the "Default Rate"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations.  Interest at the Default Rate shall accrue from the date of such Event of Default until such Event of Default is cured or waived and shall be payable upon demand.

(e)      It is the intention of the parties hereto that the Agent and each DIP Lender shall conform strictly to usury laws applicable to it. Accordingly, if the transactions contemplated hereby or by any other DIP Document would be usurious as to the Agent or any DIP Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to the Agent or such DIP Lender notwithstanding the other provisions of this Note), then, in that event, notwithstanding anything to the contrary in this Note or any other DIP Document or any agreement

DOC ID - 33364517.8

entered into in connection with or as security for the Obligations, it is agreed as follows:  (i) the aggregate of all consideration which constitutes interest under law applicable to the Agent or any DIP Lender that is contracted for, taken, reserved, charged or received by the Agent or such DIP Lender under this Note or any other DIP Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by the Agent or such DIP Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by the Agent or such DIP Lender, as applicable, to the Borrower).  If at any time and from time to time (x) the amount of interest payable to the Agent or any DIP Lender on any date shall be computed at the highest lawful rate applicable to the Agent or such DIP Lender pursuant to this Section 4(e) and (y) in respect of any subsequent interest computation period the amount of interest otherwise payable to the Agent or such DIP Lender would be less than the amount of interest payable to the Agent or such DIP Lender computed at the highest lawful rate applicable to the Agent or such DIP Lender, then the amount of interest payable to the Agent or such DIP Lender in respect of such subsequent interest computation period shall continue to be computed at the highest lawful rate applicable to the Agent or such DIP Lender until the total amount of interest payable to the Agent or such DIP Lender shall equal the total amount of interest which would have been payable to the Agent or such DIP Lender if the total amount of interest had been computed without giving effect to this Section 4(e).

(f)    The LIBOR Rate may be adjusted by the DIP Lenders on a prospective basis to take into account any additional or increased costs to the DIP Lenders of maintaining or obtaining any eurodollar deposits or increased costs, in each case, due to changes in applicable law (other than change with respect to tax law, which are addressed in Section 10 hereof) occurring subsequent to the commencement of the then applicable interest period, including changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), which additional or increased costs would increase the cost of funding loans bearing interest at the LIBOR Rate.  In any such event, the DIP Lenders shall give the Borrower notice of such a determination and adjustment and, upon its receipt of the notice from such DIP Lender, the Borrower may, by notice to such DIP Lender (1) request the DIP Lender to furnish to the Borrower a statement setting forth the basis for adjusting such LIBOR Rate and the method for determining the amount of such adjustment or (2) repay the LIBOR Rate Loans with respect to which such adjustment is made.

(g)    Anything to the contrary contained herein notwithstanding, the DIP Lenders are not required actually to acquire eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues at the LIBOR Rate.  The provisions of Sections 4(f) through (h) shall apply as if the DIP Lenders had match funded any Obligation as to which interest is accruing at the LIBOR Rate by acquiring eurodollar deposits for each interest period in the amount of the LIBOR Rate Loans.

(h)    If, after the date hereof, the DIP Lenders determine that (1) the adoption of or change in any law, rule, regulation or guideline regarding capital requirements for banks or bank holding companies, or any change in the interpretation or application thereof by any governmental authority charged with the administration thereof, or (2) compliance by the DIP Lenders or its parent bank holding company with any guideline, request, or directive of any such

entity regarding capital adequacy (whether or not having the force of law), has the effect of reducing the return on the DIP Lender's or such holding company's capital as a consequence of the DIP Lender's Term Loan hereunder to a level below that which the DIP Lender or such holding company could have achieved but for such adoption, change, or compliance (taking into consideration the DIP Lender's or such holding company's then existing policies with respect to capital adequacy and assuming the full utilization of such entity's capital) by any amount reasonably deemed by the DIP Lender to be material, then the DIP Lender may notify the Borrower thereof.  Following receipt of such notice, the Borrower agrees to pay the DIP Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable promptly after presentation by the DIP Lender to the Borrower of a statement in the amount and setting forth in reasonable detail the DIP Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error).  In determining such amount, the DIP Lender may use any reasonable averaging and attribution methods.

(i)    In no event will the Borrower have more than 4 interest periods outstanding at any time. If the Agent reasonably determines that the LIBOR Rate is unavailable, then the Term Loan shall bear interest, at a rate per annum equal to the Reference Rate plus 9.00% on the principal amount thereof from the date that the LIBOR Rate became unavailable until such time the Agent determines that the LIBOR Rate is available.

5.    <u>Payments</u>.  All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America in same day funds to the Agent at the account as shall be designated in a written notice delivered by the Agent to the Borrower.  Each payment made hereunder shall be credited first to interest then due and payable and the remainder of such payment shall be credited to principal, and interest shall thereupon cease to accrue upon the principal so repaid.

6.    <u>Optional Prepayments</u>.  Subject to the terms and conditions of the Financing Orders and Section 7(f) of this Note, the Borrower shall have the right at any time and from time to time to prepay any Term Loans under this Note in whole or in part (without premium or penalty) upon two (2) Business Days' notice to the Agent; <u>provided</u> that each such prepayment shall be in a minimum amount of $100,000.  Notice of prepayment having been given as aforesaid, the principal amount specified in such notice shall become due and payable on the prepayment date specified therein in the aggregate principal amount specified therein unless such repayment is conditioned on the receipt of any third party funds which are not received.  Any prepayment or repayment hereunder shall be accompanied by interest on the principal amount of this Note being prepaid or repaid to the date of prepayment or repayment.

7.    <u>Mandatory Prepayments</u>.  In each case, subject to the terms and conditions of the Financing Orders and the Budget:

(a)    [Reserved].

(b)    Immediately upon receipt by any Loan Party of cash proceeds of any asset disposition, unless the Agent agrees otherwise, the Borrower shall prepay the Term Loans in an amount equal to all such proceeds, net of (1) commissions and other reasonable and customary

transaction costs, fees and expenses properly attributable to such transaction and payable by the Borrower or any Loan Party in connection therewith (in each case, paid to non-affiliates), (2) transfer, sales, or similar taxes, and (3) amounts required to be applied to the repayment of debt secured by such assets sold and secured by a Lien that is senior to the Liens securing the Obligations under this Note (such net proceeds, the "Net Cash Proceeds").

(c)     If any Loan Party issues any debt or equity securities not permitted under this Note, no later than the Business Day following the date of receipt of the cash proceeds thereof, unless the Agent agrees otherwise, the Borrower shall prepay the Term Loans in an amount equal to all such proceeds, net of underwriting discounts and commissions and other reasonable costs or fees paid to non-affiliates in connection therewith.

(d)     Upon the receipt by any Loan Party or any of their Subsidiaries of any Extraordinary Receipts, unless the Agent agrees otherwise, the Borrower shall prepay the outstanding principal of the Term Loans in an amount equal to all such Extraordinary Receipts, net of any expenses incurred in collecting such Extraordinary Receipts.

(e)     No Implied Consent.  Nothing in this Section 7 shall be construed to constitute the Agent's or any DIP Lender's consent to any transaction that is not permitted by other provisions of this Note or the other DIP Documents.

(f)     Application of Payments. The Agent and the DIP Lenders may elect that the proceeds of any optional or mandatory prepayment made pursuant to this Note be applied, in whole or in part, to the Prepetition Obligations.

8.     Fees.   Borrower shall pay to the Agent for the account of the DIP Lenders the following fees:

(a)     Initial Loan Facility Fee. On the date of funding the Initial Loan, the Borrower shall pay to the Agent a facility fee (the "Initial Loan Facility Fee") equal to $55,000, which shall be fully earned upon the entry of the Interim Order and non-refundable when paid.

(b)     Additional Loan Facility Fee.  On the date of funding the first Additional Loan after the entry of the Final Order, the Borrower shall pay to the Agent a facility fee (the "Additional Loan Facility Fee") equal to $145,000, which shall be fully earned upon the entry of the Final Order and non-refundable when paid.

(c)     Administration Fee. On or prior to the date of funding of the Initial Loan, the Borrower shall pay to the Agent an administration fee (the "Administration Fee") equal to $50,000, which shall be fully earned upon the entry of the Interim Order and non-refundable when paid.

9.     Indemnity.

(a)     The Loan Parties shall indemnify and hold harmless the Agent and each DIP Lender and each of their respective affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses

(including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Note and the other DIP Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, and legal costs and expenses arising out of or incurred in connection with disputes between the Agent and the DIP Lenders on the one hand and the Loan Parties on the other hand; provided, that (i) the Loan Parties shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results solely from such Indemnified Person's breach of a material obligation under this Note or such Indemnified Person's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction and (ii) this Section 9 shall not apply with respect to taxes other than any taxes that represent losses, claims, damages, etc. arising from any non-tax claim. **NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES THAT MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY DIP DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.**

10.     <u>Adjustments for Withholding, Capital Adequacy Etc.</u>  All payments to the Agent by the Borrower under this Note shall be made free and clear of and without deduction or withholding for any and all taxes, duties, levies, imposts, deductions, charges or withholdings and all related liabilities (all such taxes, duties, levies, imposts, deductions, charges, withholdings and liabilities being referred to as "Taxes") imposed by the United States of America or any other nation or jurisdiction (or any political subdivision or taxing authority of either thereof), unless such Taxes are required by applicable law to be deducted or withheld.  If the Borrower shall be required by applicable law to deduct or withhold any such Taxes from or in respect of any amount payable under this Note other than taxes imposed on the Agent or any DIP Lender's overall net income, then (A) if such Tax is an Indemnified Tax, the amount payable shall be increased as may be necessary so that after making all required deductions or withholdings, (including deductions or withholdings applicable to any additional amounts paid under this Note) the Agent receives an amount equal to the amount it would have received if no such deduction or withholding had been made, (B) the Borrower shall make such deductions or withholdings, and (C) the Borrower shall timely pay the full amount deducted or withheld to the relevant governmental entity in accordance with applicable law.

