# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
### LEXINGTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GenCanna Global USA, Inc., *et al.*,[1] | ) | Case No. 20-50133-grs |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Honorable Gregory R. Schaaf |
| | ) | |

---

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE DEBTORS' BIDDING PROCESS; (II) APPROVING THE TRANSACTION ULTIMATELY SELECTED AS THE HIGHEST AND BEST ALTERNATIVE THROUGH THE BIDDING PROCESS, INCLUDING A POSSIBLE SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; AND (III) GRANTING RELATED RELIEF

---

GenCanna Global USA, Inc. ("GenCanna") and its affiliated debtors and debtors in possession in the above-captioned cases (the "Debtors") hereby file this *Motion for Entry of an Order (I) Approving Bidding Procedures in Connection with the Debtors' Proposed Bidding Process; (II) Approving the Transaction Ultimately Selected as the Highest and Best Alternative Through the Bidding Process, Including a Possible Sale of Assets Free and Clear of Liens, Claims and Encumbrances; and (III) Granting Related Relief* (the "Motion"), seeking among other things, the entry of an order establishing bidding procedures under sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and KYEB LBR 2002-1 and 6004-1 of the

---

[1] The Debtors in these chapter 11 bankruptcy cases are (with the last four digits of their federal tax identification numbers in parentheses): GenCanna Global USA, Inc. (0251); GenCanna Global, Inc. (N/A); and Hemp Kentucky LLC (2600).

Local Rules of the United States Bankruptcy Court for the Eastern District of Kentucky (the "Local

Rules").  In support of the Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      One of the primary goals of these cases is to conduct a fulsome process to

investigate all available strategic alternatives to maximize the value of the Debtors' assets, which

the Debtors have already begun to do with the assistance of their proposed investment banker,

Jefferies, LLC ("Jefferies"), and the Debtors' other advisors.  Indeed, specific milestones (the

"Milestones") for conducting a prompt bidding process (the "Bidding Process") were included in

the Interim DIP Order (defined below).

2.      In consultation with Jefferies, the DIP Secured Parties and the Prepetition Secured

Parties,[2] the Debtors developed the bidding procedures described herein (the "Bidding

Procedures") in order to facilitate a prompt and fulsome Bidding Process that will enable the

Debtors to identify and select an appropriate transaction to maximize value.  Such transaction may

include a sale of all or substantially all of the Debtors' assets free and clear of all liens, claims and

interests pursuant to section 363(f) of the Bankruptcy Code, and the assumption and assignment

of contracts and leases pursuant to section 365 of the Bankruptcy Code in connection with such a

sale.    Other  possible  transaction  structures  may  include  a  refinancing,  restructuring,

recapitalization or other form of transaction structure identified through the Bidding Process that

is deemed to be the highest and best alternative available under the circumstances.

3.      Initially, this Motion seeks only the entry of an order approving the Bidding

Procedures and related relief, including the approval of the form and manner of notice the Debtors

---

[2] For purposes of this Motion, "DIP Secured Parties" and "Prepetition Secured Parties" shall have the meanings
ascribed to such terms in the Interim DIP Order (as defined below).

13045372 v6

intend to provide in respect of the bidding process and the various dates and deadlines established by the Bidding Procedures in accordance with the Milestones, and the scheduling of a final hearing at which the Court will consider authorizing and approving the transaction that is ultimately selected through the bidding process. In accordance with the Milestones, a hearing on the proposed Bid Procedures is to be held on or before March 11, 2020.

4.      As the Bidding Process progresses, the Debtors will determine the highest and best transaction alternative available, in consultation with the DIP Secured Parties, the Prepetition Secured Parties and the creditors committee (once appointed, the "Committee"), will disclose the details of such transaction to the Bankruptcy Court in a subsequent filing, and will seek approval of such transaction at the final hearing.

5.      For the reasons set forth below, the Debtors believe that such relief is in the best interest of their estates and creditors, and the Motion should therefore be granted.

## JURISDICTION

6.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

7.      Debtors GenCanna and GenCanna Global, Inc. have maintained their principal places of business in Winchester, Clark County, Kentucky during the 180-day period immediately preceding their respective petition dates. Debtor Hemp Kentucky LLC maintained its principal place of business in Lexington, Fayette County, Kentucky during the same period as well. Accordingly, venue for the Debtors' Cases is proper in this District under 28 U.S.C. §§ 1408 and 1409.

8.      The statutory bases for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002 and 6004, and Local Rules 2002-1 and 6004-1. Furthermore, to the extent the transaction ultimately selected involves the assumption and/or the

13045372 v6

assignment of any executory contracts or unexpired leases, the statutory bases for such relief also include section 365 of the Bankruptcy Code, Bankruptcy Rule 6006, and Local Rules 6006-1.

## BACKGROUND

**A.     General Background**

9.      On January 24, 2020, Pinnacle, Inc., Crawford Sales, Inc. and Integrity / Architecture, PLLC filed an involuntary chapter 11 petition under the Bankruptcy Code against GenCanna.

10.     On February 5, 2020, the Debtors GenCanna Global, Inc. and Hemp Kentucky LLC filed with the Court voluntary chapter 11 petitions for relief under the Bankruptcy Code.  On February 6, 2020 (the "Order for Relief Date"), GenCanna consented to the involuntary petition for relief under chapter 11 of the Bankruptcy Code that was filed with the Court, and the Court subsequently entered the order for relief under chapter 11 of the Bankruptcy Code with respect to GenCanna.  The Debtors' chapter 11 cases (the "Cases") are being jointly administered together for procedural purposes only [D.I. 89].

11.     The Debtors are continuing to operate their business and manage their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.     No official committee of unsecured creditors has been appointed in these Cases as of the date hereof.

13.     A description of the Debtors' business and the events leading to the commencement of these Cases is set forth in the *Declaration of James Alt in Support of Chapter 11 Filings and First Day Motions* (the "Alt Declaration") [D.I. 44].

13045372 v6

B.      **The Debtors' Prepetition Sale and Marketing Efforts**

14.     During the course of 2019, the Debtors engaged in various efforts to raise debt and equity financing and to explore the possibility of entering into certain strategic transactions. Those efforts did not result in a viable transaction for various reasons. However, such efforts were not as expansive as the Bidding Process that is currently being conducted by the Debtors in these Cases, which the Debtors expect will engage additional potential transaction parties and will seek to explore and identify any and all available transactions that will maximize value and help facilitate the Debtors' efforts to reorganize through these Cases.

