UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GenCanna Global USA, Inc., *et al.*,[1] | ) | Case No. 20-50133 (GRS) |
| | ) | |
| | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | Hon. Gregory R. Schaaf |
| | ) | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE DEBTORS' BIDDING PROCESS; (II) APPROVING THE TRANSACTION ULTIMATELY SELECTED AS THE HIGHEST AND BEST ALTERNATIVE THROUGH THE BIDDING PROCESS, INCLUDING A POSSIBLE SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; AND (III) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") of GenCanna Global USA, Inc. and its related debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), hereby submits this objection (the "Objection") to the *Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures in Connection with the Debtors' Proposed Bidding Process; (II) Approving the Transaction Ultimately Selected as the Highest and Best Alternative Through the Bidding Process, Including a Possible Sale of Assets Free and Clear of Liens, Claims and Encumbrances; and (III) Granting Related Relief* [ECF No. 136] (the "Bidding Procedures Motion").[2] In support of the Objection, the Committee respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases are (with the last four digits of their federal tax identification numbers in parentheses): GenCanna Global USA, Inc. (0251); GenCanna Global, Inc. (N/A); and Hemp Kentucky LLC (2600).

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to such term in the Bidding Procedures Motion.

4849-8409-8742.5

## INTRODUCTION

1. As in every chapter 11 case, the Debtors must either reorganize or sell their assets as a going concern. While the Bidding Procedures Motion purports to provide a pathway to consider both of those alternatives, in reality, it requests approval to conduct a lightning-fast process that almost assuredly will result in a fire-sale type transaction that would benefit only MGG Investment Group LP ("MGG"), the Debtors' secured lender that is driving this case.

2. This Court should not approve any proposed bidding procedures (the "Bidding Procedures")³ until the following flaws are corrected. *First*, as set forth in the Committee's objection to the Debtors' DIP Financing Motion [Docket No. 224] (the "DIP Objection"), the proposed timeline for the Debtors' sales process – just over six weeks from the hearing on Bidding Procedures to the bid deadline – is wholly unreasonable and designed to distribute value to MGG to the detriment of all other constituents. Unlike certain fast-track sales processes that have been approved in other cases, the Debtors did *not* conduct a robust pre-petition marketing process, which is a fatal flaw to their expedited timeline. Moreover, while the Debtors purport to be pursuing a restructuring as well as a sale, that option – which may be a much better alternative for creditors – is virtually impossible to consummate on the Debtors' timeline. This is further evidenced by the facts involving immediate issues regarding the 2020 growing season, including but not limited to (i) Debtor's seeking to reject its lease on the Arrow Farm (the "corporate farm") property; (ii) Debtor's correspondence telling growers it does not intend to honor any of the grower contracts for 2020; and (iii) the immediate licensing deadlines facing growers and Debtors.

3. *Second*, this Court should not grant the Debtors *carte blanche* authority to enter

---

³ The Bidding Procedures are reflected on Exhibit 1 to the proposed order granting the Bidding Procedures Motion, Docket No. 136-2.

2

into an as-yet-undisclosed "Stalking Horse" agreement (a "Stalking Horse Agreement") for the sale of their assets. To date, the Debtors have not (a) identified a proposed Stalking Horse, or (b) otherwise established clear parameters for a Stalking Horse bid.

4.    *Third*, while the Committee does not object in principle to a break-up fee payable to a Stalking Horse *cash bidder*, this Court should not approve a break-up fee payable to MGG or any other lender (collectively, the "Lenders") for submitting a *credit bid* for the Debtors' assets.[4] This is especially important in light of the problematic language in the Interim DIP Order (defined below), which provides that any "credit bid shall be treated as the equivalent of a cash bid." (Interim DIP Order ¶ 4.10).[5] In addition, the Lenders' credit bid rights should be subject to the Committee's rights to challenge the Lenders' liens.

5.    *Finally*, there are a number of additional clarifying points, discussed below, that must be addressed before the Court approves any Bidding Procedures.

**RELEVANT BACKGROUND**

6.    On January 24, 2020, Pinnacle, Inc., Crawford Sales, Inc. and Integrity/Architecture, PLLC filed an involuntary chapter 11 petition (the "Involuntary Petition") under title 11 of the United States Code (the "Bankruptcy Code") against GenCanna Global USA, Inc. ("GenCanna USA") in the United States Bankruptcy Court for the Eastern District of Kentucky (the "Court"). On February 5, 2020, GenCanna Global, Inc. and Hemp Kentucky LLC filed voluntary chapter 11 petitions for relief under the Bankruptcy Code. On February 6, 2020,

---

[4] The Committee has not determined whether the Lenders in fact hold properly perfected security interests, and if so, to what extent.