If the effect of the adoption, effectiveness, phase-in or applicability after the date hereof of any law, rule or regulation (including without limitation any tax, duty, charge or withholding on or from payments due from the Borrower (but excluding Indemnified Taxes, Excluded Taxes, and taxation on the overall net income of the DIP Lenders)), or any change therein or in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, is to reduce the rate of return on the capital of the Agent with respect to this Note or to increase the cost to the Agent of making or maintaining amounts available under this Note, the Borrower agrees to pay to the

Agent such additional amount or amounts as will compensate the Agent on an after-tax basis for such reduction or increase.

The Borrower agrees to timely pay any present or future stamp or documentary taxes or any other excise or property taxes, charges, financial institutions duties, debits taxes or similar levies (all such taxes, charges, duties and levies being referred to as "Other Taxes") which arise from any payment made by the Borrower under this Note or from the execution, delivery or registration of, or otherwise with respect to, this Note.

The Borrower shall indemnify the Agent and each of the DIP Lenders for the full amount of Indemnified Taxes (including, without limitation, any Indemnified Taxes imposed by any jurisdiction on amounts payable by the Borrower hereunder) paid by the Agent or any DIP Lender and any liability (including penalties, interest and expenses) arising from or with respect to such Indemnified Taxes paid by the Agent or any DIP Lender, whether or not they were correctly or legally asserted, excluding taxes imposed on the Agent or any DIP Lender's overall net income. Payment under this indemnification shall be made upon demand. A certificate as to the amount of such Indemnified Taxes submitted to the Borrower by the Agent shall be conclusive evidence, absent manifest error, of the amount due from the Borrower to the DIP Lenders.

The Borrower shall furnish to the DIP Lenders the original or a certified copy of a receipt evidencing any payment of Taxes made by the Borrower pursuant to this Section 10 within thirty (30) days after the date of any such payment. If any Recipient becomes aware that it has received a refund of any Taxes with respect to which the Borrower has paid any amount pursuant to this Section 10, such Recipient shall pay the amount of such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such Recipient and without interest (other than any interest received from the relevant governmental authority with respect thereto), to the Borrower promptly after receipt thereof.

Any Recipient of a payment hereunder shall, to the extent it is legally entitled to do so, deliver to the Borrower on or prior to the date hereof (and from time to time thereafter upon the reasonable request of the Borrower), two properly completed and executed copies of IRS Forms W-8 or W-9 and properly completed and executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction (if any) required to be made. In addition, any such Recipient, if reasonably requested by the Borrower, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower as will enable the Borrower to determine whether or not such Recipient is subject to backup withholding or information reporting requirements. Each Recipient agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall timely update such form or certification or promptly notify the Borrower in writing of its legal inability to do so.

11.    Priority of Obligations and DIP Lenders' Liens.

(a)    To secure all of the Borrower's Obligations now existing or hereafter

arising, the Agent, for the benefit of itself and the DIP Lenders, is granted, effective as of the Order for Relief Date: (i) subject to the Carve-Out, an allowed super-priority administrative expense claim against each of the Borrower and Guarantors (jointly and severally) pursuant to Section 364(c)(1) of the Bankruptcy Code, and except as set forth in the Financing Orders, having a priority over any and all other claims and costs and expenses of administration of any kind whatsoever, whether now existing or hereafter arising, including, without limitation, those specified in, ordered pursuant to or arising under, *inter alia*, sections 105, 326, 328, 330, 331, 363, 364, 503, 506, 507, 546, 726, 1113 or 1114 or any other provision of the Bankruptcy Code or otherwise (whether incurred in these Chapter 11 Cases and any Successor Case), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed superpriority administrative claim (x) shall at all times be senior to the rights of the Debtors, any successor trustee or estate representative, or any other creditor or party in interest in the Chapter 11 Cases or any Successor Case, (y) shall be, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, considered an administrative expense allowed under section 503(b) of the Bankruptcy Code, and (z) shall be payable from and have recourse to all prepetition and postpetition property, whether existing as of the Order for Relief Date or thereafter acquired, of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, proceeds of Avoidance Actions (as defined in the Financing Orders)); and (ii) (x) pursuant to Sections 364(c)(2) of the Bankruptcy Code, Liens on, and security interests in, the Collateral, that are first and senior in priority to all other Liens on, and security interests in, the Collateral that was not encumbered by a valid, enforceable, properly perfected and non-avoidable Lien as of the Order for Relief Date, subject only to the Carve-Out, and (y) pursuant to sections 364(c)(3) and 364(d) of the Bankruptcy Code, priming Liens on, and security interests in, all other Collateral, subject only to the Carve-Out and Permitted Prior Liens. Except as set forth in the Financing Orders, the security interests and Liens granted to the Agent hereunder shall not be (i) subject to any Lien or security interest which is avoided and preserved for the benefit of the Loan Parties' estate under Section 551 of the Bankruptcy Code, or (ii), subordinated to or made pari passu with any other Lien or security interest under Section 364(d) of the Bankruptcy Code or otherwise.

(b)     The priority of the Agent's Liens on the Collateral shall be as set forth in the Financing Orders.

(c)     Notwithstanding anything herein to the contrary (i) all proceeds received by the Agent and the DIP Lenders from the Collateral subject to the Liens granted in this Section 11 and in each other DIP Document, including the Financing Orders shall be subject to the Carve-Out, and (ii) no Person entitled to the Carve-Out shall be entitled to sell, or otherwise dispose, or seek or object to the sale or other disposition of, any Collateral.

(d)     Each of the Loan Parties agrees for itself that the Obligations of such Person shall constitute allowed administrative expenses in the Chapter 11 Cases, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 363, 364, 365, 503, 506, 507, 546, 726, 1113 and/or 1114 of the Bankruptcy Code, except as set forth in the Financing Orders.

(e)     The Agent's Liens on the Collateral and the super-priority administrative claim under Section 364(c) of the Bankruptcy Code afforded the Obligations and the Guaranteed Obligations shall, following the occurrence and during the continuation of an Event of Default, be subject to the Carve-Out, in accordance with the Financing Orders.

12.     Further Assurances.  Each Loan Party agrees that it shall, at its expense and upon the reasonable request of the Agent, duly execute and deliver or cause to be duty executed and delivered, to the Agent or such DIP Lender, as the Agent shall direct such Loan Party such further instruments and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of the Agent to carry out more effectively the provisions and purposes of this Note or any other DIP Document, including, upon the written request of the Agent and in form and substance reasonably satisfactory to the Agent, security agreements, UCC-l financing statements and other Collateral Documents confirming and perfecting the granting to the Agent, on behalf of the DIP Lenders, of the Liens (subject to the Financing Orders) in the Collateral to secure the Obligations.

13.     Reports and Notices.  The Loan Parties agree that they shall deliver (which delivery may be made by electronic communication (including email)) to the Agent each of the reports and other items (without duplication) set forth on Schedule 13 and in the Financing Orders no later than the times specified therein.  The Parent agrees not to, and agrees to cause each of its Subsidiaries not to, change its fiscal year.  In addition, the Parent agrees to, and agrees to cause each of its Subsidiaries to, maintain a system of accounting that enables the Parent and such Subsidiaries to produce financial statements in accordance with GAAP in all material respects.

14.     Affirmative Covenants.

The Parent and its Subsidiaries agree that:

(a)     Upon request of the Agent, the Parent and its Subsidiaries will permit any officer, employee, attorney or accountant or agent of the Agent to audit, review, make extracts from or copy, at the Parent's and its Subsidiaries' expense, any and all corporate and financial and other books and records of the Parent and its Subsidiaries at all times during ordinary business hours and, in the absence of an Event of Default, upon reasonable advance notice and to discuss the Parent's and its Subsidiaries' affairs with any of their directors, officers, employees, attorneys, or accountants.  The Parent and it Subsidiaries will permit the Agent, or any of its officers, employees, accountants, attorneys or agent, to examine and inspect any Collateral or any other property of the Parent and its Subsidiaries at any time during ordinary business hours and, in the absence of an Event of Default, upon reasonable prior notice. Notwithstanding the foregoing, none of the Parent or any of its Subsidiaries will be required to disclose information to the Agent (or any agent or representative thereof) that is prohibited by applicable law or is subject to attorney-client or similar privilege or constitutes attorney work product.