15.     More specifically, during the early months of 2019, the Debtors engaged Cowen and Company, LLC ("Cowen") as their investment banker to investigate various strategic transactions. That effort led to the debt financing with MGG Investment Group LP as agent for the Prepetition Secured Parties, but did not result in any of the expected equity opportunities for the Debtors, and Cowen was terminated on or around August 21, 2019.

16.     On August 24, 2019, the Debtors engaged Goldman Sachs & Co., LLC ("Goldman Sachs") to serve as a financial advisor to assist the Debtors in evaluating an initial public offering and other strategic alternatives. Working in consultation with the Debtors' Chief Investment Officer, Goldman Sachs pursued various potential transactions on behalf of the Debtors. In August of 2019, the Debtors received a significant offer that exceeded $1 billion in the form of a letter of intent, but ultimately this transaction was not realized due to the acquirer suffering a substantial decline in its own stock price. The scope of that process was narrow, and Goldman Sachs focused on only a limited number of potential opportunities. Unfortunately, no transaction came to fruition through those efforts and Goldman Sachs was terminated in January 2020.

17.     The Debtors also worked with a third party broker in an effort to identify potential sources for equity and debt raises for the Debtors.  Those efforts were similarly unsuccessful.

C.     **The Retention of Huron and Jefferies, and the Proposed Bidding Process**

18.     On or about September 1, 2019, the Debtors retained Huron Consulting Services LLC ("Huron") to provide limited finance and accounting related services.  On or about November 2, 2019, Huron's engagement was expanded to, among other things, provide the Debtors with the services of Mr. James Alt to serve as Chief Transformation Officer and Mr. Marc Passalacqua to serve as Deputy Chief Transformation Officer and Chief Administrative Officer.

19.     As of January 28, 2020, the Debtors also engaged Jefferies to serve as their investment banker to provide financial advice and assistance in connection with a possible sale, disposition or other business transactions or series of transactions.  Jefferies (subject to the oversight of the Finance Committee of the Board of Directors) is responsible for leading all aspects of the Bidding Process.  Among other things, Jefferies has already been in contact with numerous potential transaction counterparties (the "Potential Transaction Counterparties"), and has sent out a process letter (the "Process Letter") to such parties and to many others, a copy of which is attached hereto as **Exhibit A**.

20.     In total, Jefferies has already contacted approximately 145 Potential Transaction Counterparties, including strategic and financial buyers, as well as potential sources of debt and equity financing.  Jefferies began reaching out to Potential Transaction Counterparties on or about February 7, 2020.  As disclosed in the Process Letter, Jefferies is soliciting non-binding letters of intent ("Proposals") for all potential forms of transactions, which are due by February 24, 2020 in accordance with the Milestones.  The Proposals are required to disclose, at a minimum, the following information: (a) form of transaction; (b) valuation and other key assumptions; (c)

6

identify of the purchaser/contributor; (d) financing sources; (e) due diligence requirements; (f) approvals; (g) timing; and (h) other substantive conditions or terms.

21.    Jefferies has also prepared a Confidential Information Presentation ("CIP"), and will provide Potential Transaction Counterparties with the CIP and access to a confidential data room (the "Data Room"), subject to execution of a confidentiality agreement.  As of the date hereof, 27 parties have executed confidentiality agreements, and 6 additional parties are in the process of signing confidentiality agreements.  Beginning on February 15, 2020, certain strategic buyers had limited access to the Data Room and all other Potential Transaction Counterparties who have executed confidentiality agreements had full access to the Data Room.

22.    Upon receiving the Proposals, the Debtors and Jefferies will evaluate the same, and, in consultation with the DIP Secured Parties, the Prepetition Secured Parties and the Committee, determine which Proposals represent the highest and best alternatives to further pursue.

23.    Concurrently herewith, the Debtors are filing the *Declaration of Richard W. Morgner in Support of the Debtors' Bidding Procedures Motion* (the "Morgner Declaration"), which provides support for this Motion and further details of the process being run by Jefferies.

**D.    The Debtors' DIP Financing and Milestones for the Bidding Process**

24.    On February 6, 2020, the Bankruptcy Court entered the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection to Prepetition Lenders; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [D.I. 82] (the "Interim DIP Order").

7

25.     Among other things, the Interim DIP Order set forth the Milestones that would

govern the Bidding Process.   Interim DIP Order, ¶ 4.3.   The Milestones are summarized as

follows:[3]

| Date | Milestone |
|---|---|
| February 18, 2020 | Deadline to file a motion to approve the Bidding Procedures[4] |
| February 24, 2020 | Deadline to receive Proposals from Potential Transaction Counterparties |
| March 11, 2020 | Deadline to hold a hearing on the proposed Bidding Procedures |
| March 13, 2020 | Deadline to obtain an order approving the Bidding Procedures |
| April 17, 2020 | Deadline to receive Qualified Bids |
| April 20, 2020 | Deadline to conduct an auction if more than one Qualified Bid is received |
| April 23, 2020 | Deadline to hold a hearing to approve the transaction ultimately selected as the highest and best alternative |
| April 24, 2020 | Deadline to obtain an order approving the selected transaction |
| May 1, 2020 | Deadline to consummate the selected transaction |

## **RELIEF REQUESTED**

### Bidding Procedures Order

26.     The Debtors initially seek the entry of an order approving the proposed Bidding

Procedures, scheduling a final hearing by no later than April 23, 2020 to approve the transaction

ultimately selected through the Bidding Process as the highest and best alternative (the

"Transaction Hearing"), approving the form and manner of notice in respect of the same, and

---

[3] The following is only a summary.  The full Milestones are set forth in detail in paragraph 4.3 of the Interim DIP Order.

[4] The Milestone set forth in the DIP Order contemplates the filing of a motion seeking bid procedures for the sale of all or substantially all of the Debtors' assets.  To the extent an alternative transaction structure is proposed by any Potential Transaction Counterparty, the Debtors will work with the DIP Secured Parties, the Prepetition Secured Parties and the Committee to determine whether such alternative transaction structure is feasible, represents the highest and best offer to the Debtors, and if so, the means for its implementation.

13045372 v6

granting related relief (the "Bidding Procedures Order").   A copy of the proposed Bidding

Procedures Order is filed with this Motion.