[5] The "Interim DIP Order" means the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection to Prepetition Lenders; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 82].

3

GenCanna USA consented to the Involuntary Petition.

7. On February 18, 2020, the United States Trustee appointed the Committee. The Committee hired legal counsel at the close of business on February 21, 2020 and financial advisors on February 25, 2020. The Committee and their professionals have been working diligently since appointment to analyze these chapter 11 cases and represent general unsecured creditors.

8. Also on February 18, 2020, the Debtors filed the Bidding Procedures Motion. The Bidding Procedures Motion requests that this Court approve the following deadlines/dates for a § 363 sales process.

    a. **February 18, 2020**: Deadline to file a motion to approve the Bidding Procedures;

    b. **February 24, 2020**: Deadline to receive Proposals from Potential Transaction Counterparties;

    c. **March 11, 2020**: Deadline to hold a hearing on the proposed Bidding Procedures;

    d. **March 13, 2020**: Deadline to obtain an order approving the Bidding Procedures;

    e. **April 17, 2020**: Deadline to receive Qualified Bids;

    f. **April 20, 2020**: Deadline to conduct an auction if more than one Qualified Bid is received;

    g. **April 23, 2020**: Deadline to hold a hearing to approve the transaction ultimately selected as the highest and best alternative;

    h. **April 24, 2020**: Deadline to obtain an order approving the selected transaction; and

    i. **May 1, 2020**: Deadline to consummate the selected transaction.

(Bidding Procedures Motion, ¶ 25).

9. These dates and milestones are intertwined with the DIP Facility (as defined in the Interim DIP Order), where the Debtors' failure to meet of any of the above milestones is an "Event of Default." (DIP Facility, Section 4.4). As noted above, the Committee objected to these "Sale Milestones" as part of its DIP Objection.

10. The Bidding Procedures Motion also requests that this Court authorize the Debtors to designate an as-yet-unnamed Stalking Horse for the sale of their assets. (Bidding Procedures Motion, ¶ 27). The Debtors also request authority, in consultation with the Consultation Parties but in the Debtors' *sole discretion*, to provide certain stalking horse protections in the form of (a) a break-up fee equal to 3% of the purchase price or other consideration to be paid, exclusive of any value associated with assumed liabilities, leases or contracts (the "Break-Up Fee"), (b) expense reimbursement up to 1% of the total purchase price or other consideration to be paid, exclusive of any value associated with assumed liabilities, leases or contracts (not to exceed $1 million; "Expense Reimbursement"), and (c) a minimum initial bidding increment of at least $250,000 to be used at any auction (the "Bidding Increment" and together with the Break-Up Fee and the Expense Reimbursement, the "Stalking Horse Protections"). (*Id.* at ¶¶ 27, 46).

11. The Debtors did not limit their request for pre-approval of Stalking Horse Protections to *cash bidders* for their assets, nor did they set a minimum bid threshold or other parameters for selecting a Stalking Horse. As such, the Lenders, for whom the Debtors request approval now (i.e., before any Committee investigation) to submit credit bids for the Debtors' assets, could receive a Break-Up Fee (and Expense Reimbursement) solely for bidding on their own purported collateral.

**OBJECTION**

**I. The Proposed Expedited Sale Timeline Benefits Only the Lenders to the Detriment of the Remaining Creditors of the Estates**

12. The Debtors have requested this Court's approval of a lightning-fast sales process that cannot possibly maximize the value of the Debtors' assets for creditors. The proposed April 17 bid deadline is only 44 days after the hearing on the Bidding Procedures Motion. Despite pushing for an immediate sale, the Debtors fail to explain how, within 44 days: (a) they plan to

5

locate and qualify Potential Transaction Counterparties; and (b) such bidders can conduct due diligence, submit Preliminary Proposals and, then, after all of these stages, submit a bid that meets all the requirements to qualify as a Qualified Bid.

13. There is simply no legitimate justification for such an expedited process. There are no extraordinary circumstances here that warrant such a hard and short deadline.