(b)     (A) The Parent and its Subsidiaries will comply with all requirements of applicable law, the non-compliance with which could reasonably be expected to have a Material Adverse Effect and (B) the Parent and its Subsidiaries will obtain, maintain in effect and comply with all contracts and all permits, licenses and similar approvals necessary for the operation of their respective businesses as now or hereafter conducted other than to the extent contemplated by

the Budget, the Sale Motion or the Financing Orders.

(c)     The Parent and its Subsidiaries will pay or discharge, when due, (i) all taxes, assessments and governmental charges levied or imposed upon them or upon their respective income or profits, upon any respective properties of the Parent and its Subsidiaries (including, without limitation, the Collateral) or upon or against the creation, perfection or continuance of the security interest, prior to the date on which penalties attach thereto, except in each case (1) where the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Parent and its Subsidiaries (as applicable) and (2) taxes the nonpayment of which is permitted or required by the Bankruptcy Code or this Note, (ii) all federal, state and local taxes required to be withheld by them, and (iii) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a lien or charge upon any respective properties of the Parent and its Subsidiaries.

(d)     (i) The Parent and each of its Subsidiaries will keep and maintain the Collateral and all of their respective other properties necessary or useful in their respective businesses in good condition, repair and working order (normal wear and tear excepted) other than to the extent contemplated by the Budget, any Sale Order or the Financing Orders, (ii) the Parent and each of its Subsidiaries will defend the Collateral against all claims or demands of all Persons (other than Permitted Encumbrances) claiming the Collateral or any interest therein, and (iii) the Parent and each of its Subsidiaries will keep all Collateral free and clear of all security interests, liens and encumbrances, except Permitted Encumbrances and other than to the extent contemplated by any Sale Order or the Financing Orders.

(e)     The Parent and its Subsidiaries will obtain and at all times maintain insurance with responsible and reputable insurers, in such amounts and against such risks as may be required by the Prepetition Facility whether or not such facility remains in effect. Without limiting the generality of the foregoing, the Parent and its Subsidiaries will at all times keep all tangible Collateral insured against such risks as may be required by the Prepetition Facility whether or not such facility remains in effect, with any loss payable to the Agent to the extent of its interest and subject to the Financing Orders, and shall provide within 10 days of the Closing Date (as may be extended by the Agent in its sole discretion) that all policies of such insurance shall contain a loss payable endorsement in favor of the Agent and subject to the Financing Orders, in form and substance acceptable to the Agent in its sole discretion. The Parent and its Subsidiaries shall use commercially reasonable efforts to provide within 10 days of the Closing Date (as may be extended by the Agent in its sole discretion) that all policies of liability insurance required hereunder shall name the Agent as an additional insured.

(f)     The Parent and its Subsidiaries will preserve and maintain their existence and all of their rights, privileges and franchises necessary or desirable in the normal conduct of their business, except to the extent contemplated by the Budget, the Sale Motion or the Financing Orders.

(g)     The Parent and its Subsidiaries shall at all times operate their businesses in a manner consistent with the Budget except to the extent of any Permitted Variance.

(h)     The Parent and its Subsidiaries each agree that they shall take all actions

necessary to cause each of the following to occur (each a "Milestone" and collectively, the "Milestones"):

(1)    no later than 2 Business Days after the Order for Relief Date, the Interim Order approving this Note shall be entered by the Bankruptcy Court;

(2)    no later than 30 days after the entry of the Interim Order, the Final Order approving this Note and the financing contemplated hereby shall be entered by the Bankruptcy Court;

(3)    no later than February 18, 2020, the Loan Parties shall file one or more motions (together with all exhibits, annexes and related documents, the "Sale Motion"), in form and substance reasonably acceptable to the Agent, which Sale Motion shall be in form and substance acceptable to the Agent in its sole discretion, seeking entry of orders (x) establishing bidding procedures (the "Bid Procedures") for the sale(s) of all or substantially all of the Loan Parties' assets (such order, together with all exhibits, annexes and related documents, the "Bid Procedures Order"), which Bid Procedures Order shall be in form and substance acceptable to the Agent in its sole discretion, and (y) approving the sale(s) of all or substantially all the assets of the Loan Parties (any such order, together with all exhibits, annexes and related documents, the "Sale Order"), which Sale Order shall be in form and substance acceptable to the Agent in its sole discretion;

(4)    no later than February 24, 2020, the Loan Parties shall have received one or more letters of intent from potential bidders, each in form and substance acceptable to the Agent in its sole discretion;

(5)    no later than March 11, 2020, the hearing on the Sale Motion as it relates to the approval of the Bid Procedures and entry of the Bid Procedures Order shall be held;

(6)    no later than March 13, 2020, the Loan Parties shall obtain entry of the Bid Procedures Order in form and substance acceptable to the Agent in its sole discretion;

(7)    no later than April 17, 2020, the Loan Parties shall have received one or more Qualified Bid(s) (as defined in the Bid Procedures), each in form and substance acceptable to the Agent in its sole discretion;

(8)    to the extent required under the Bid Procedures Order and more than one Qualified Bid is received by the Bid Deadline (as defined in the Bid Procedures), not later than April 20, 2020, the Loan Parties shall commence an auction in accordance with the Bid Procedures Order, and after consultation with and approval by the Agent , select the successful bid(s);

(9)    no later than April 23, 2020, the hearing on the Sale Motion as it relates to the approval of the sale(s) of all or substantially all of the Loan Parties' assets and entry of the Sale Order shall be held;

(10)    no later than April 24, 2020, the Bankruptcy Court shall have entered Sale Order, in form and substance acceptable to the Agent in its sole discretion, which Sale Order, among other things, (x) authorizes the sale(s) of the Loan Parties' assets free and clear of all liens, claims and interests (other than those expressly preserved in the Sale Order) and (y) contains the "good faith" protections pursuant to Bankruptcy Code section 363(m) (the "Approved Sale(s)"); and

(11)    no later than May 1, 2020, the Approved Sale(s) shall have been consummated and all proceeds of such sales applied in accordance with the Financing Orders.

15.    Negative Covenants.

The Parent and its Subsidiaries each agree that, without the prior written consent of the Agent:

(a)    Neither the Parent nor any of its Subsidiaries shall directly or indirectly, by operation of law or otherwise, (i) form or acquire any Subsidiary, or (ii) merge with, consolidate with, acquire all or substantially all of the assets or Equity Interests of, or otherwise combine with or acquire, any Person, except in the case of this clause (ii), with respect to existing Subsidiaries to the extent consented to by the Agent.

(b)    Neither the Parent nor any of its Subsidiaries shall create, incur, assume or permit to exist any Indebtedness, except (without duplication), to the extent not prohibited by the Financing Orders, Permitted Indebtedness.

(c)    Neither the Parent nor any of its Subsidiaries shall enter into, renew, extend or be a party to, or permit any of its Subsidiaries to enter into, renew, extend or be a party to, any transaction with any affiliate, except transactions otherwise expressly permitted by this Note.

(d)    Neither the Parent nor any of its Subsidiaries shall create, incur, assume or permit to exist any Lien on or with respect to any of its properties or assets (whether now owned or hereafter acquired) except for Permitted Encumbrances or as expressly permitted by the Financing Orders.

(e)    Neither the Parent nor any of its Subsidiaries shall (a) make any Restricted Payment, except dividends and distributions by Subsidiaries of the Parent paid to the Parent or other wholly-owned Subsidiaries of the Parent and (b) make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except pursuant to the terms of the Financing Orders and as permitted under this Note.

(f)    Neither the Parent nor any of its Subsidiaries will assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other Person (other than the Parent or any of its Subsidiaries), except the endorsement of negotiable instruments by Parent and its Subsidiaries for the deposit or collection or similar transactions in the ordinary course of business.

(g)    Neither the Parent nor any of its Subsidiaries will convey, sell, lease, assign,

transfer or otherwise dispose of any of its property, business or assets, whether now owned or hereinafter acquired other than (a) the sale of Inventory in the ordinary course of business, (b) the sale or disposition of obsolete equipment, (c) the sale of other property on terms acceptable to the Agent in its sole discretion, and (d) the transfer, sale or disposition of assets approved by an order of the Bankruptcy Court, which order shall be in form and substance acceptable to the Agent in its sole discretion.

(h)    Neither the Parent nor any of its Subsidiaries shall consent to any amendment, supplement or other modification of any of the terms or provisions contained in, or applicable to, (a) any of the Financing Orders, (b) the Prepetition Obligations or (c) Material Contracts.  Except for (i) claims of employees for unpaid wages, bonuses, accrued vacation and sick leave time, business expenses and contributions to employee benefit plans for the period immediately preceding the Order for Relief Date and prepetition severance obligations, in each case to the extent permitted to be paid by an order of the Bankruptcy Court (which order shall be in form and substance acceptable to the Agent in its sole discretion) and pursuant to the Budget, and (ii) payments permitted by the Financing Orders and the Budget, neither the Parent nor any of its Subsidiaries shall make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except for other payments consented to by the Agent in writing in its sole discretion or applied by the Agent to any Prepetition Obligations as provided for under this Note.