27.      The Debtors also respectfully request that the Bidding Procedures Order authorize

the Debtors to designate, in consultation with the Consultation Parties, a stalking horse purchaser

or bidder ("Stalking Horse") and to offer such Stalking Horse customary protections in exchange

for agreeing to serve as a stalking horse ("Stalking Horse Protections"), including a breakup fee in

an amount to be negotiated (but in no event greater than 3% of the total purchase price or other

consideration to be paid, exclusive of any value associated with assumed liabilities, leases or

contracts) ("Breakup Fee"), expense reimbursement up to 1% of the total purchase price or other

consideration to be paid, exclusive of any value associated with assumed liabilities, leases or

contracts (not to exceed $1 million; "Expense Reimbursement"), and a minimum initial bidding

increment of at least $250,000 to be used at any auction ("Bidding Increment").  Such designation

could be made by the Debtors at any time during the Bidding Process in their business judgment,

but in no event later than Saturday, April 18, 2020 at 5:00 p.m. (the "Stalking Horse Designation

Deadline").  The Debtors will coordinate such designation with the DIP Secured Parties, the

Prepetition Secured Parties and any Committee appointed.  The Debtors shall file a notice of any

such designation with the Bankruptcy Court by the Stalking Horse Designation Deadline.

<u>Transaction Approval Order</u>

28.      Second, this Motion also seeks the entry of an order following the Transaction

Hearing approving the transaction that is ultimately selected as the highest and best alternative

through the Bidding Process and presented to the Bankruptcy Court for approval (the "Successful Bidder Transaction"), and authorization to consummate the same.

29.    In the event the transaction involves the sale of all or substantially all of the Debtors' assets, the Debtors will seek approval of such a sale free and clear of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code, and may also seek the approval of the assumption and/or assignment of executory contracts and unexpired leases in connection therewith pursuant to section 365 of the Bankruptcy Code.

30.    The Debtors intend to file a proposed form of order (the "Transaction Approval Order") at least seven days in advance of the Transaction Hearing.

<u>The Proposed Bidding Procedures</u>

31.    The following proposed Bidding Procedures were developed by the Debtors and their advisors, including Jefferies, and in consultation with the DIP Secured Parties and the Prepetition Secured Parties.  The Bidding Procedures aim to provide the Debtors with maximum flexibility to conduct the Bidding Process in a manner they believe will maximize value and facilitate competitive bidding in accordance with the timeline set by the Milestones.

32.    Among other things, the proposed Bidding Procedures: (a) provide a form asset purchase agreement (the "APA") to be used in connection with any proposed asset sale structure;[5] (b) identify the relevant dates and deadlines for submitting bids and conducting an auction; (c) define minimum requirements for qualified bids (which may be modified by the Debtors in their discretion, after consultation with the Consultation Parties, as the process progresses); and (d) give

---

[5] The Debtors are in the process of finalizing the form APA, and expect to file the same at least three days prior to the hearing in respect of the Bidding Procedures.

13045372 v6

certain consultation rights to the DIP Secured Parties, the Prepetition Secured Parties and to any

Committee that may be appointed (the "Consultation Parties").

33.    The Bidding Procedures are based on what is set forth in the Process Letter and are

set forth in greater detail as an attachment to the proposed Bidding Procedures Order.  The salient

portions of the Bidding Procedures are as follows:

a.    **Preliminary Proposal**: Potential Transaction Counterparties interested in submitting a Proposal for a transaction must submit a written non-binding Proposal by no later than **5:00pm (EST) on February 24, 2020.**

b.    **Form of Transaction**: The Proposal must provide a description of the proposed transaction, including an indication of whether the Proposal relates to an acquisition of the entire business or a portion of the Debtors' assets, a refinancing of the Debtors' indebtedness, or any other form of transaction.  The Proposal must also provide an overview of the key terms of the transaction as well as the anticipated transaction structure.  If the Proposal is for the purchase of less than the entire business, the Proposal must specify which assets will be acquired.

If the Proposal is for a refinancing transaction, the Proposal must provide the amount and form of capital, proposed sources and uses, post-transaction equity ownership, treatment of existing debt, contemplated leverage, milestones, and any other similar substantive terms.

c.    **Valuation and Other Key Assumptions**:  The Proposal must disclose the proposed valuation for the company or the assets for which the Proposal is submitted, on a cash-free, debt-free basis, any major assumptions made with respect to the proposed transaction structure and valuation, and a description of any information or other factors that could potentially increase or decrease the valuation.

d.    **Identity of the Purchaser / Contributor:**  The Proposal must confirm the identity of the proposed purchaser or participating parties.  To the extent that the Proposal is a joint effort of multiple persons or entities, whether acting together through a single purchaser or otherwise, the Proposal must identify all such persons or entities.

e.    **Financing Source(s)**:  The Proposal must provide a description of how the transaction is intended to be financed, including expected sources of equity and/or debt.  If applicable, the Proposal must include the anticipated key debt financing terms including without limitation, pricing, ranking, guarantees, length of term, redemption / conversion provisions, restrictions on prepayment or use of proceeds, covenants, milestones, and similar substantive provisions.

11

If the Proposal requires external financing, it should provide a description of the expected sources of financing, including the form, amounts and institutions the Potential Transaction Counterparty intends to work with to provide such financing.

f.  **Due Diligence**:  Upon execution of a confidentiality agreement, each Potential Transaction Counterparty will receive a copy of the CIP and will be given access to the Data Room, and will be provided with various financial data and other relevant and confidential information, subject to the Debtors' right to exclude such access for competitive concerns.  Ultimately, any Proposal must indicate the names, telephone numbers, and e-mail addresses for the primary contacts involved with the proposed transaction, including any advisors that are, or are expected to be, engaged to assist in the evaluation of the proposed transaction.

g.  **Approvals:**  A Proposal must indicate what level of internal review and approval has been obtained for the Proposal, and must specify any corporate, shareholder, regulatory or other approvals and/or filing requirements required to consummate the proposed transaction.

h.  **Consideration of Proposals**:  Upon receipt and review of the Proposals, one or more Potential Transaction Counterparties may be selected to continue discussions with the Debtors, which will include management presentations and continued access to the Data Room.  The Debtors reserves the right to alter the schedule for or to modify or terminate the process related to a possible transaction, including the process for consideration of Proposals, at any time in consultation with the Consultation Parties.

i.  **Final Bid Deadline**:  All final and binding bids ("Bids") must be received by Jefferies on or before **5:00 p.m. (EST) on April 17, 2020** (the "Bid Deadline").

j.  **Qualified Bid Requirements**:  Following the review of Proposals received, the Debtors will communicate further details regarding specific requirements for a Bid to be a qualified bid that will be considered by the Debtors (a "Qualified Bid") and reserve all rights in that regard.  The Debtors will determine, after consultation with the Consultation Parties, and subject to the Bidding Procedures and the requirements set forth herein, whether a Bid is a Qualified Bid and, ultimately, a successful bid.  At minimum, to be a Qualified Bid, a Bid must be timely and submitted in writing with all required information and supporting documentation, and include the following:

(i)  a Bid for a sale transaction must include an executed APA, blacklined to show changes from the form APA, clearly setting forth any conditions for closing and stating that the Bid is irrevocable as set forth below;

(ii)  a Bid that requires the assumption and assignment of an executory contract or unexpired lease must identify with particularity each and every unexpired lease or executory contract (each, an "Assumed Contract") to be assumed

12

and assigned, and include an executed assumption and assignment agreement;

(iii)   a Bid must identify the structure proposed for undertaking the Proposed Transaction, including, if the Proposed Transaction is a Sale, the specific assets of the Debtors being acquired and liabilities being assumed, the proposed steps to accomplish such acquisition, and any financial, legal, or tax considerations upon which the Bid's structure relies;

(iv)   if a Bid contemplates a Sale of less than all assets, the Bid must identify whether or not the Acceptable Bidder is willing to aggregate its Bid into any acceptable consolidated Bid with other Potential Bidders;

(v)   a Bid must be final and binding, and shall not be contingent upon any further due diligence investigation, any material adverse change, the receipt of financing, or approval by any board of directors, shareholders, or other entity;

(vi)   a Bid must include evidence, including financial statements (or such other form of financial disclosure and credit-quality support or enhancement reasonably acceptable to the Debtors in consultation with the Consultation Parties) sufficient to establish the financial wherewithal of the interested party to complete the contemplated transactions and, to the extent the interested party will rely upon the financial wherewithal of an affiliate, bid partner, or other sponsor (whether because the party is a newly-formed entity or otherwise; each, a "Sponsor"), evidence sufficient to establish the financial wherewithal and intent of the Sponsor to provide appropriate financial support;

(vii)   a Bid must contain financial and/or other information that will allow the Debtors, in consultation with the Consultation Parties, to make a reasonable determination as to the bidder's financial and other capabilities to provide adequate assurance of future performance under section 365 of the Bankruptcy Code in a form requested by the Debtors to allow the Debtors to serve on counterparties to any contracts or leases being assigned in connection with the proposed sale that have requested, in writing, such information;

(viii)   a Bid must disclose the identity of the bidder's organization and principals;

(ix)   a Bid must include an acknowledgement and representation that the bidder (a) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or assets to be acquired and liabilities to be assumed in making its bid; (b) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding any assets to be acquired or liabilities to be assumed or the completeness of

13

any information provided in connection therewith, including by the Debtors, their professionals or any of their respective professionals and advisors, except as expressly stated in the APA or other transaction documentation; (c) is a sophisticated party capable of makings its own assessments in respect of making its Bid; and (d) has had the benefit of independent legal advice in connection with its Bid;

(x)     a Bid must contain full details of the proposed number of employees of the Debtors who will become employees of the bidder and the proposed terms and conditions of employment to be offered to those employees;

(xi)    a Bid must (a) include an acknowledgement and representation that the bidder will assume the obligations of each of the Debtors under all executory contracts, unexpired leases, and licenses proposed to be assigned; (b) contains the bidder's agreement to pay the related cure costs; and (c) indicate which of these executory contracts, unexpired leases, and licenses, if any, the bidder must be permitted to assume as a condition of closing;

(xii)   a Bid must provide for closing of the transaction no later than May 1, 2020;

(xiii)  a Bid must include evidence of authorization and approval from the Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery, and closing of the transaction;

(xiv)   a Bid for a sale transaction must include a cashier's check or be accompanied by a wire transfer payable or delivered to the Debtors, their counsel, or other agreed upon escrow agent, in an amount equal to ten percent (10%) of the total purchase price in the APA (excluding any value associated with assumed liabilities, leases or contracts, the "Deposit");

(xv)    a Bid must disclose any agreements or understandings between the bidder and any third party with respect to the assets to be acquire or with respect to any possible transaction involving the Debtors;

(xvi)   a Bid must acknowledge in writing (a) that the bidder has not engaged in any collusion with respect to any Bids, specifying that it did not agree with any Acceptable Bidder or Potential Bidders to control price; and (b) that the bidder agrees not to engage in any collusion with respect to any Bids, the Auction, or any Proposed Transaction;

(xvii)  a Bid must constitute a good faith, *bona fide* offer to consummate a Proposed Transaction; and

(xviii) a Bid must submit the bidder to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes related to the Debtors' qualifications of Bids, the Auction, the construction and enforcement of these Bidding Procedures, and the Proposed Transaction documents and the closing, as applicable.

14

k.  **Evaluation of Qualified Bids**:  The Debtors will determine the sufficiency of any submitted Bid, after consultation with the Consultation Parties, and they reserve the right to consider late Bids in their discretion and to waive any of the requirements for a Bid to be a Qualified Bid in consultation with the Consultation Parties.  The Debtors shall as promptly as practicable notify bidders of their selection as a qualified bidder (each a "Qualified Bidder") and that their Bid is a "Qualified Bid."

l.  **Stalking Horse Bids**:  The Debtors reserve the right, in consultation with the Consultation Parties, to enter into an agreement with a Stalking Horse and provide such Stalking Horse with any or all of the Stalking Horse Protections.  The Debtors are under no obligation, however, to choose a Stalking Horse or to offer any of the Stalking Horse Protections.

If the Debtors identify a Stalking Horse, the Debtors will file a notice with the Court and serve such notice on all other Qualified Bidders identifying the Stalking Horse and the terms of the Stalking Horse Bid, including any Stalking Horse Protections that have been agreed to, by the Stalking Horse Designation Deadline.

m.  **The Auction**:  If more than one Qualified Bid is received, an auction may be conducted on **April 20, 2020 at 10:00 a.m. (EST)** (the "Auction Date") at the offices of Debtors' counsel, or such other location as may be determined by the Debtors and communicated to Qualified Bidders.  Qualified Bidders at the Auction will be informed of the terms of the previous Bids made by other Qualified Bidders, including the identity of the Qualified Bid that the Debtors determine is the highest or best Bid received by the Bid Deadline.  Each Qualified Bidder at the Auction shall confirm that it has not engaged in any collusion with regard to the bidding or any sale of assets to be acquired.  Any assets to be acquired shall be sold free and clear of all liens, claims, and encumbrances to the fullest extent allowed under section 363(f) of the Bankruptcy Code.