14. While prepetition, the Debtors engaged Cowen and Company, LLC ("Cowen") as their investment banker, and, following Cowen's termination, Goldman Sachs & Co., LLC ("Goldman Sachs"), to run transactional processes for the Debtors, those processes provide no support for the Debtors' requested relief. By the Debtors' own admission, Cowen's effort "led to the debt financing with MGG Investment Group LP as agent for the Prepetition Secured Parties, but did not result in any of the expected equity opportunities for the Debtors." (Bidding Procedures Motion, ¶ 15). Goldman Sachs' process, in turn, "was narrow" and "focused on only a limited number of potential opportunities." (*Id.*, at ¶ 16). These efforts provide no "market test" evidence supporting the Debtors' expedited timeline.

15. Moreover, the Debtors did not engage Jefferies until January 28 – after the filing of the Involuntary Petition – and Jefferies thus did *nothing* pre-petition to market the Debtors' assets. Indeed, there is no better evidence of the Debtors' "shotgun" type process than their filing of the Bidding Procedures Motion *without* a stalking horse in tow. Having a stalking horse lined up is commonplace in cases where, unlike here, a robust pre-petition process has been undertaken.

16. Not only does the expedited sales process fail to adequately test the market for a sale, but it virtually eliminates any attempt to restructure the Debtors, an outcome that is likely to provide significantly more value for creditors. Despite potential interest in restructuring the Debtors, it would be a quixotic task to ask parties to conduct due diligence, line up refinancing and

propose a confirmable plan on the Debtors' current timetable. This Court should not essentially foreclose a reorganization at the Bidding Procedures stage, especially given that the Debtors apparently had a $1 billion valuation in the summer of 2019 and may be suffering through a temporary trough in the industry.

17. Accordingly, it is apparent that the sole reason the Debtors request a truncated sales process is to satisfy the arbitrary "Sale Milestones" the Lenders demanded as part of the DIP Facility. As detailed in the DIP Objection, there is no basis for that demand. The Lenders should not be permitted to manipulate and control this case to their exclusive benefit, and to the detriment of the Debtors' estates and other creditors, by foreclosing a reorganization, chilling bidding and, potentially, acquiring the Debtors' assets on the cheap via a "credit bid" without a proper marketing process.

18. The Lenders undoubtedly will argue that they are the "only ones providing a DIP Facility"[6] and, therefore, they should be able to control the timeline for the sales process. There are at least two responses to this point. *First*, reasonable timelines to allow a fulsome process are the price of playing in chapter 11—a secured creditor cannot compel a sale yet dictate that it be the only one that benefit from it through a truncated timeline. If the Lenders do not like it, they are free to refuse to lend and the chips can fall where they may. *Second*, as detailed in the DIP Objection, the Committee believes that there are significant opportunities to curb expenses in the Debtors' DIP Budget and allow a more reasonable "runway" for this case.

19. Because the Committee is just reviewing pertinent financial information about the Debtors, scrutinizing their Budget and identifying possible cost-savings, it does not have its final position on how much time is necessary to conduct a sales/restructuring process. The Committee

---

[6] This may not be true, as the Committee is working on an alternative DIP facility, but timelines are short.

4849-8409-8742.5

intends to be able to comment on such issue at this Court's March 4 hearing.

## II. The Court Should Not Grant The Debtors Unfettered Authority To Enter Into A Stalking Horse Agreement

20. This Court should not grant the Debtors unfettered authority to enter into a Stalking Horse Agreement. The Debtors did not limit the parameters under which they could sign up a Stalking Horse bidder. Nor did the Debtors identify the material terms that they would require in any Stalking Horse bid (*e.g.*, minimum price etc.). Instead, the Debtors request pre-approval to enter into a Stalking Horse Agreement, but without prior notice to parties-in-interest or approval of this Court (other than an assurance that the Debtors will consult with the Consultation Parties and with no mechanism for sorting out disagreements).

21. While debtors typically may use or sell assets under § 363(b) of the Bankruptcy Code if they have a "good business reason" for that relief, *see Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 389 (6th Cir. 1986), without the material terms of a proposed Stalking Horse bid, neither the Committee nor this Court can determine if the Debtors have a "good business reason" (or a reason other than expediency itself) for accepting such a bid. Moreover, because the Debtors also request the authority to grant the Stalking Horse Protections under a Stalking Horse Agreement, they could be unilaterally binding their estates to millions in liabilities without any vetting of the Stalking Horse bidder, the financial terms of its bid, or the obstacles to closing, all without having demonstrated a reasonable basis to undertake these risks, all of which would fall upon creditors.