(i)    Neither the Parent nor any of its Subsidiaries shall make any investment in, or make loans or advances of money to, any Person, through the direct or indirect lending of money, holding of securities or otherwise.

16.    <u>Events of Default; Rights and Remedies</u>.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

A.    Any Loan Party (i) shall fail to make any payment of principal of, or interest on, or fees owing in respect of, the Term Loans or any of the other Obligations when due and payable, or (ii) shall fail to pay or reimburse the Agent on behalf of the DIP Lenders for any expense reimbursable hereunder or under any other DIP Document within three (3) Business Days following the Agent's demands for such reimbursement or payment.

B.    Any Loan Party shall fail to comply with any of the provisions of (i) Sections 13, 14(b), 14(c), 14(d), 14(e) or 14(f) of this Note and such failure shall remain uncured for a period of one (1) Business Day, or (ii) Section 14(a) of this Note and such failure shall remain uncured for a period of three (3) Business Days, or (iii) Section 15 of this Note or any material provision of the Guaranty.

C.    Any Loan Party shall fail to comply with any of other provision of this Note or any of the other DIP Documents (other than any provision embodied in or covered by any other clause of this Section 16) and the same (other than the provisions covered by Section 14(h)), if capable of being remedied, shall remain unremedied for ten (10) days after the earlier of the date a senior officer or any Loan Party becomes aware of such failure and the date written notice of

such default shall have been given by the Agent to such Loan Party.

D.    Except for defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party from complying or permits any Loan Party not to comply, a default or breach shall occur under any other agreement, document or instrument to which any Loan Party is a party that is not cured within any applicable grace period therefor, and such default or breach (i) involves the failure to make any payment when due in respect of any Indebtedness (other than the Obligations) of any Loan Party in excess of $50,000 in the aggregate, or (ii) causes, or permits any holder of such Indebtedness or a trustee to cause, Indebtedness or a portion thereof in excess of $50,000 in the aggregate to become due prior to its stated maturity or prior to its regularly scheduled dates of payment, regardless of whether such default is waived, or such right is exercised, by such holder or trustee.

E.    Any representation or warranty herein or in any other DIP Document or in any written statement, report, financial statement or certificate made or delivered to DIP Lenders by any Loan Party is untrue or incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date when made or deemed made.

F.    Any Loan Party shall bring a motion in any Chapter 11 Case:  (i) to obtain financing from any Person other than DIP Lenders under Section 364(c) or 364(d) of the Bankruptcy Code, except to the extent the proceeds of such financing would be used to indefeasibly repay in full in cash all of the Obligations under this Note; (ii) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral, except to the extent the proceeds of any such financing secured by such Lien would be used to indefeasibly repay in full in cash all of the Obligations under this Note; (iii) [reserved]; or (iv) to authorize any other action or actions adverse to the Agent or the DIP Lenders, or the Agent's and/or the DIP Lenders' rights and remedies hereunder or their interests in the Collateral.

G.    The entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization that does not contain a provision for the termination of the DIP Lenders' commitment to make Term Loans and the indefeasible repayment in full in cash of all the Obligations under this Note and the obligations under the Prepetition Facility on or before the effective date of such plan or plans and that is not otherwise acceptable to the Agent in its sole discretion.

H.    The filing of any motion by the Borrower or any other Loan Party seeking, or the entry of any order in the Chapter 11 Cases in respect of, any claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any Collateral.

I.    The sale without the Agent's consent in its sole discretion, of all or substantially all of Borrower's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise, that does not provide for the indefeasible payment in full in cash of the Obligations and the obligations under the Prepetition Facility and termination of the DIP Lenders' commitment to make Term Loans, and is not otherwise acceptable to the Agent in its sole discretion.

J.      The occurrence of any postpetition judgments, liabilities or events that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

K.      The entry by the Bankruptcy Court of an order authorizing the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, business, or reorganization of any Loan Party.

L.      The Chapter 11 Cases, or any of them, shall be dismissed or converted from cases under Chapter 11 to cases under Chapter 7 of the Bankruptcy Code.

M.      The entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Note or the other DIP Documents.

N.      The entry of an order in any Chapter 11 Case granting any other super-priority administrative claim or Lien equal to or superior to that granted to the Agent (other than any such claim or Lien permitted by the Financing Orders), unless (i) consented to by the Agent in its sole discretion or (ii) the Obligations and the obligations under the Prepetition Facility are indefeasibly paid in full in cash and the DIP Lenders' commitment to make Term Loans is terminated.

O.      The entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor (other than the Agent) to execute upon or enforce a Lien on any Collateral except with respect to Permitted Encumbrances arising prior to the Order for Relief Date in an aggregate amount not to exceed $50,000.

P.      The Financing Orders (or either of them) shall be stayed, amended, modified, reversed or revoked in any respect without the Agent's prior written consent (which consent shall be in its sole discretion).

Q.      There shall commence any suit or action against the Agent or any DIP Lender by or on behalf of (i) any Loan Party or (ii) any official committee in the Chapter 11 Cases, in each case, that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of DIP Lenders and, if such suit or action is commenced by any Person other than any Loan Party, officer, or employee of any Loan Party, such suit or action shall not have been dismissed or stayed within 10 days after service thereof on the Agent or any DIP Lender, as applicable, and, if stayed, such stay shall have been lifted.

R.      Failure of the Loan Parties to comply with any Milestone set forth in Section 14(h).

S.      Any provision of any DIP Document shall for any reason cease to be valid, binding and enforceable in accordance with its terms (or any Loan Party shall challenge the enforceability of any DIP Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any DIP Document has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any Lien created under any

DIP Document shall cease to be a valid and perfected first priority Lien (except as otherwise permitted herein or in the Financing Orders) in any of the Collateral purported to be covered thereby.

T.      Termination of the use of Cash Collateral pursuant to the terms of the Financing Orders.

U.      Assets of any Loan Party with a fair market value of $100,000 or more are attached, seized, levied upon or subjected to a writ or distress warrant, or come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors of any Loan Party and such condition continues for ten (10) days or more.

V.      A breach by any Loan Party of any of the terms of any of the Financing Orders.

W.      A Material Adverse Deviation shall have occurred.

X.      Entry of an order authorizing and/or directing the reclamation of goods pursuant to section 546(c) of the Bankruptcy Code.

Y.      The Final Order shall not have been entered by the Bankruptcy Court within 30 days from the date of the entry of the Interim Order.

Z.      The Loan Parties terminate or fail to continue to retain on terms and conditions (including scope of authority) reasonably acceptable to the Agent (1) Huron Consulting Group, as chief transformation officer of the Loan Parties or (2) Jefferies LLC, as investment banker and financial advisor to the Loan Parties.

If any Event of Default shall have occurred and be continuing, then the Agent may, upon written notice to the Borrower and subject to the terms of the Financing Orders: (i) terminate the Commitment of each DIP Lender with respect to further Term Loans; (ii) declare all or any portion of the Obligations, including all or any portion of any Term Loan, to be forthwith due and payable; (iii) revoke the Borrower's and the other Loan Parties' rights to use Cash Collateral in which the Agent and the DIP Lenders have an interest; and (iv) exercise any rights and remedies under the DIP Documents or at law or in equity, all in accordance with the Financing Orders. Upon the occurrence of an Event of Default and the exercise by the Agent or the DIP Lenders of their rights and remedies under this Note and the other DIP Documents pursuant to clause (iv) above and subject to the Financing Orders, each Loan Party shall assist the Agent in effecting the sale or other disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable from such sale or other disposition.

Except as otherwise provided for in this Note or by applicable law, each Loan Party waives:  (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the Agent on which any such Loan Party may in any way be liable, and hereby ratifies and confirms whatever the Agent may do in this regard; (b) all rights to notice and a hearing prior to the Agent taking possession or

control of, or Agent's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Agent to exercise any of its remedies; and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

To the extent permitted by law and subject in all respects to the terms of the Financing Orders, the Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under section 9-207 of the Uniform Commercial Code or otherwise, shall be to deal with it in the same manner as Agent deals with similar securities and property for its own account, the Agent's duty of care with respect to Collateral in the custody or possession of a bailee or other third person shall be deemed fulfilled if the Agent exercises reasonable care in the selection of the bailee or other third person, and the Agent need not otherwise preserve, protect, insure or care for any Collateral, and the Agent shall not be obligated to preserve any rights any Loan Party may have against prior parties.

17.    <u>Reference Agreements</u>.  This Note evidences the Term Loans that may be made to Borrower from time to time in the aggregate principal amount outstanding of up to $10,000,000 and is issued pursuant to and entitled to the benefits of the Financing Orders, to which reference is hereby made for a more complete statement of the terms and conditions under which the Term Loans evidenced by this Note are made and are to be repaid.

18.    <u>Definitions</u>.  The following terms used in this Note shall have the following meanings (and any of such terms may, unless the context otherwise requires, be used in the singular or the plural depending on the reference):

"<u>Additional Loan Facility Fee</u>" shall have the meaning given such term in Section 8 of this Note.

"<u>Bankruptcy Code</u>" shall have the meaning given such term in the recital to this Note.

"<u>Bankruptcy Court</u>" shall have the meaning given such term in the recital to this Note.