n.  **Auction Procedures**:  At the auction, the Debtors reserve the right to disclose procedures that will govern the conduct of the auction, including any minimum overbid requirements.  The Debtors reserve the right to modify such procedures in any way, subject to the reasonable consent of the Consultation Parties.  The auction may be adjourned or cancelled as the Debtors, after consultation with the Consultation Parties, deem appropriate.  Reasonable notice of such adjournment and the time and place for the resumption of the auction or cancellation shall be given to all participants.

o.  **Selection of Successful Bid**:  At the conclusion of the auction, and subject to Court approval following the auction, the successful Bid or Bids shall be selected and announced by the Debtors, in consultation with the Consultation Parties (the "Successful Bid").  The Debtors also reserve the right to select a successful backup Bid in their sole discretion (the "Backup Bid").  As soon as practicable thereafter, the Debtors shall file with the Bankruptcy Court a notice of the Successful Bid and the Backup Bid.  The Successful Bid and the Backup Bid are binding upon the bidders who made them, and such parties shall be obligated to close such

15

transactions subject to approval of the transaction by the Bankruptcy Court (and in the case of the Backup Bid, only in the event the Successful Bid fails to close).

p.   **Backup Bid**:   If the Successful Bidder fails to consummate the transaction, breaches the APA or other applicable transaction documents, or otherwise fails to perform, upon consultation with the Consultation Parties, the Debtors may consummate the proposed transaction with the Backup Bidder and without the need for further Court approval.

q.   **Right to Credit Bid**: Any Qualified Bidder who has a valid and perfected lien on any of the Debtors' assets (a "Secured Creditor") shall have the right to credit bid all or a portion of such Secured Creditor's allowed secured claims pursuant to section 363(k) of the Bankruptcy Code; *provided* that a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured; *provided* that a credit bid shall not constitute a Qualified Bid if the Bid does not include a cash component sufficient to pay in full, in cash, all claims for which there are valid, perfected, and unavoidable liens on any of the assets included in such Bid that are senior in priority to those of the party seeking to credit bid (unless such senior lien holder consents to alternative treatment).   Pursuant to the Interim DIP Order, the DIP Secured Parties have the right to credit bid some or all of their claims in the DIP Collateral (as defined in the Interim DIP Order) to the extent permitted by section 363(k) of the Bankruptcy Code.

r.   **Transaction Hearing**:   The hearing in respect of the Successful Bid and Backup Bid (the "Transaction Hearing") will be conducted by the Bankruptcy Court on April __, 2020 at __:__ _.m. (EST).   At the Transaction Hearing, the Debtors will request that the Court enter the order approving the transaction (the "Transaction Approval Order").   The Bankruptcy Court shall also determine: (a) any cure required under 11 U.S.C. § 365(b) if the affected landlord or contract party timely filed an objection to the Debtors' proposed cure of any unexpired lease or executory contract to be assumed and assigned, and (b) if applicable, whether the Debtors have demonstrated adequate assurance of future performance under 11 U.S.C. § 365.

s.   **"As Is, Where Is"**:   The proposed transfer of any of the Debtors' assets will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents, or estates, except to the extent set forth in the APA of the Successful Bidder (or other applicable transaction documentation) as accepted by the Debtors and approved by the Court.   Except as otherwise provided in the APA (or other applicable transaction documentation), all of the Debtors' rights, title, and interests in and to the assets will be transferred free and clear of all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code.   All such liens, claims and encumbrances will attach to the net cash proceeds of the transaction.

16

t.    **Consultation Parties**:  The term "Consultation Parties" shall mean (a) the DIP Secured Parties and the Prepetition Secured Parties, and their counsel, and (b) the Committee and the Committee's counsel.  The Debtors shall consult with the Consultation Parties as required by these Bidding Procedures.  Any failure to specifically identify consultation rights in any section of these Bidding Procedures shall not limit or otherwise impair the rights of the Consultation Parties to consult with the Debtors.

u.    **Modification of Bidding Procedures**:  The Debtors reserve the right to modify the Bidding Procedures, in consultation with the Consultation Parties, to the extent the Debtors reasonably determine may be necessary to promote an efficient process.

v.    **Damages for Failure to Close**:  If the Successful Bidder fails to consummate the transaction in accordance with the terms of its Successful Bid and applicable APA: (a) the Debtors will retain the Deposit of such bidder, to the extent provided by the APA, and (b) the Debtors will maintain the right to pursue all available remedies against such bidder.

<u>The Proposed Notice of the Bidding Process and Transaction Hearing</u>

34.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide at least 21 days' notice of the Transaction Hearing.  Pursuant to Bankruptcy Rule 2002(c), notice of the transaction must include the time and place of the auction and the hearing and the deadline for filing any objections to the relief requested herein.  The Debtors propose that, to be considered, objections to the transaction of the Successful Bidder and the Backup Bidder, or any component thereof, must be in writing, filed with the Bankruptcy Court and served so as to be received no later than 11:59 p.m. (Eastern Time) on April 21, 2020 on (a) the United States Trustee; (b) counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff, LLP, 222 Delaware Avenue, Suite 801, Wilmington, Delaware 19801 (Attn: Michael Barrie and Jennifer Hoover), Benesch, Friedlander, Coplan & Aronoff, LLP, 200 Public Square, Suite 2300, Cleveland, OH 44114 (Attn: Elliot Smith), and Dentons Bingham Greenebaum LLP, 3500 PNC Tower, 101 South Fifth Street, Louisville, Kentucky, 40202 (Attn: James R. Irving);  (c) counsel to any Committee then appointed; (d) counsel to the DIP Secured Parties and the Prepetition Secured Parties, Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022 (Attn: Adam C. Harris, Esq. and

Kristine Manoukian, Esq.); and (e) counsel to any Stalking Horse (collectively, the "Notice Parties").

35.     Further, on or before April 1, 2020, the Debtors will file a notice of contracts and leases that may be assumed and assigned in connection with a proposed transaction (the "Assumption Notice") that identifies the proposed cure amounts for each (the "Proposed Cure Amounts"). The Debtors shall promptly serve the Assumption Notice on the counterparties to the contracts and leases listed thereon, and such counterparties shall have 14 days from the date of service of the Assumption Notice to file a written objection with the Bankruptcy Court to the Proposed Cure Amount ("Cure Objection"). Any party who fails to timely file a Cure Objection shall be forever barred from objecting to the Proposed Cure Amounts or from challenging the sufficiency of such amounts on any basis. Furthermore, such party shall be deemed to have consented to the Proposed Cure Amounts. All other objections to assumption and assignment of a particular contract or lease (i.e., those objections that are **not** based on a cure amount) are reserved for consideration at the Transaction Hearing, and are subject to the selection of the Successful Bid and Backup Bid.