22. Accordingly, this Court should not approve the Debtors' entry into a Stalking Horse Agreement without the Debtors (a) filing such agreement with the Court, (b) allowing a reasonable period for parties, including the Consulting Parties, to object to such agreement, and (c) if parties timely object to the Stalking Horse Agreement, obtaining this Court's approval of the agreement.

**III.     This Court Should Not Approve Stalking Horse Protections For Credit Bidders**

23. This Court should not approve Stalking Horse Protections for any credit bids submitted by the Lenders or other alleged secured parties. Because this is a liquidating chapter 11 case, "no particular discretion should be given to the debtor's business decision." *In re S.N.A. Nut Co.*, 186 B.R. 98, 105 (Bankr. N.D. Ill. 1995). Rather, "[i]n a liquidating Chapter 11, more deference is shown to the unsecureds' viewpoint than in a reorganization case 'because the principle [sic] underlying rationale for the "business judgment rule", i.e., that a DIP is entitled to some free reign in fulfilling its perceived mission of aiding the economy . . . is lacking in such circumstances.'" *Id.*

24. A proposed break-up fee "must be carefully scrutinized to insure that the Debtor's estate is not unduly burdened and that the relative rights of the parties in interest are protected." *In re Tiara Motorcoach Corp.*, 212 B.R. 133, 137 (Bankr. N.D. Ind. 1997) (quoting *In re America West Airlines, Inc.*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994)). "The analysis conducted by the Court must therefore include a determination that *all* aspects of the transaction are in the best interests of all concerned." *America West*, 166 B.R. at 912. The business judgment rule also does not apply for that reason, as well. *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999).

25. Break-up fees should not be approved when they may serve as "an unwarranted expense upon the Debtor's estate." *In re Hupp Indus., Inc.*, 140 B.R. 191, 196 (Bankr. N.D. Ohio 1992). In *O'Brien Environmental*, the court refused to approve the payment of a break-up fee to a creditor who was willing to bid on the debtor's assets whether or not it received the break-up fee. The court stated that:

> [E]ven if the purpose for the break-up fee is not impermissible, the break-up fee may not be needed to effectuate that purpose. For example, in some cases a potential purchaser will bid whether or not break-up fees are offered. . . . In such

9

cases, the award of a break-up fee cannot be characterized as necessary to preserve the value of the estate.

*O'Brien Environmental*, 181 F.3d at 535.

26. Moreover, courts have denied bid protections, like the Stalking Horse Protections, to secured lenders seeking to credit bid in the role of a stalking horse bidder. *See In re Orchids Paper Products Co.*, *et al.*, Case No. 19-10729 (MFW) (Bankr. D. Del. May 20, 2019) [ECF No. 179] (denying stalking horse bid protections for expense reimbursement in connection with a credit bid). In *Orchids*, the court noted that the lenders were likely to bid regardless of receiving bid protections since they had "kicked the tires" and "are more likely than not to bid with or without any expense reimbursement or breakup fee." *Id.* (Bankr. D. Del., May 10, 2019) H'rng Tr. at 74: 20-22; 105: 13-19.

27. Here, the Lenders have already more than "kicked the Debtors' tires." Through the DIP Facility and their pre-petition credit facility, the Lenders will assert up to $78.5 million in claims against the Debtors. As such, these parties already have performed all necessary due diligence on the Debtors' assets and do not need an "incentive" in the form of a Break-Up Fee to credit bid. Under these circumstances, a Break-Up Fee would be an unwarranted and expensive give-away to the Lenders without any commensurate value to the Debtors' estates.

28. With respect to the Expense Reimbursement, the Debtors should not receive the authority to pay up to $1 million in fees to the Lenders. The Lenders' fees are covered under the terms of the Interim DIP Order (*see* Interim DIP Order, ¶¶ 2.1, 2.2 (a)-(c)), and they should not be granted a second round of attorneys' fees through the "back door" of an Expense Reimbursement. This case simply cannot weather that kind of expense. At a minimum, the Expense Reimbursement payable to a Lender serving as a Stalking Horse bidder should be capped at $200,000, and only apply to those expenses that are demonstrably related to the bid process.