"<u>Borrower</u>" shall have the meaning given such term in the recital to this Note.

"<u>Budget</u>" means a rolling thirteen (13) week forecast of projected receipts, disbursements, net cash flow, liquidity, loans and availability for the immediately following consecutive 13 weeks after the date of delivery, which shall be in substantially the form of the Initial Budget or otherwise in form and substance acceptable to the Agent in its sole discretion and shall be approved by the Agent in its sole discretion.  The initial Budget, which shall be in form and substance acceptable to, and approved by, the Agent in its sole discretion (the "<u>Initial Budget</u>") is attached hereto as <u>Exhibit A</u>.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or legal holiday under the laws of the State of New York or any other day on which banking institutions located in the State of New York are authorized or required by law or other governmental action to close.

"<u>Carve-Out</u>" shall have the meaning given such term in the Financing Orders.

DOC ID - 33364517.8

"Cash Collateral" shall have the meaning given such term in the Financing Orders, and shall include "cash collateral" as that phrase is defined in Section 363(a) of the Bankruptcy Code.

"Chapter 11 Case" and "Chapter 11 Cases" shall have the respective meanings given such terms in the recital to this Note.

"Closing Date" means the Business Day when each of the conditions applicable to the Initial Funding and listed in Section 2 of this Note shall have been satisfied or waived in a manner satisfactory to the Agent.

"Collateral" shall mean the assets and property covered by the Financing Orders and the other Collateral Documents and any other assets and property, real or personal, tangible or intangible, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of the Agent on behalf of the DIP Lenders, to secure the Obligations and the Guaranteed Obligations, and shall include DIP Collateral (as defined in the Financing Orders). Without limiting the foregoing, the Collateral shall include all present and future property of each Loan Party under Section 541(a) of the Bankruptcy Code (including, without limitation, the proceeds of avoidance actions upon entry of the Final Order) and all proceeds thereof.

"Collateral Documents" shall mean any agreement entered into pursuant to Section 12 hereof and all similar agreements entered into guaranteeing payment of, or granting a Lien upon property as security for payment of, the Obligations and the Guaranteed Obligations, each in form and substance acceptable to the Agent in its sole discretion, including the Financing Orders and the Guaranty.

"Commitment" means, with respect to each DIP Lender, the commitment of such DIP Lender to make its portion of the Term Loans to the Borrower in the principal amount set forth on the signature page to this Note for each DIP Lender, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Debtors" shall have the meaning given to such term in the Financing Orders.

"Default" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning given such term in Section 4(d) of this Note.

"DIP Documents" shall mean this Note, the Collateral Documents, the Guaranty, the Financing Orders, and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of the Agent and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Loan Party, or any employee of any Loan Party, and delivered to the Agent in connection with this Note or the transactions contemplated thereby, in each case in form and substance acceptable to the Agent in its sole discretion.  Any reference in this Note or any other DIP Document to a DIP Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto,

and shall refer to such DIP Document as the same may be in effect at any and all times such reference becomes operative.

"DIP Lenders" shall have the meaning given such term in the recital to this Note.

"Dollars" or "$" shall mean lawful currency of the United States of America.

"Equity Interests" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"Event of Default" shall have the meaning given such term in Section 16 of this Note.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any DIP Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof), (b) in the case of a DIP Lender, federal withholding Taxes imposed on amounts payable to or for the account of such DIP Lender with respect to an applicable interest in a Term Loan or Commitment pursuant to a law in effect on the date on which (i) such DIP Lender acquires such interest in the Term Loan or Commitment or (ii) such DIP Lender changes its lending office, except in each case to the extent that, pursuant to Section 10, amounts with respect to such Taxes were payable either to such DIP Lender's assignor immediately before such DIP Lender became a party hereto or to such DIP Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to provide the Borrower with the tax documentation described in Section 10 hereof and (d) any withholding Taxes imposed under FATCA.

"Extraordinary Receipts" means any cash received by the Parent or any of its Subsidiaries not in the ordinary course of business (and not consisting of proceeds described Sections 7(b) and (c) hereof), including, without limitation, (i) foreign, United States, state or local tax refunds, (ii) pension plan reversions, (iii) proceeds of insurance, (iv) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (v) condemnation awards (and payments in lieu thereof), (vi) indemnity payments and (vii) any purchase price adjustment received in connection with any purchase agreement.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among governmental authorities and implementing such Sections of the Internal Revenue Code.

"Final Order" shall mean the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing pursuant to Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001, satisfactory in form and substance to the Agent in its sole discretion, together with all

extensions, modifications and amendments thereto (which extensions, modifications and/or amendments are satisfactory in form and substance to the Agent in its sole discretion), authorizing Borrower to obtain credit, incur Indebtedness, and grant Liens under this Note and/or certain financing documentation, all as set forth in such order.

"Financing Orders" shall mean, collectively, the Interim Order and the Final Order.

"GAAP" shall mean generally accepted accounting principles in the United States of America.

"Guaranteed Obligations" shall mean the obligations to be guaranteed by each Guarantor pursuant to the terms of the Guaranty.

"Guarantor" shall have the meaning given such term in the recital to this Note.

"Guaranty" shall mean a guaranty of the Guarantors, in form and substance satisfactory to the Agent in its sole discretion, with respect to the Obligations.

"Indebtedness" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"Indemnified Person" shall have the meaning given such term in Section 9 of this Note.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any DIP Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Initial Loan Facility Fee" shall have the meaning given such term in Section 8 of this Note.

"Interim Order" shall mean the interim order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications and amendments thereto, satisfactory in form and substance to the Agent in its sole discretion, authorizing, on an interim basis, Borrower to execute and perform under the terms of this Note and the other DIP Documents.

"Inventory" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"LIBOR Rate" means "LIBOR Rate" as such term is (i) applicable to the Term Loan (as defined in the Prepetition Credit Agreement) and (ii) defined in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"LIBOR Rate Loan" means each portion of a Term Loan that bears interest at a rate determined by reference to the LIBOR Rate.

"Lien" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction).

"Loan Party" means the Borrower and any Guarantor.

"Material Adverse Deviation" means, as of any date of determination, an adverse deviation of more than the Permitted Variance from the aggregate amount set forth in the following line items of the Budget: (i) "Total Operating Disbursements" for the following periods: the 3 weeks ending on February 21, 2020,  the 4 weeks ending on February 28, 2020 and each rolling 4 week period thereafter and (ii) "Cash Receipts" for the following periods: the 2 weeks ending on February 21, 2020, the 3 weeks ending on February 28, 2020, the 4 weeks ending on March 6, 2020 and each rolling 4 week period thereafter.

"Material Adverse Effect" means a material adverse effect on (i) the operations, business, assets, properties or condition (financial or otherwise) of the Loan Parties taken as a whole, (ii) the ability of any Loan Party to perform any of its payment or other material obligations under any DIP Document to which it is a party, (iii) the legality, validity or enforceability of this Note or any other DIP Document, (iv) the rights and remedies of the Agent and the DIP Lenders under any DIP Document, or (v) the validity, perfection or priority of a Lien in favor of DIP Lenders on any of the Collateral.

"Material Contract" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"Maturity Date" means the earliest to occur of (i) 120 days from the Closing Date, (ii) the date that is 30 days following the date of entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (iii) the consummation of a sale of all or substantially all of the Loan Parties' assets, (iv) the substantial consummation of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order of the Bankruptcy Court, (v) the filing of a motion by any of the Loan Parties seeking dismissal of any of the Chapter 11 Cases, (vi) the dismissal of any of the Chapter 11 Cases, (vii) the filing of a motion by any of the Loan Parties seeking to convert of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, (viii) the conversion of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, (ix) the date on which the Term Loans are accelerated pursuant to Section 16 or (x) any other event set forth in the Financing Orders and/or the other DIP Documents as triggering a Maturity Date.

"Maximum Amount" shall have the meaning given such term in Section 1 of this Note.

"Milestones" shall have the meaning given such term in Section 14 of this Note.

"Note" shall have the meaning given such term in the recital to this Note.

"Obligations" shall mean all loans, advances, debts, liabilities and obligations for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by Borrower to DIP Lenders, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, in all cases, arising under this Note or any of the other DIP Documents.  This term includes all principal, interest, fees, charges, expenses, attorneys' fees and any other sum chargeable to Borrower under this Note or any of the other DIP Documents.

"Other Taxes" shall have the meaning given such term in Section 10 of this Note.

"Participant Register" shall have the meaning given such term in Section 21 of this Note.

"Payment Office" means such office or offices of the Agent as may be designated in writing from time to time by the Agent to the Borrower.