36.     Within five (5) days after entry of the Bidding Procedures Order (the "Mailing Deadline"), the Debtors shall serve a notice of the entry of the Bidding Procedures Order and a copy of the Bidding Procedures Order on the core service list maintained by the Debtors' claims and noticing agent, which includes all parties who have appeared in these Cases to date, and on all Potential Transaction Counterparties identified by Jefferies.

37.     Within seven (7) business days of entry of the Bidding Procedures Order, the Debtors will send a notice of the entry of the Bidding Procedures Order, with all applicable

13045372 v6

deadlines set by the Bidding Procedures Order listed in the notice itself, to all other parties in the

Debtors' consolidated mailing matrix.

38.    In addition, no later than April 1, 2020, the Debtors will (a) publish a notice of sale

one time in *The New York Times* (national edition), as well as one time in a local newspaper and/or

one time in an industry publication, as determined by the Debtors and their advisors, and (b) mail

a copy of the same notice of sale by first-class mail to all of the Debtors' creditors that have filed

proofs of claim in these Cases or whose claims are listed by the Debtors in their schedules of

liabilities and (c) publish the notice of sale on the Debtors' website hosted by Epiq Corporate

Restructuring, LLC ("Epiq").  The notice shall provide that any party that wishes to obtain a copy

of this Motion or the Bidding Procedures Order may do so by making such a request in writing to

Epiq at:

> GenCanna Global, Inc.
> c/o Epiq Corporate Restructuring LLC
> PO Box 4419
> Beaverton, OR 97076-4419

 or by accessing the Epiq website at http://www.dm.epiq11.com/case/gencanna/info.

39.    The Debtors submit that the notice of the Motion, the auction and the Transaction

Hearing as provided for herein complies fully with Bankruptcy Rule 2002 and constitutes good

and adequate notice of the proposed transaction.  Therefore, the Debtors respectfully request that

this Bankruptcy Court approve the notice procedures proposed above (the "Notice Procedures").

## **BASIS FOR RELIEF REQUESTED**

**A.    The Bidding Procedures are Necessary and Appropriate to Effectuate the Bidding Process and Should be Approved.**

40.    Pursuant to section 363(b) of the Bankruptcy Court, after notice and a hearing, the

Debtors may be authorized to use, sell, or lease outside of the ordinary course of business.  11

U.S.C. § 363(b)(1).  Furthermore, the Bankruptcy Court has the authority to issue "any order,

13045372 v6

process, or judgment that is necessary or appropriate" to carry out the provisions of the Bankruptcy

Code.  11 U.S.C. § 105(a).  Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in the ordinary

course of business may be by private sale or by public auction."  FED. R. BANKR. P. 6004(f)(1).

41.     The paramount goal of any proposed sale of property of the debtor's estate is to

maximize the value of the sale proceeds received by the estate. *See In re Big Rivers Elec. Corp.*,

233 B.R. 726, 734 (Bankr. W.D. Ky. 1998) ("a Chapter 11 DIP owes a fiduciary duty to all of the

creditors and other interest holders of its bankruptcy estate to maximize the value of the bankruptcy

estate"); *see also In re Jillian's Entm't Holdings*, 327 B.R. 616, 618 (Bankr. W.D. Ky. 2005) (in

selling estate assets, the plan administrator should "maximize the return to the bankruptcy estate");

*In re Omegas Grp, Inc.*, 16 F.3d 1443, 1452 (6th Cir. 1994) ("the Code recognizes that each

creditor has suffered disappointed expectations at the hands of the debtor; for this reason, it makes

maximization of the estate the primary concern").  Courts recognize that procedures established

for the purpose of enhancing competitive bidding are consistent with the fundamental goal of

maximizing value of a debtor's estate.  *In re JW Res., Inc.*, 536 B.R. 193, 196 (Bankr. E.D. Ky.

2015); *see also Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*,

181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding

provide a benefit to a debtor's estate); *In re Fin'l News Network, Inc.*, 126 B.R. 152, 156 (Bankr.

S.D.N.Y. 1992) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate

basis for comparison of offers, and [should] provide for fair and efficient resolution of bankrupt

estates.").

42.     A debtor's business judgment is entitled to substantial deference with respect to the

procedures to be used in selling assets from the estate*. See, e.g., In re Michael Day Enters., Inc.*,

2010 Bankr. LEXIS 4381 (Bankr. N.D. Ohio Jan. 13, 2010); *In re Berkeley Premium*

*Nutraceuticals, Inc.*, 2008 Bankr. LEXIS 3578 (Bankr. S.D. Ohio Dec. 26, 2008); *see also In re Integrated Resources, Inc.*, 147 B.R. 650, 656-57 (Bankr. S.D.N.Y. 1992) (noting that bidding procedures negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

43.    Further, in a sale of property of the estate, the debtors' primary goal is to maximize the proceeds received by the estate. *See also Pacificorp. Ky. Energy Corp. v. Big Rivers Elec. Corp. (In re Big Rivers Elec. Corp.)*, 233 B.R. 739, 752 (W.D. Ky. 1998) ("when a debtor desires to sell an asset, its main responsibility, and the primary concern of the bankruptcy court, is the maximization of the value of the asset sold") (internal quotation omitted); *In re Nashville Senior Living*, 2008 Bankr. LEXIS 3197 (Bankr. M.D. Tenn. Oct. 22, 2008). Further, a debtor maximizes value for creditors by selecting the 'highest and best bid, and thereby protecting the interests of [the] debtor, its creditors, and its equity holders.'" *In re GSC, Inc.*, 453 B.R. 132, 169-170 (Bankr. S.D.N.Y. 2011) (*quoting In re Fin. News Networks, Inc.*, 126 B.R. 152, 157 (S.D.N.Y. 1991)).

44.    As a result, courts routinely recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See, e.g., Integrated Resources*, 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets").

45.    The Debtors believe in their business judgment that the proposed Bidding Procedures will facilitate the Bidding Process and promote competitive bidding from the most interested parties, and will therefore elicit the highest and best offers available for a potential transaction. The proposed Bidding Procedures will allow the Debtors to conduct the Bidding

21

Process in a controlled, transparent and fair fashion that will encourage meaningful input from key constituents and participation by financially capable bidders who will offer the best proposals under the circumstances, and who can demonstrate the ability to close a transaction. The Debtors believe that the Bidding Procedures are consistent with other procedures previously approved by this District, and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.