4849-8409-8742.5

### IV. The Lenders' Credit Bid Rights Should Be Subject To The Committee's Rights To Challenge The Lenders' Liens

29. The Lenders' rights to credit bid their claims should be subject to the Committee's right to challenge the Lenders' liens under the Interim DIP Order. It is well established that, under section 363(k) of the Bankruptcy Code, the Lenders may only credit bid their claims on assets on which they have an unavoidable lien. *See*, *e.g.*, *In re Pine Coast Enters., Ltd.*, 147 B.R. 30, 31 (Bankr. N.D. Ill. 1992) ("Of course, Boyne could only bid in its claim to acquire property against which it had a lien."); *In re Moritz*, 162 B.R. 618 (Bankr. M.D. Fla. 1994) (holding that unsecured creditors cannot "credit bid" their claims under section 363(k)); *see also* 11 U.S.C. § 363(k) ("At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale …").

30. In recognition of these principles, the Interim DIP Order provided that the Prepetition Secured Parties' rights to credit bid are subject to the Committee's challenge rights, including under ¶ 4.14 of the Interim DIP Order. (See Interim DIP Order at ¶ E(vii) (credit bid rights are "subject to the entry of a Final Order and to the rights preserved in Section 4.14")). Any order approving the Bidding Procedures Motion should incorporate the same protective language on credit bidding that is set forth in the Interim DIP Order.

31. In addition, if a Lender or other secured party credit bids, and this Court subsequently avoids such party's liens, the bidder must pay the estate in cash for any liens that are avoided. To ensure that the estate is protected in such an instance, any credit bids submitted by a Lender should be backed by some form of security to the Debtors' estates, such as a deposit or letter of credit, to prevent a back-door release of potentially valuable estate claims. *See*, *e.g.*, *In re Octagon Roofing*, 123 B.R. 583, 592 (Bankr. N.D. Ill. 1991) (bank allowed to credit bid

conditioned upon the posting of an irrevocable letter of credit to protect the estate in the event the liens were later avoided). This was the result reached in the *Cambrian* chapter 11 case as well. *See In re Cambrian Holding Company, Inc.*, No. 19-51200 (Bankr. E.D. Ky. Aug. 7, 2019) [Docket No. 339, at Annex 1, § 10].

### V. Items Requiring Clarification

32. The Bidding Procedures should also be clarified to confirm the following:

    a. *Preservation Of Rights* Any order approving the Bidding Procedures Motion should clarify that all rights to object to the ultimate § 363 sale are preserved.

    b. *Payment Of Cure Costs* The Bidding Procedures should be clarified to provide that the Successful Bidder will be responsible for paying all cure costs for assumed and assigned executory contracts and leases.

    c. *No Open Ended Process Changes* The Bidding Procedures should include limitations on the Debtors' ability to change the procedures employed, to require prior consent of the Committee, or in the absence of such consent, acknowledgment that such absence shall be a valid basis for objection to the sale result.

WHEREFORE, the Committee requests that the Court condition any granting of the Bidding Procedures Motion upon revisions and clarifications that address the points raised in this Objection.

Dated: March 2, 2020

Respectfully Submitted,

DELCOTTO LAW GROUP PLLC

/s/ Laura Day DelCotto
Laura Day DelCotto
KY Bar No. 81763
200 North Upper Street
Lexington, Kentucky 40507
T: (859) 231-5800 |
F: (859) 281-1179
ldelcotto@dlgfirm.com

-and-

Geoffrey S. Goodman (pro hac vice pending)
IL Bar No. 6272297
Joanne Molinaro (pro hac vice pending)
Michael Small (pro hac vice to be filed)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 3000
Chicago, Illinois 60654
Telephone: (312) 832-4500
Facsimile: (312) 832-4700
ggoodman@foley.com

PROPOSED COUNSEL FOR OFFICIAL
COMMITTEE OF UNSECURED CREDITORS
(APPLICATIONS TO BE FILED)

4849-8409-8742.5

**CERTIFICATE OF SERVICE**

      In addition to the parties who will be served electronically by the Court's ECF System, the undersigned certifies that a true and accurate copy of the foregoing document was served on March 2, 2020, by electronic mail and/or first class U.S. mail, postage fully prepaid, on all creditors and parties of interest listed on the Master Service List [ECF No. 242].

      /s/ Laura Day DelCotto, Esq.
PROPOSED COUNSEL FOR
OFFICIAL COMMITTEE OF
UNSECURED CREDITORS
(APPLICATION TO BE FILED / PRO
HAC VICE TO BE FILED)