"Permitted Encumbrances" shall mean the following encumbrances:  (a) Liens for taxes or assessments or other governmental charges (i) not yet due and payable, (ii) that are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, or (iii) the nonpayment of which is permitted or required by the Bankruptcy Code;  (b) pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation (excluding Liens under ERISA); (c) pledges or deposits of money securing bids, tenders, contracts (other than contracts for the payment of money) or leases to which any Loan Party is a party as lessee made in the ordinary course of business; (d) carriers', warehousemen's, suppliers' or other similar possessory liens arising in the ordinary course of business; (e) deposits securing, or in lieu of, surety, appeal or customs bonds in proceedings to which any Loan Party is a party; (f) zoning restrictions, easements, licenses, or other restrictions on the use of any real estate or other minor irregularities in title (including leasehold title) thereto so long as the same do not materially impair the use, value, or marketability of such real estate; (g) the Agent's and DIP Lenders' Liens; (h) Liens existing on the Order for Relief Date (to the extent valid, enforceable, properly perfected, senior to the Liens of Prepetition Secured Parties, and not subject to avoidance, in each case, as of the Order for Relief Date or perfected after the Order for Relief Date pursuant to section 546(b) of the Bankruptcy Code); (i) Liens in favor of the Prepetition Secured Parties and other Liens granted pursuant to the Financing Order (including, to the extent constituting a Lien, the Carve-Out), subject to the priorities set forth in the Financing Orders; and (j) to the extent constituting Liens, Liens on goods delivered to any Loan Party after the Order for Relief Date under any consignment or similar title retention agreements.

"Permitted Indebtedness" shall mean:  (a) current Indebtedness incurred in the ordinary course of business for inventory, supplies, equipment, services, taxes or labor, in each case, in accordance with the Budget; (b) Indebtedness arising under this Note and the other DIP Documents; (c) Prepetition Obligations; (d) deferred taxes and other expenses incurred in the ordinary course of business, in accordance with the Budget; (e) any Indebtedness existing on the Order for Relief Date, subject to the terms of the Financing Order and the Budget; and (f)

administrative expenses of Borrower for which the Bankruptcy Court has not directed payment, subject to the terms of the Financing Order and the Budget.

"Permitted Prior Liens" shall mean certain permitted senior liens as expressly set forth, and defined, in the Financing Orders.

"Permitted Variance" means (a) a variance of up to 10% between the actual disbursements for the applicable 2, 3 or 4 week period and the "Total Operating Disbursements" line item as set forth in the Budget for the applicable 2, 3 or 4 week period (other than professional fees) and/or (b) a negative variance of up to 10% between the actual receipts for the applicable 2, 3 or 4 week period and the "Cash Receipts" line item as set forth in the Budget for the applicable 2, 3 or 4 week period.

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"Prepetition Secured Parties" shall have the meaning given such term in the Financing Orders.

"Prepetition Credit Agreement" shall have the meaning given such term in the Financing Orders.

"Prepetition Facility" shall have the meaning given such term in the Financing Orders.

"Prepetition Obligations" shall have the meaning given such term in the Financing Orders.

"Pro Rata Share" means with respect to a DIP Lender's obligation to make Term Loans and receive payments of interest, fees and principal with respect thereto, the percentage obtained by dividing (i) such DIP Lender's Commitment by (ii) the Maximum Amount.

"Recipient" means the Agent or any DIP Lender, as applicable.

"Reference Rate" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"Reference Rate Loan" means each portion of a Term Loan that bears interest at a rate determined by reference to the Reference Rate.

"Register" shall have the meaning given such term in Section 21 of this Note.

"Registered Loan" shall have the meaning given such term in Section 21 of this Note.

"Related Fund" shall mean, with respect to any Person, an affiliate of such Person, or a fund or account managed by such Person or an affiliate of such Person.

"Required Lenders" shall mean, at any time, DIP Lenders whose aggregate Pro Rata Shares exceed 50%.

"Restricted Payment" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"Sale Motion" shall have the meaning given such term in Section 14 of this Note.

"Stockholder" shall mean with respect to any Person, each holder of Equity Interests of such Person.

"Subsidiary" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"Successor Case" shall have the meaning given such term in the Financing Orders.

"Taxes" shall have the meaning given such term in Section 10 of this Note.

"Term Loans" shall have the meaning given such term in Section 1 of this Note.

19.    Representations and Warranties.  The Parent and each of its Subsidiaries represent as follows:

(a)    the Parent and each of its Subsidiaries are duly formed and/or organized, validly existing and in good standing under the laws of their jurisdictions of incorporation or formation;

(b)    upon entry of the Financing Orders, the execution and delivery of this Note and the other DIP Documents and the performance by the Loan Parties of the Loan Parties' obligations hereunder and under the other DIP Documents are within its corporate powers, have been duly authorized by all necessary corporate action of the Loan Parties, have received all necessary bankruptcy, insolvency or governmental approvals, and do not and will not contravene or conflict with any provisions of applicable law or of the Loan Parties' corporate charter or by-laws or of any agreements binding upon or applicable to the Loan Parties or any of their Subsidiaries or any of their properties;

(c)    the Chapter 11 Cases have been duly authorized by all necessary legal and corporate action by or on behalf of each Loan Party and have been duly and properly commenced;

(d)    upon entry of the Financing Orders, this Note and each other DIP Document is the legal, valid and binding obligation, enforceable against the Loan Parties in accordance with its terms except as limited by equitable principles relating to enforceability;

(e)    the Parent and its Subsidiaries have good and marketable title to, or valid leasehold interests in, all of its property and assets; none of the properties and assets of the Parent

and its Subsidiaries are subject to any Liens other than Permitted Encumbrances;

(f)     no information contained in this Note, any of the other DIP Document, any projections, financial statements or collateral reports or other reports from time to time delivered hereunder or any written statement furnished by or on behalf of the Parent and its Subsidiaries to the DIP Lenders pursuant to the terms of this Note or otherwise contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of all of the circumstances under which they were made;

(g)     the Liens granted to the DIP Lenders pursuant to the Collateral Documents and the Financing Orders are fully perfected Liens in and to the Collateral described therein, subject, as to priority, only to Permitted Prior Liens or other Liens permitted to have such priority under the Financing Orders;

(h)     except for proceedings in the Chapter 11 Cases in connection with the entry of the Financing Orders, no action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of the Parent, threatened against the Parent or its Subsidiaries before any governmental authority or before any arbitrator or panel of arbitrators that challenges the rights or powers of the Parent or its Subsidiaries to enter into or perform any of its obligations under the DIP Documents to which it is a party, or the validity or enforceability of any DIP Document or any action taken thereunder;

(i)     the Parent and its Subsidiaries are and will be at all times the owners of the Collateral free and clear of any lien, security interest or other charge or encumbrance except for the security interest created by this Note or any other DIP Documents and the other Permitted Encumbrances;

(j)     the execution, delivery and performance of this Note and the other DIP Documents will not (immediately or with the giving of notice or passage of time, or both) violate the articles of incorporation or bylaws of any Loan Party, or violate any law or regulation;

(k)     except for the Chapter 11 Cases, there is no order, notice, claim, litigation, proceeding or investigation pending or threatened against or in any way affecting (i) any Loan Party, whether or not covered by insurance, that would reasonably be expected to have a Material Adverse Effect or (ii) this Note or any other DIP Document; and

(l)     the Parent and its Subsidiaries have filed all federal, state and other tax returns and reports required to be filed, and have paid all federal, state and other taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable.

20.    Agent.

(a)     Appointment.  Each DIP Lender hereby irrevocably appoints and authorizes the Agent to perform the duties of the Agent as set forth in this Note including:  (i) to receive on behalf of each DIP Lender any payment of principal of or interest on the Term Loans outstanding hereunder and all other amounts accrued hereunder for the account of the DIP Lenders and paid to the Agent, and to distribute promptly to each DIP Lender its Pro Rata Share of all payments so

received; (ii) to distribute to each DIP Lender copies of all material notices and agreements received by the Agent; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Term Loans, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (iv) to execute or file any and all notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Note or any other DIP Document; (v) to perform, exercise, and enforce any and all other rights and remedies of the DIP Lenders with respect to the Borrower, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by the Agent of the rights and remedies specifically authorized to be exercised by the Agent by the terms of this Note or any other DIP Document; (vi) to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Note or any other DIP Document; and (vii) to take such action as the Agent deems appropriate on its behalf to administer the Term Loans and the DIP Documents and to exercise such other powers delegated to the Agent by the terms hereof or the other DIP Documents together with such powers as are reasonably incidental thereto to carry out the purposes hereof and thereof.

(b)    Nature of Duties.  The Agent shall have no duties or responsibilities except those expressly set forth in this Note or in the other DIP Documents.

(c)    Rights, Exculpation, Etc.  The Agent and its directors, officers, agents or employees shall not be liable for any action taken or omitted to be taken by them under or in connection with this Note or the other DIP Documents, except for their own gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction.

(d)    Reliance.  The Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Note or any of the other DIP Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

(e)    Indemnification.  To the extent that the Agent is not reimbursed and indemnified by the Borrower, the DIP Lenders will reimburse and indemnify the Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Agent in any way relating to or arising out of this Note or any of the other DIP Documents or any action taken or omitted by the Agent under this Note or any of the other DIP Documents, in proportion to each DIP Lender's Pro Rata Share.

(f)    Collateral Matters.

(1)    The DIP Lenders hereby irrevocably authorize the Agent, at its option and in its discretion, to release any Lien granted to or held by the Agent upon any Collateral upon cancellation of this Note and payment and satisfaction of the Term Loans and all other Obligations which have matured and which the Agent has been notified in writing are then due and payable; or constituting property being sold or disposed of in the ordinary course of the Borrower's business or otherwise in compliance with the terms

of this Note and the other DIP Documents; or if approved, authorized or ratified in writing by the DIP Lenders.