**B.      The Debtors Should be Authorized to Designate a Stalking Horse and Provide a Stalking Horse Protections in Their Discretion.**

46.      The Debtors also seek authority to designate a Stalking Horse and offer customary Stalking Horse Protections, including a Breakup Fee, an Expense Reimbursement and a minimum Bid Increment. The Debtors will file a notice of any such designation by the Stalking Horse Designation Deadline, and believe that having the flexibility and authority to do so will benefit the overall Bidding Process, and motivate bidders to provide their highest and best offers.

47.      In the event that a Stalking Horse is designated, its Bid will be subject to higher and better offers through competitive bidding at an auction. The use of a stalking horse in a public auction process pursuant to section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, because the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by locking in a purchase price "floor" and helping to garner interest in the assets. As a result, stalking horse bidders virtually always require breakup fees and other forms of bidding protections as an inducement for holding their purchase offer open while it is exposed to overbids in an auction process.

48.      Approval of the Break-Up Fee and other forms of bid protections in this context is an established practice in chapter 11 cases. Courts in this district use several approaches in evaluating break-up fees. *See In re JW Res., Inc.*, 536 B.R. at 193 (noting that courts have a variety

13045372 v6

of ways to evaluate break-up fees including (i) a debtor's business judgment, (ii) whether the fee

is in the best interest of the estate, or (iii) treating the fee as an administrative claim).  This Court

recognized that termination and similar fees may be used to protect bidders in connection with a

sale of assets pursuant to section 363 of the Bankruptcy Code and that "the purpose of a break-up

fee is to induce the stalking horse bidder to enter into and pursue a transaction through an auction

and closing." *Id.* at 196. Such protections enable a debtor to assure a sale to a contractually

committed bidder at a price the debtor believes is fair and reasonable, while providing the debtor

with the opportunity of obtaining even greater benefits for the estate through an auction process.

*Id*. (internal citations omitted).  This Court has approved similar break-up fees in other chapter 11

cases.  *In re JW Res., Inc.*, 536 B.R. at 193 (approving break-up fee of $375,000); *In re Innovative*

*Mattress Solutions, LLC et al.*, Case No. 19-50042-grs [D.I. 334] (Bankr. E.D. Ky. Feb. 25, 2019)

(approving break-up fee of $650,000, which was between 2% and 3% of stalking horse bid

amount); *In re Clearwater Natural Resources, LP et al.,* Case No. 09-70011 [D.I. 985] (Bankr.

E.D. Ky. December 14, 2009) (approving break-up fee of $500,000, which was between 2% and

3% of cash portion of the stalking horse bid amount).

49.    Other courts have approved similar bid protections and break-up fees to what is

sought here.  *See e.g., In re Kmart,* No. 02-B-02474 (Bankr. N.D. Ill. May 10, 2002) (authorizing

a termination fee and overbid protections for potential bidders); *In re Comdisco, Inc.*, No. 01-

24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a terminate fee, as *inter alia*, an actual and

necessary cost and expense of preserving the debtor's estate, of substantial benefit to the debtor's

estate, and a necessary inducement for, and a condition to, the proposed purchaser's entry into the

purchase agreement); *In re HMX Acquisition Corp.*, No. 12-14300 (ALG) (Bankr S.D.N.Y. Nov.

29, 2012) (approving a breakup fee of approximately 3% of the purchase price); *In re The Great*

*Atlantic & Pacific Tea Company, Inc.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. May 2, 2011)

(approving a breakup fee of 2.5% of the purchase price); *In re BearingPoint, Inc.*, No. 09-10691

(REG) (Bankr. S.D.N.Y. Apr. 7, 2009) (approving a breakup fee of approximately 3% of the

purchase price); *In re Silicon Graphics, Inc.*, No. 09- 11701 (MG) (Bankr. S.D.N.Y. Apr. 3, 2009)

(approving breakup fee of approximately 2.8% of the purchase price); *In re Steve & Barry's

Manhattan LLC*, No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 5, 2008) (approving break-up fee

of 2% of the purchase price).

50.    The Debtors believe that the ability to select a Stalking Horse and grant the Stalking

Horse Protections is beneficial to their estates and their creditors, as a Stalking Horse's Bid would

establish a floor for further bidding and potentially increase the value of the assets for the benefit

of the estates.  Given the expedited nature of the Bidding Process, the Debtors' ability to offer bid

protections and a break-up fee to potential bidders may induce a potential bidder to serve as a

stalking horse.  Having a stalking horse bidder identified will provide certainty regarding the

outcome of the Bidding Process, and will likely stimulate the market for bids on the Debtors'

assets.  Indeed, Mr. Morgner states in his declaration that the Stalking Horse Protections will

benefit "the overall [Bidding Process] and incentivize[] bidders to put forth their highest and best

offers, as the Debtors seek to create a floor for future competitive bidding."  (Morgner Declaration,

¶ 13).

## C.    The Transaction Should be Approved Pursuant to Section 363 of the Bankruptcy Code.

51.    Section 363(b) of the Bankruptcy Code provides that a debtor must demonstrate a

sound business justification for a sale or use of assets outside the ordinary course of business.  *See,

e.g., In re Concord Steel, Inc.*, 2009 Bankr. LEXIS 5196 (Bankr. N.D. Ohio Dec. 9, 2009); *In re

Country Manor*, 172 B.R. 217, 220-21 (Bankr. N.D. Ohio 1994) ("sound business purpose test has

four (4) requirements: 1) sound business reason; 2) accurate and reasonable notice; 3) adequate price; and 4) good faith") (internal citation omitted); *Licensing by Paolo, Inc.  v. Sinatra (In re Gucci),* 126 F.3d 380, 387 (2d Cir. 1997), *citing Comm. of Equity Sec. Holders v.  Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Global Crossing Ltd.,* 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *In re Phx. Steel Corp.,* 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that judicial approval of a section 363 sale requires a showing that the proposed sale is fair and equitable, a good business reason exists for completing the sale and the transaction is in good faith).

52.    The Debtors have sound business justifications for marketing and seeking to identify an appropriate transaction to maximize value, including a possible sale of assets pursuant to section 363 of the Bankruptcy Code.  The Bidding Process is designed to identify the highest and best transaction for the Debtors that will maximize value in these Cases, and such process will involve the DIP Secured Parties and the Prepetition Secured Parties, any Committee, and other key stakeholders.  Thus, the Bidding Process is reasonably expected to yield a transaction capable of being approved.