(2)    Without in any manner limiting the Agent's authority to act without any specific or further authorization or consent by the DIP Lenders, each DIP Lender agrees to confirm in writing, upon request by the Agent, the authority to release Collateral conferred upon the Agent under paragraph (f)(1) above.

The Agent shall have no obligation whatsoever to any DIP Lender to assure that the Collateral exists or is owned by the Loan Parties, or is cared for, protected or insured or has been encumbered or that the Lien granted to the Agent pursuant to this Note or any other DIP Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Agent in this section or in any other DIP Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Agent may act in any manner it may deem appropriate, in its sole discretion, given the Agent's own interest in the Collateral as one of the DIP Lenders and that the Agent shall have no duty or liability whatsoever to any other DIP Lender, except as otherwise provided herein.

21.    <u>Miscellaneous</u>.

(a)    All notices and other communications provided for hereunder shall be in writing (including facsimile communication) and mailed, emailed or delivered as follows:

| | |
|---|---|
| If to Borrower: | GenCanna Global USA, Inc.<br>321 Venable Road, Winchester, KY 40391<br>Attention:  Steve Bevan<br>Telephone:  859-489-3954<br>email: steve.bevan@gencanna.com |
| with copies to: | Benesch, Friedlander, Coplan & Aronoff LLP<br>222 Delaware Avenue, Suite 801<br>Wilmington, Delaware 19801-1611<br>Attn:  Michael J. Barrie<br>Email: mbarrie@beneschlaw.com |
| If to Agent or any DIP Lender: | MGG Investment Group LP<br>One Penn Plaza, 53rd Floor<br>New York, New York 10119<br>Attention: Mustafa Tayeb and Mier Wang<br>Telephone:  212-356-6100<br>Email:  creditagreementnotices@mgginv.com |
| with copies to: | Schulte Roth & Zabel LLP<br>919 Third Avenue |

DOC ID - 33364517.8

New York, New York 10022
Attn:  Adam Harris and Frederic L. Ragucci
Email: adam.harris@srz.com
          frederic.ragucci@srz.com

All such notices and communications shall, when mailed or sent by overnight courier, be effective when deposited in the mails or delivered to the overnight courier, as the case may be, or when sent by email be effective when confirmation is received.

(b)      The Loan Parties shall reimburse the Agent for all reasonable out-of-pocket expenses incurred in connection with the negotiation and preparation of the DIP Documents and the obtaining of approval of the DIP Documents by the Bankruptcy Court (including the reasonable fees and expenses of outside counsel for Agent, all of its special local counsel, fees for one (in the absence of any conflicts of interest) financial advisor for the Agent and the DIP Lenders, and auditors retained in connection with the DIP Documents and advice in connection therewith). Subject to the foregoing, the Loan Parties shall reimburse the Agent for all reasonable fees, costs and expenses, including the reasonable fees, costs and expenses of counsel or other advisors for advice, assistance, or other representation in connection with:

(1)      any amendment, modification or waiver of, consent with respect to, or termination or enforcement of, any of the DIP Documents or advice in connection with the administration of the Term Loans made pursuant hereto or its rights hereunder or thereunder;

(2)      the review of pleadings and documents related to the Chapter 11 Cases and any subsequent Chapter 7 case, attendance at meetings related to the Chapter 11 Cases and any subsequent Chapter 7 case, and general monitoring of the Chapter 11 Cases and any subsequent Chapter 7 case;

(3)      any litigation, contest, dispute, suit, proceeding or action (whether instituted by the Agent, the Borrower or any other Person, and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the DIP Documents or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against Borrower or any other Person that may be obligated to the Agent by virtue of the DIP Documents, including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(4)      any attempt to enforce any remedies of the Agent against any or all of the Borrower or any other Person that may be obligated to the Agent by virtue of any of the DIP Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(5)    any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default; and

(6)    any efforts to (A) monitor the Term Loans or any of the other Obligations, (B) evaluate, observe or assess any of the Loan Parties or their respective affairs, (C) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral and (D) monitor any sales;

including, as to each of clauses (1) through (6) above, all attorneys' and other professional and service providers' fees arising from such services, including those in connection with any appellate proceedings, and all expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this Section 20(b), all of which shall be payable, on demand, by the Loan Parties to the Agent on behalf of the DIP Lenders. Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: fees, costs and expenses of accountants, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services.  All expenses incurred by the Agent shall receive super-priority administrative expense status per Section 364 of the Bankruptcy Code (subject to the Financing Orders).

(c)    No failure or delay on the part of the Agent or any other holder of this Note to exercise any right, power or privilege under this Note and no course of dealing between Borrower and the Agent shall impair such right, power or privilege or operate as a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies expressly provided in this Note are cumulative to, and not exclusive of, any rights or remedies that the Agent would otherwise have. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of the Agent to any other or further action in any circumstances without notice or demand.

(d)    Borrower and any endorser of this Note hereby consent to renewals and extensions of time at or after the maturity hereof without notice, and hereby waive diligence, presentment, protest, demand and notice of every kind and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

(e)    If any provision in or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(f)    **THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF THE BORROWER AND THE AGENT HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK INCLUDING WITHOUT**

LIMITATION SECTION 5-1401 OF TUE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

      (g)     Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Note or any DIP Document, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.

      (h)     **THE BORROWER AND, BY THEIR ACCEPTANCE OF THIS NOTE, THE AGENT, ANY DIP LENDER AND ANY SUBSEQUENT HOLDER OF THIS NOTE, HEREBY IRREVOCABLY AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS NOTE AND THE AGENT'S/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED**. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including without limitation contract claims, tort claims, breach of duty claims and all other common law and statutory claims. The Borrower and, by their acceptance of this Note, the Agent, any DIP Lender and any subsequent holder of this Note, each (i) acknowledges that this waiver is a material inducement to enter into a business relationship, that each has already relied on this waiver in entering into this relationship, and that each will continue to rely on this waiver in their related future dealings and (ii) further warrants and represents that each has reviewed this waiver with its legal counsel and that each knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. **THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING) THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS OF THIS NOTE**. In the event of litigation, this provision may be filed as a written consent a trial by the court.

      (i)     The Borrower hereby waives the benefit of any statute or rule of law or judicial decision which would otherwise require that the provisions of this Note be construed or interpreted most strongly against the party responsible for the drafting thereof.

      (j)     The Borrower shall not have the right to assign their obligations or liabilities under this Note without the prior written consent of the Agent in its sole discretion. The DIP Lenders may assign to one or more entities all or any part of, or may grant participations to one or more entities in or to all or any part of, the amounts outstanding hereunder, and to the extent of any such assignment or participation (unless otherwise stated therein) the assignee or participant shall have the same rights and benefits hereunder as it would have if it were a DIP Lender hereunder. An assigning DIP Lender shall notify the Borrower of any such assignment (other than an assignment to an affiliate of such DIP Lender or a Related Fund) which notice shall include a

description of the assignment and include customary instructions from the DIP Lender and such assignee with respect to the making of payments and other communications with the DIP Lender and such assignee.

(k)    The Agent shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain, or cause to be maintained at the Payment Office, a copy of each assignment notice delivered to and accepted by it and a register (the "Register") for the recordation of the names and addresses of the Persons, if any, that take an assignment from it and the principal amount of the Term Loans and stated interest thereon (the "Registered Loans") owing to each DIP Lender from time to time. The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower and the Agent may treat each Person whose name is recorded in the Register as a DIP Lender hereunder for all purposes of this Note. The Register shall be available for inspection by Borrower and the DIP Lenders at any reasonable time and from time to time upon reasonable prior notice.

(l)    Upon receipt by the Agent of an assignment notice, the Agent shall accept such assignment and record the information contained therein in the Register.

(m)    A Registered Loan may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register. Any assignment or sale of all or part of such Registered Loan may be effected only by registration of such assignment or sale on the Register. Prior to the registration of assignment or sale of any Registered Loan, the Agent shall treat the Person in whose name such Registered Loan is registered as the owner thereof for the purpose of receiving all payments thereon and for all other purposes, notwithstanding notice to the contrary.

(n)    In the event that a DIP Lender sells participations in a Registered Loan, such DIP Lender shall maintain a register for this purpose as a non-fiduciary agent of Borrower on which it enters the name of all participants in the Registered Loans held by it and the principal amount (and stated interest thereon) of the portion of the Registered Loan that is the subject of the participation (the "Participant Register"). A Registered Loan may be participated in whole or in part only by registration of such participation on the Participant Register. Any participation of such Registered Loan may be effected only by the registration of such participation on the Participant Register. The Participant Register shall be available for inspection by the Borrower and the DIP Lenders at any reasonable time and from time to time upon reasonable prior notice.

(o)    No provision of this Note may be amended or waived unless such amendment or waiver is in writing and is signed by the Borrower and the Agent.

(p)    Any provision of this Note which is prohibited or unenforceable shall be ineffective to the extent such prohibition or unenforceability without invalidating the remaining provisions hereof.