53.    The Debtors will file a notice of the Successful Bid and Backup Bid with the Bankruptcy Court following an auction as described above.

**D.    It Would be Appropriate to Approve the Sale Transaction Free and Clear.**

54.    If the transaction selected as the Successful Bid is a sale transaction, the Debtors request approval to sell the assets that are the subject of that sale transaction free and clear of any and all liens, claims, and encumbrances to the fullest extent permitted by section 363(f) of the Bankruptcy Code.  Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may

13045372 v6

sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

- applicable nonbankruptcy law permits sale of such property free and clear of such interest;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

- such interest is in *bona fide* dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). As section 363(f) of the Bankruptcy Code is stated in the disjunctive, when proceeding pursuant to section 363(b), it is only necessary for a debtor to meet one of the five conditions of section 363(f). *See Mich. Employment Sec. Comm'n v. Wolverine Radio Co.* (*In re Wolverine Radio Co.*), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) written in disjunctive; holding that court may approve sale "free and clear" provided at least one of the subsections of Bankruptcy Code 363(f) is met).

55.    The Debtors believe that each of the parties holding claim or interests in the assets to be sold could be compelled to accept a monetary satisfaction of such claims. In addition, absent any objection to this Motion, certain holders of claims or interests may be deemed to have consented to the sale of the assets. Finally, any liens, claims or interests that may exist will attach to the net cash proceeds of such transaction, subject to any claims and defenses the Debtors may possess with respect thereto. Accordingly, the Debtors believe that (a) the transaction will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code and (b) the sale of any assets through the transaction should be approved free and clear of liens, claims and encumbrances.

13045372 v6

E.    **The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases is Appropriate.**

56.    Section 365(a) of the Bankruptcy Code provides that, subject to the Court's approval, a trustee "may assume or reject any executory contracts or unexpired leases of the debtor." 11 U.S.C. § 365(a).  Upon finding that a trustee has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code.  *See In re VisionAmerica, Inc.*, 2001 Bankr. LEXIS 1142, *17 (Bankr. W.D. Tenn. Sept. 12, 2001); *In re Structurelite Pastics Corp.*, 1988 Bankr. LEXIS 658, *7 (Bankr. S.D. Ohio May 11, 1988); *Nostas Assocs. v. Ostich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993).

57.    Under section 365(f)(2) of the Bankruptcy Code, a trustee may assign an executory contract or unexpired lease of nonresidential property if:

> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

58.    The meaning of adequate assurance of future performance depends upon the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."); *see also Carlisle Homes, Inc. v. Arrais (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989).

13045372 v6

59.     Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Barnhill's Buffet, Inc.*, 2008 Bankr. LEXIS 2864 (Bankr. M.D. Tenn. Feb. 28, 2008) (the Court must consider whether purchaser can meet its financial obligations relative to the contracts or leases being assumed and assigned); *In re Bygraph, Inc.*, 56 B.R. 597, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

60.     The Debtors and the Successful Bidder will present evidence at the Transaction Hearing to provide the financial credibility, willingness, and ability of the Successful Bidder to perform under the assumed contracts and leases.  The Court and other interested parties will therefore have the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance of the assumed contracts and leases, as required by section 365(b)(1)(C) of the Bankruptcy Code.

61.     In addition, the Cure procedures are appropriate and consistent with section 365 of the Bankruptcy Code.  To the extent that any defaults exist under any assumed executory contract, any such default will be cured pursuant to the Successful Bidder's APA.  Any provision in the assumed executory contracts that would restrict, condition, or prohibit an assignment of such contracts will be deemed unenforceable under section 365(f)(1) of the Bankruptcy Code.

62.     Accordingly, the Debtors submit that the Cure procedures for effectuating the assumption and assignment of the assumed contracts and leases as set forth herein are appropriate and should be approved.

## NOTICE

63.     Notice of this Motion has been provided to: (a) all Potential Transaction Counterparties that have been identified by Jefferies; (b) all parties who appeared in these Cases or who filed proofs of claim in these cases; (c) the United States Trustee; (d) the Debtors' twenty largest unsecured creditors; (e) entities known by the Debtors to possess a security interest in any assets of the Debtors; (f) all applicable federal, state, and local taxing authorities with jurisdiction over the Debtors; and (g) counsel to the DIP Secured Parties and the Prepetition Secured Parties. The Debtors respectfully submit that further notice of this Motion is neither required nor necessary.

## NOTICE OF HEARING

64.     PLEASE TAKE NOTICE that the *Debtors Motion for Entry of an Order (I) Approving Bidding Procedures in Connection with the Debtors' Bidding Process; (II) Approving the Transaction Ultimately Selected as the Highest and Best Alternative Through the Bidding Process, Including a Possible Sale of Assets Free and Clear of Liens, Claims and Encumbrances; and (III) Granting Related Relief* shall come on for hearing before the Honorable Judge Gregory R. Schaaf, Second Floor Courtroom, United States Bankruptcy Court, 100 East Vine Street, Lexington, Kentucky 40507, at the hour of 9:00 a.m. Eastern on Wednesday, March 4, 2020.


[*Remainder of page intentionally left blank*]

13045372 v6

WHEREFORE, the Debtors respectfully request that the Bankruptcy Court enter an order

granting the relief requested herein and such other or further relief as is just and proper.

Dated: February 18, 2020                                   Respectfully submitted,


/s/ James R. Irving                                        Michael J. Barrie
James R. Irving                                            Jennifer R. Hoover
April A. Wimberg                                           BENESCH, FRIEDLANDER, COPLAN, &
Christopher B. Madden                                      ARONOFF LLP
DENTONS BINGHAM GREENEBAUM LLP                             222 Delaware Avenue, Suite 801
3500 PNC Tower                                             Wilmington, DE 19801
101 South Fifth Street                                     Telephone:     (302) 442-7010 Phone
Louisville, Kentucky 40202                                 E-mail:        mbarrie@beneschlaw.com
Telephone:     (502) 587-3606                                             jhoover@beneschlaw.com
Facsimile:     (502) 540-2215
E-mail:        james.irving@dentons.com                    -and-
               april.wimberg@dentons.com
               chris.madden@dentons.com                    Elliot M. Smith
                                                           BENESCH, FRIEDLANDER, COPLAN, &
                                                           ARONOFF LLP
*Proposed counsel to the Debtors*                          200 Public Square, Suite 2300
                                                           Cleveland, OH 44114
                                                           Telephone:     (216) 363-4500
                                                           E-mail:        esmith@beneschlaw.com

                                                           *Proposed Counsel for the Debtors*

13045372 v6