(q)    This Note, the other DIP Documents, and all Liens created hereby or pursuant to the Collateral Documents or any other DIP Document shall be binding upon the Borrower and each other Loan Party, the estates of the Borrower, and any trustee or successor in interest of the Borrower and each other Loan Party in the Chapter 11 Case or any subsequent case

commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code.  This Note and the other DIP Documents and the Financing Orders shall be binding upon, and inure to the benefit of, the successors of the Agent and the DIP Lenders and each of their respective assigns, transferees and endorsees.  The Liens created by this Note, and the other DIP Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of any Loan Party to a case under chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Agent file financing statements or otherwise perfect its security interests or Liens under applicable law.

(r)    In the event of any inconsistency between the terms and conditions of this Note and the Financing Orders, the provisions of the Financing Orders shall govern and control.

(s)    THIS WRITTEN PROMISSORY NOTE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

*    *    *    *    *

IN WITNESS WHEREOF, the Borrower have caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place first above written.

GENCANNA GLOBAL USA, INC., as Debtor and Debtor in Possession

By: _____

    Name:

    Title

Acknowledged and Agreed

MGG INVESTMENT GROUP LP, as Agent

By:  MGG GP LLC, its general partner


By:  _____
        Name: Kevin Griffin
        Title: Chief Executive Officer



MGG (BVI) Limited
MGG Canada Fund LP
MGG Insurance Fund Series Interests of the SALI Multi-
Series Fund, L.P.
MGG Onshore Funding II LLC
MGG SF Drawdown Master Fund (Cayman) LP
MGG SF Drawdown Unlevered Fund II LP
MGG SF Drawdown Unlevered Master Fund II (Cayman)
MGG SF Evergreen Fund LP
MGG SF Evergreen Master Fund (Cayman) LP
MGG SF Evergreen Unlevered Fund LP
MGG SF Evergreen Unlevered Master Fund II (Cayman)
MGG Specialty Finance Fund II LP,

each as a DIP Lender

By:  MGG Investment Group LP, on behalf of each of the above,
as Authorized Signatory


By:  _____
        Name: Kevin Griffin
        Title: Chief Executive Officer

Schedule 1(a)

DIP LENDERS AND DIP LENDER COMMITMENTS

| DIP Lender | Commitment |
|---|---|
| MGG (BVI) Limited | $7,772.00 |
| MGG Canada Fund LP | $404,182.00 |
| MGG Insurance Fund Series Interests of the SALI Mu | $16,943.00 |
| MGG Onshore Funding II LLC | $2,390,794.00 |
| MGG SF Drawdown Master Fund (Cayman) LP | $198,977.00 |
| MGG SF Drawdown Unlevered Fund II LP | $648,926.00 |
| MGG SF Drawdown Unlevered Master Fund II (Cayman) LP | $679,271.00 |
| MGG SF Evergreen Fund LP | $759,446.00 |
| MGG SF Evergreen Master Fund (Cayman) LP | $1,918,854.00 |
| MGG SF Evergreen Unlevered Fund LP | $1,870,393.00 |
| MGG SF Evergreen Unlevered Master Fund II (Cayman) LP | $337,436.00 |
| MGG Specialty Finance Fund II LP | $767,006.00 |
| **Total** | **$10,000,000.00** |

## EXHIBIT A

(attach Budget)

DOC ID - 33364517.8

Schedule 13

Deliver (which delivery may be made by electronic communication (including email)) to the Agent, the monthly reports, quarterly reports, annual reports and compliance certificates required by Section 7.01(a) of the Prepetition Credit Agreement and each of the financial statements, reports, or other items set forth below at the following times in form and substance satisfactory to the Agent in its sole discretion:

| | |
|---|---|
| on Tuesday of each week for the period ending the preceding Friday beginning with the first Friday ending a full calendar week after the Order for Relief Date, | (a)     a weekly DIP variance report/reconciliation for the prior week and for the period from the commencement of the Initial Budget to the end of the prior week in each case (i) showing actual results for the following items: (A) receipts, (B) disbursements, (C) net operating cash flow, (D) [reserved] and (E) professional fees and expenses, noting therein variances from values set forth for such periods in both the Initial Budget and the most recent Budget and (ii) an explanation for all material variances, certified by the chief financial officer of the Borrower,<br><br>(b)     a weekly report of sales results, |
| on Monday of each week beginning with the first full calendar week after the Order for Relief Date, | (c)     a report of the balance of all of the deposit accounts of the Loan Parties, including a breakdown of the balances of deposit accounts held at each depository institution, as of the close of business on the preceding Friday, |
| upon the request of Agent, | (d)     a revised proposed budget (it being understood that upon written approval of such proposed budget by the Agent, in its sole discretion, such proposed budget shall become the "Budget") and timing changes with respect to any periods that were included in a previously delivered report and which shall be in form and substance acceptable to the Agent, |
| promptly, but in any event at least two (2) business days prior to filing (except for emergency motions, which shall be delivered as promptly as possible prior to filing), | (e)     drafts of all pleadings, motions, applications or financial information (including any proposed order) filed or to be filed by any Loan Party with the Bankruptcy Court; provided that any such documents that are publicly available shall be deemed to have been delivered, |
| promptly, but in any event within 3 Business Days after Borrower has knowledge of any event or condition that constitutes a Default, | (f)     notice of such event or condition and a statement of the curative action that Borrower proposes to take with respect thereto, |

| | |
|---|---|
| weekly, | (g)    participate in status update conference calls with the Agent, the chief transformation officer and Jefferies LLC, |
| upon the request of Agent, | (h)    any other information requested relating to the financial condition of the Parent or its Subsidiaries, and |
| upon notice of Agent, | (i)    access to the chief transformation officer and Jefferies LLC at all times during the Chapter 11 Cases, including, in the case of Jefferies LLC, access to any data room established and bids and letters of intent received; <u>provided</u>, that if the Agent and the DIP Lenders have submitted a Qualified Bid, not including any bids or other confidential information of competing bidders. |

# **EXHIBIT B**

**Initial Budget**

20828720.1

**GenCanna Global**

**Debtor-in-Possession Sizing Analysis**

| ($ in 000s) | 2/7/2020 | 2/14/2020 | 2/21/2020 | 2/28/2020 | 3/6/2020 | 3/13/2020 | 3/20/2020 | 3/27/2020 | 4/3/2020 | 4/10/2020 | 4/17/2020 | 4/24/2020 | 5/1/2020 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | $ 600 | $ 625 | $ 650 | $ 675 | $ 725 | $ 750 | $ 775 | $ 800 | $ 825 | $ 850 | $ 875 | $ 900 | $ 950 | $ 10,000 |
| | | | | | | | | | | | | | | |
| Employee-related | 1,048 | 11 | 427 | 159 | 537 | 9 | 420 | 9 | 679 | 9 | 412 | 9 | 671 | 4,400 |
| Processing Including Freight | 424 | 427 | 654 | 439 | 441 | 444 | 521 | 298 | 303 | 303 | 303 | 304 | 304 | 5,166 |
| Equipment leases | 52 | 14 | 22 | 37 | 52 | 14 | 22 | 22 | 17 | 52 | 34 | 22 | 17 | 377 |
| Overhead | 13 | 3 | 13 | 235 | 195 | 3 | 13 | 3 | 428 | 41 | 13 | 3 | 428 | 1,387 |
| Utilities | 60 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 180 |
| Debt service/Fees | - | - | - | - | 99 | - | - | - | 99 | - | - | - | 99 | 297 |
| OID/Commitment Fee | 105 | - | - | 145 | - | - | - | - | - | - | - | - | - | 250 |
| Pre-petition/other/KERP | 115 | - | - | - | - | - | - | - | - | - | - | - | 1,000 | 1,115 |
| Contingency | 75 | 75 | 75 | 75 | 75 | 75 | 107 | 107 | 107 | 107 | 107 | 107 | 107 | 1,199 |
| **Total operating disbursements** | **1,891** | **539** | **1,201** | **1,100** | **1,409** | **554** | **1,093** | **449** | **1,643** | **523** | **879** | **454** | **2,636** | **14,370** |
| | | | | | | | | | | | | | | |
| **DIP For Operations** | **(1,291)** | **86** | **(551)** | **(425)** | **(684)** | **196** | **(318)** | **351** | **(818)** | **327** | **(4)** | **446** | **(1,686)** | **(4,370)** |
| Professional fees | 385 | 285 | 285 | 823 | 280 | 280 | 280 | 280 | 966 | 285 | 285 | 285 | 915 | 5,630 |
| **Total DIP including Professionals** | **(1,676)** | **(198)** | **(835)** | **(1,248)** | **(964)** | **(84)** | **(598)** | **72** | **(1,783)** | **42** | **(289)** | **161** | **(2,601)** | **(10,000)** |
| | | | | | | | | | | | | | | |
| January shortfall | (1,823) | | | | | | | | | | | | | (1,823) |
| **Net Increase (Decrease) in cash** | **(3,499)** | **(198)** | **(835)** | **(1,248)** | **(964)** | **(84)** | **(598)** | **72** | **(1,783)** | **42** | **(289)** | **161** | **(2,601)** | **(11,823)** |